# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| GLENN ALTO; EDWARD CONNOLLY, in his individual capacity and as trustee of the Connolly 2014 Grantor Retained Annuity Trust; and LEWIS WILLIAM WATERS, in his individual capacity and as trustee of the Lewis William Waters III 2014 Qualified Annuity Trust, <br><br> Plaintiffs, <br><br> v. <br><br> SUN PHARMACEUTICAL INDUSTRIES, INC., <br><br> Defendant. | CIVIL ACTION NO. _____ <br><br> **COMPLAINT** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Glenn Alto ("Alto"), Edward Connolly ("Connolly"), and Lewis William Waters ("Waters" and together with Alto and Connolly, "Plaintiffs" or "Sellers"), by and through their undersigned attorneys, bring this Complaint against Defendant Sun Pharmaceutical Industries Inc. ("Sun Inc.," "Defendant" or "Buyer"), and allege as follows:

## NATURE OF THE ACTION

1.      This action arises from the improper and unlawful actions of Sun Inc., as well as others acting at Sun Inc.'s behest, to deprive Plaintiffs of their rights to receive payments due under the earn-out provisions of the Equity Purchase Agreement (the "EPA") entered into between the parties on May 15, 2014.

2.      Pharmalucence, Inc. ("Pharmalucence" or the "Company") is a Massachusetts based company with a state-of-the-art sterile manufacturing facility located in Billerica,

Massachusetts (the "Facility"),[1] specializing in the development, production and marketing of radiopharmaceuticals and other injectable drug products.  Prior to the transaction that is the subject of this litigation, Plaintiffs were the sole owners of Pharmalucence.

3.     Sun Inc. is a corporation organized under the laws of Michigan and headquartered in New Jersey.  Sun Inc. is a wholly owned subsidiary of Sun Pharmaceuticals Ltd. ("Sun Ltd.," and, together with Sun Inc., "Sun Pharma").  Sun Inc. develops, licenses, manufactures, markets and distributes generic, prescription and over-the-counter pharmaceuticals to the nation's largest wholesalers, distributors, warehousing and non-warehousing chain drugstores and managed care providers through the United States.  Prior to the transaction, neither Sun Inc. nor Sun Ltd. had access to a sterile injectable facility in the United States.

4.     On May 15, 2014, the Plaintiffs and Defendant entered into the EPA[2] for the sale of Pharmalucence.  Under the terms of the EPA, Sellers received $70 million at closing, and are entitled to post-closing payments totaling $30 million, upon the achievement of certain milestones (the "Milestone Payments").  These post-closing Milestone Payments are governed by the EPA's Earn-Out Schedule.

5.     The Earn-Out Schedule identifies four Pharmalucence products that trigger a total of $25 million in milestone payments to Plaintiffs upon filing and FDA approval within a specified time period, including two tetrofosmin products.  The Earn-Out Schedule further provides for (i) the elimination of the milestone deadlines in the event the last Seller remaining employed by Pharmalucence is terminated or not renewed, without cause; and (ii) the substitution of other products for the four listed products based upon Sun Inc.'s business needs

---

[1] Pharmalucence also operated a manufacturing facility in Bedford, MA.
[2] The sale closed on July 15, 2014.

and priorities, such that Plaintiffs receive the milestone payments for the "first four products out" of the Facility.

6.      Defendant has violated the terms of the EPA and Earn-Out Schedule.  First, Defendant has failed and refused to make a milestone payment in the amount of $3.125 million for the regulatory approval by the FDA of mertiatide (generic MAG-3).  In addition, the submission and acceptance of the ANDA submission for In-111 pentetreotide (generic Octreoscan) should have been completed in the first half of 2019 based upon prior project status updates provided to the Plaintiffs by the Defendant.  Defendant has failed to inform the Plaintiffs if this filing has occurred and the Plaintiffs have no alternative means to assess if the milestone has been triggered.  This milestone payment amounts to an additional $3.125 million due for a total outstanding amount of $6.25 million.

7.      These payments are due as the Defendant failed to renew the employment of Plaintiff Alto, the last of the three Sellers employed by Pharmalucence, thus triggering the Last Man Standing provision and eliminating the milestone deadlines under the terms of the Earn-Out Schedule.

8.      Second, Defendant has wrongfully prevented Plaintiffs from realizing milestone payments from two other products by (i) wrongfully preventing the development of two of the four products on the milestone list, and (ii) refusing to identify or acknowledge substitutions for those products.  In September 2014, the FDA issued an extensive Form 483 to Sun Ltd. following an inspection Sun Ltd.'s Halol India manufacturing facility.  As a result of insufficient response to this regulatory action, a Warning Letter was subsequently issued resulting in the withholding of future product approvals from the Halol facility until it came back into compliance.  The consequences for Sun Ltd.'s injectable product business were catastrophic; at

that time, Sun Ltd.'s entire injectable portfolio was filled from the Halol site.  In July 2014, Sun Ltd.'s management directed Plaintiff Alto to prepare the Facility for the transfer of high priority products from its Halol India plant.  The results of the September 2014 FDA inspection increased pressure to execute the Halol product transfer in the shortest possible time.  Because the Facility was at capacity for product development and product transfer projects, this directive required Alto to assess the status and profitability of all Pharmalucence projects and reprioritize the manufacturing pipeline at the Facility to accommodate Sun Ltd.'s product transfer directive. Alto performed the required assessment and recommended that Pharmalucence deprioritize the two tetrofosmin products in order to accommodate Sun Ltd.'s new manufacturing exigencies. Plaintiffs understood that two of the products transferred from India would be substituted for the two tetrofosmin products for purposes of the Milestone payments, consistent with the terms of the Earn-Out Schedule.  When Sun Ltd. informed Alto that it would not acknowledge the new products as substitutes for tetrofosmin under the Earn-Out Schedule, Alto requested that Sun Ltd. reinstate the tetrofosmin program.  Sun Ltd. refused and made clear that if Alto persisted in his efforts to reprioritize development of the two tetrofosmin products, his actions would be viewed as "actions against company interests".  Alto viewed Sun Ltd's position as a direct threat to terminate his employment if he did not comply.

9.      In addition to Defendant and Sun Ltd.'s refusal to develop the two tetrofosmin products, Defendant has further refused to identify any replacement products which would trigger the milestone payments in their place.

10.     Accordingly, Plaintiffs now bring this action to enforce their rights under the EPA, and seek a declaration from this Court that:  (i) the first four products (whether the products specifically identified in Schedule 2.4 or Sun Pharma products) produced from the

Facility trigger milestone payments regardless of whether Sun Inc. provides written notice of a substitution, and (ii) the Last Man standing provision has been triggered.  Additionally, Plaintiffs seek damages in an amount to be determined at trial caused by Defendant's breach of the EPA through its refusal to pay the $6.25 million, on information and belief, currently due under the Earn-Out Schedule and refusal to pursue tetrofosmin.

## THE PARTIES

11.     Plaintiff Glenn Alto is an individual who resides in and is a citizen of the state of Massachusetts.

12.     Plaintiff Edward Connolly is an individual who resides in and is a citizen of the state of Massachusetts.  Connolly is also the trustee of The Connolly 2014 Grantor Retained Annuity Trust, a grantor formed annuity trust formed in the State of Massachusetts and party to the EPA.

13.     Plaintiff Lewis William Waters is an individual who resides in and is a citizen of the state of Massachusetts.  Waters is also the trustee of the Lewis William Waters III 2014 Qualified Annuity Trust, a grantor formed annuity trust formed in the State of Massachusetts and party to the EPA.

14.     Upon information and belief, Defendant Sun Pharmaceutical Industries, Inc. is a corporation organized under the laws of Michigan and headquartered in New Jersey.  Sun Inc. is a wholly owned subsidiary of Sun Ltd., a corporation organized under the laws of, and headquartered in, India.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

§ 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendant,

and Plaintiffs seek recovery in excess of $75,000, exclusive of interests and costs.

16.     This Court has personal jurisdiction over Defendant because it consented to

jurisdiction in this Court under the terms of the Equity Purchase Agreement.

17.     Venue is proper in this district because Defendant has consented to venue under

the terms of the Equity Purchase Agreement.

## FACTUAL ALLEGATIONS

**A.      Pharmalucence Becomes The Region's First Company To Utilize Fully
          Automated And Isolated Aseptic Technology**

18.     Pharmalucence is a leading provider of molecular imaging products for nuclear

medicine practitioners with a state-of-the-art sterile injectable manufacturing facility in Billerica,

MA.

19.     In July 2007, Plaintiffs, long standing employees of CIS-US, Inc., acquired CIS-

US, Inc. from CIS Bio International and renamed the company Phamalucence, Inc.

20.     Aware of the FDA's increasingly stringent manufacturing standards for injectable

products, Plaintiffs invested significant resources in building a state-of-the-art manufacturing

facility utilizing cutting edge production equipment which exceeded the FDA's quality and

safety requirements at the time.  With a small portfolio of Pharmalucence products, Plaintiffs

also sought to use their state-of-the-art equipment for contract fill and finish services.

21.     In 2013, Pharmalucence finished construction of the 70,000 sq. ft. Billerica

Facility, the region's first to utilize fully automated and isolated aseptic technology in support of

a wide array of needs, from small clinical fills up to full commercial scale production for markets worldwide.

**B.    Sun Ltd. Seeks To Acquire Aseptic Fill Facilities In The United States**

22.    Sun Ltd. is an Indian multinational pharmaceutical company headquartered in Mumbai, India.  Sun Ltd. is India's largest drug maker and the fifth largest specialty generics company globally.  The United States is Sun Ltd.'s largest market.

23.    In order to gain entry into the U.S. generics market, in 1997, Sun Ltd. acquired Caraco Pharmaceutical Laboratories Ltd. ("Caraco").  Around the same time as the transaction at issue here, Caraco's name was changed to Sun Inc.

24.    On information and belief, Sun Ltd. controls the operations of Sun Inc.

25.    Sun Ltd. and Sun Inc. share the email domain name "sunpharma.com," use the same logo and the same business cards.

26.    Sun Inc.'s Independent Auditors' Report for the year ending on March 31, 2015 notes that Sun Ltd. provides substantial support to Sun Inc. and that Sun Inc. has significant economic dependence on Sun Ltd.

27.    Sun Ltd.'s Annual Report for 2018-19 lists Pharmalucence, but not Sun Inc., as a subsidiary.

28.    In or around 2013, the FDA began a well-publicized crackdown against deficient manufacturing practices in India, where inspectors had discovered widespread manufacturing deficiencies, and even outright fraud.  In the 12 months ending September 2013, the FDA issued at least seven warning letters to Indian pharmaceutical firms.

29.    Upon information and belief, approximately 40 percent of Sun Ltd.'s United States sales, and around 25 percent of the company's profits, came from products manufactured at from Sun Ltd.'s facility in Halol, India.

30.     Amidst the FDA's crackdown on Indian manufacturing facilities, on January 29, 2014, Sun Ltd. sent a non-binding proposal to Plaintiffs to acquire Pharmalucence for $100 million.  Under the terms of the final Equity Purchase Agreement (EPA), Sun Ltd. offered to pay $70 million at the time of the sale and $30 million in deferred payments to be governed by an earn-out schedule.

31.     As described in Sun Ltd.'s 2014-15 Annual Report, Sun Ltd. sought to acquire Pharmalucence through its wholly owned subsidiary Sun Inc. in order to gain access to its sterile injectable facility in the United States.

32.     Sun Ltd. represented to Plaintiffs that it intended to build a Center of Excellence for injectable production in the United States, centered around Pharmalucence's Billerica facility and its superior compliance standards, manufacturing capabilities and know how.  With ample space for real estate development around the facility, Pharmalucence's Billerica facility presented a unique opportunity for a manufacturing campus.

### C.     Plaintiffs And Defendant Engage In Extensive Negotiation Of The Terms Of The Equity Purchase Agreement

33.     Between January 2014 and May 2014, the parties negotiated the specific terms of the EPA.  Because a significant portion of the deal consideration to be paid to Plaintiffs was contingent upon post-closing events, much of the negotiations focused on making clear the terms under which Plaintiffs would be entitled to payments under the Earn-Out Schedule.

#### 1.     Plaintiffs Are To Receive Milestone Payments On The First Four Products Out Of The Pharmalucence Facility

34.     In particular, in order to ensure that they would receive their post-closing payments irrespective of subsequent changes to the planned use of the facility, Plaintiffs sought to clarify the terms of the Earn-Out Schedule.

35.     At the time of the closing, Sun Inc. planned to develop four of Pharmalucence's pipeline products: mertiatide (generic MAG-3), a 30-cc vial of tetrofosmin (generic Myoview), a 10-cc vial of tetrofosmin (generic Myoview), and In-111 pentetreotide (generic Octreoscan). These four products were defined in the Earn-Out Schedule as the product milestones.

36.     However, Plaintiffs insisted that the Earn-Out Schedule provide that the milestone payments would be triggered by the first four new products to be made at and/or filed from the Facility, irrespective of whether they are products listed on the Earn-Out Schedule, or any Sun Inc. substitutes for those products, including Sun Inc. products transferred to the Pharmalucence facilities or new products developed in the facilities (a "Sun Replacement Product").

37.     Ultimately, Sellers proposed, and Buyer agreed to, the following language for the Earn-Out Schedule:

> In the event a product substitution occurs, the milestone timing and milestone payments associated with the product that was replaced ("**PL Product**") apply to the product that was substituted in its place ("**Sun Replacement Product**").  For clarification, the next four products that are filed from the facility are subject to the milestones ("Product 1, Product 2, Product 3, Product 4").  If, for example, the PL Product in the Product 1 slot is substituted by a Sun Replacement Product, the Sun Replacement Product triggers the Product 1 milestone payments (both upon filing and approval) and the PL Product that was originally in the Product 1 slot moves to the Product 2 slot and is therefore subject to the milestone timing and milestone payments associated with the Product 2 slot. For the avoidance of doubt, the milestones set forth above shall be payable based on the first four products submitted for approval (whether PL Products or Sun Replacement Products).
>
> In the event that Sun takes any action that materially diminishes the manufacturing and/or development capacity of the Facilities to the extent the ability to file four (4) PL or Sun Replacement Products is materially affected, Buyer shall continue in good faith, the development and filing of remaining PL Products and make any remaining Earn Out Payments on the earlier of (1) when the milestones are achieved within the specified time period, or (2) the deadline specified above as applicable to each milestone, regardless of whether or not milestone has been achieved.

**2.      The Deadlines To Achieve Each Milestone Are Removed Upon The Triggering Of The Last Man Standing Provision**

38.      In order to ensure a smooth and efficient transition, Sun Inc. required each Seller to enter into an employment agreement with Pharmalucence as a condition of the sale.

39.      Specifically, Waters remained as an employee in order to integrate Sun Pharma's financial and computer systems, Connolly remained as an employee in order to spearhead site expansion and technology implementation, and Alto remained employed as general manager of the Billerica Facility with overall responsibility for management of the Facility, organizational integration and transition to new leadership.

40.      The continued employment of at least one Seller also served to ensure that progress continued toward the Milestone Payments.  Thus, the Last Man Standing provision of the Earn-Out Schedule and Plaintiffs' Employment Agreements were also the subject of extended negotiations.

41.      On May 14, 2014, Morse Barnes circulated an updated Earn-Out Schedule to Reed Smith adding the Last Man Standing provision and noting that the protections will be triggered if Sun terminates the employment of the last employed Seller without cause (or fails to renew the employment of such employee past the original employment term), or such Seller terminates his employment for good reason.

42.      Ultimately, Sellers proposed, and Buyer agreed to, the following language regarding the Last Man Standing provision:

> In the event (i) Buyer terminates the employment of the Individual Seller who remains employed with Buyer for the longest period following the Closing without Cause (as defined in the applicable Employment Agreement between Buyer and such employee), (ii) fails to renew the employment of such Individual Seller following the expiration of the term set forth in such Individual Seller's employment agreement with Buyer or (iii) such Individual Seller resigns his employment with Buyer for Good Reason, in either case prior to the earlier of (x) the achievement of the

10

milestones set forth herein, or (y) the expiration of the time in which such milestones may be achieved, then Buyer shall pay the full amount of all potential remaining Earn-Out Payments hereunder, at the time such milestones are achieved, but disregarding any time limitations on the achievement of such milestones.

43.     The Sellers and Buyer executed the final EPA on May 15, 2014.  Pursuant to the "Purchase and Sale" Provision of the Agreement (Section 2.1), Buyer agreed to purchase "all the Equity Securities of Pharmalucence owned by all the Sellers, which in the aggregate represent One Hundred Percent (100%) of the Equity Securities and interests of Pharmalucence."  A true and correct copy of the EPA is attached hereto as **Exhibit A.**  The sale closed on July 15, 2014.

44.     The final Earn-Out Schedule divides the $30 million into: (1) $5 million upon FDA approval of the sterile injectable facility, located at Billerica, Massachusetts; and (2) $25 million to be paid in 8 equal installments, on filing and approval of four new products.  A true and correct copy of the Earn-Out Schedule is attached hereto as **Exhibit B.**

**D.     Sun's Halol Facility Fails FDA Inspection, And Sun Directs Alto To Prioritize Halol Transfers To Billerica Facility**

45.     Post-closing, the parties began the transition process for Pharmalucence's existing product lines and to incorporate Sun Inc's technology and systems.  One week post-closing, Sun Inc. presented its first projection of product transfer and development objectives, including multiple products deemed high value.  Throughout the transition process, Alto, who managed the transition of the product portfolio, reported to Kal Sundaram ("Sundaram"), CEO of Sun Ltd. and the individual who signed the EPA on behalf of Sun Inc.

46.     The transition process included a significant amount of work associated with bringing the Billerica facility online, transferring technology and contract manufacturing for a third party, and the ongoing development and product site transfer efforts for Pharmalucence's existing products.  Together, these products strained the Billerica Facility's existing resources.

47.     Within nine weeks of the acquisition, Sun Pharma management informed Alto that Sun Ltd.'s Halol facility received an extensive notice (Form 483) of non-compliance to current Good Manufacturing Procedures (cGMP) from an FDA inspection which had been conducted between September 8 and September 19, 2014.  Bringing the Halol facility into compliance with FDA standards required extensive remedial action.

48.     The FDA's action against Sun Ltd.'s Halol facility ultimately resulted in an embargo to the United States market of any product made there.  This was a catastrophic event for Sun Ltd., as Halol was Sun Ltd.'s sole injectable product facility, accounting for a large portion of Sun Ltd.'s United States revenue and up to 25% of overall company profit, the financial impact of which dwarfed the entirety of Pharmalucence's revenue and financial contribution.

49.     Sun Pharma management informed Alto that as a result of the Halol inspection outcome, Sun Ltd.'s priorities for Pharmalucence manufacturing plans had intensified, with its highest priority being to transfer production of high value products formerly made in Halol to the Billerica Facility.  Alto was directed to prepare for the transfer of manufacturing and production of the high value products on an expedited basis from the Halol facility to the Billerica Facility.

50.     In assessing the resources necessary to expedite execution of the directive from Sun Pharma, Alto determined that Pharmalucence did not have the resources necessary to both (i) accomplish Pharmalucence's existing projects, and (ii) transfer production of the Sun Ltd. products from Halol to the Billerica Facility as directed by Sun Pharma.

51.     Therefore, in September of 2014, with the assistance of Pharmalucence's executive management and subject matter experts, Alto conducted an evaluation of then-current Pharmalucence projects to determine which should be de-prioritized to make room for the Sun

12

Ltd. products to be transferred from its Halol facility.  That evaluation took into account projected return on investment, technical risk, regulatory expediency, strategic importance, project complexity and Defendant's development priorities.

52.     As a result of that process, and with the understanding that the transferred Halol products would trigger the substitution clauses of the Earn-Out Schedule, on or about September 16, 2014, Alto recommended to Sun Pharma that it discontinue development of tetrofosmin so that Pharmalucence could instead devote the resources necessary to transfer products to the Facilities from Halol.

53.     Neither Defendant nor Sun Ltd. questioned this decision or requested additional information justifying the discontinuation of tetrofosmin development.

54.     In or around February 19, 2015, Sunil Mehta ("Mehta"), Head of Operations at Sun Ltd., reported to Alto that the Halol facility would be shut down for six months to address the observations from the September 2014 FDA inspection, which added heightened urgency to the Halol transfer effort.  In fact, Halol did not receive FDA clearance for renewal of drug supply to the United States until June 2018.

55.     On or about May 6, 2015, Sun Ltd.'s Senior Vice President of Global Manufacturing, Benny Klener ("Klener"), stated to Alto that any attempt to prioritize development of Pharmalucence products over transfer of Halol products would be against company interests.  Alto interpreted this statement as a threat that he would be terminated for cause should he pursue further development of tetrofosmin.

56.     At the time of the recommendation to discontinue the development of tetrofosmin, Sellers understood that (i) they were responding to Buyers' need and directive to reprioritize the product pipeline to accommodate the need to transfer products from Halol, and (ii) their

recommendation would not impact their earn-out rights under the "First Four Products"

provision of the Earn-out Schedule.

      **E.**     **Sun Pharma Refuses To Acknowledge Its Obligations Under The Earn-Out Schedule**

57.     In accordance with the language of the Earn-Out Schedule, in February 2015,

Alto sent a memorandum to Sundaram, requesting that the first of the Sun Ltd. products

transferring to the Billerica production site be formally recognized as a substitute product for

tetrofosmin under the Earn-Out Schedule.

58.     After receiving no reply to the February 2015 memorandum, Sellers again

reached out to Sun Ltd. in March 2015.

59.     On April 17, 2015, Alto reiterated Sellers' request to "update[e] Schedule 2.4 of

the Equity Purchase Agreement to reflect the new priorities established by Sun Pharma for new

product manufacturing at the Billerica site."  The proposed modification sought by Sellers

included the following substitutions: (i) Vecuronium Bromide (10 mg) CBE30 shall substitute

for ANDA, tetrofosmin, 30cc vial (generic Myoview), Milestone events #3 and #7; and (2)

Vecuronium Bromide (20 mg) CBE30 shall substitute for ANDA, tetrofosmin, 10cc vial (generic

Myoview), Milestone events #5 and #9.

60.     Vecuronium bromide 10 mg and 20 mg were both included in the Halol product

transfer, with the 10 mg version being designated "highest priority."

61.     On or around April 28, 2015, Alto and Sundaram discussed Sellers' proposed

modification to Schedule 2.4.  Sundaram, on behalf of Buyer, acknowledged that transfers from

other facilities were properly considered "milestone triggers."  However, Buyer declined to

amend Schedule 2.4 due to the fact that filings for the substitute products had not yet occurred.

Additionally, Sundaram stated that all of Sellers' rights to milestone payments for the

tetrofosmin products had been forfeited in September 2014, when Sellers deprioritized tetrofosmin.  Sun also stated that no product substitutions had been made.

> **F.      Sun Pharma Thwarts Sellers' Attempts To Reprioritize Tetrofosmin**

62.     Upon learning that Buyer interpreted the "First Four Products" provision as not applicable to their recommendation that tetrofosmin be replaced, and no longer considered the $12.5 million in milestones originally linked to the development of tetrofosmin available to Sellers, Sellers requested that Buyer resurrect the tetrofosmin program and its payment obligations upon completion of the tetrofosmin related milestones.

63.     Sellers continued to ask Sun Ltd. management for updates regarding the priority and status of Pharmalucence development projects.  For example, Connolly asked Mehta for guidance on this subject in May 2015, just prior to his departure from Pharmalucence in June of 2015.  He also asked Mehta whether Sellers should secure resources for re-starting the tetrofosmin projects.

64.     In May 2015, Connolly and Paul Damphousse ("Damphousse"), Development Director at Pharmalucence, discussed Buyer's plans (or lack thereof) for restarting the tetrofosmin projects at the Pharmalucence facilities.  Damphousse informed Connolly that Mehta did not indicate any intention to restart the tetrofosmin development efforts.

65.     On May 29, 2015, Connolly circulated a "Development Project Priorities" list to Damphousse, Deepak Verma ("Verma") Vice President Operations at Sun Inc., and Kathleen Dennis ("Dennis"), the Sun Inc. point person for project management for Pharmalucence initiatives.  The list included both the tetrofosmin 30 cc and tetrofosmin 10 cc vials.

66.     On June 1, 2015, Alto sent a memorandum regarding these product development program priorities to Sundaram and Mehta.  Included in this memorandum was a list of product development and transfer activities currently underway or planned at Pharmalucence.  Because

of a staff shortage, timelines for several projects were viewed as "at risk."  Mr. Alto provided a prioritization of the various development projects and said that Pharmalucence would place projects further down the list on hold until the resource deficiencies were remedied.  In the same memorandum, Mr. Alto recommended swapping tetrofosmin 10 cc vial and tetrofosmin 30 cc vial on the list of priorities (placing the 10-cc vial in a higher spot) for a variety of strategic reasons.

67.     Buyer, through Mehta, rejected these proposed project priorities and stated that resources would not change.

68.     One week prior to his departure from Pharmalucence, Connolly emailed Mehta requesting project priority feedback.  Connolly sought to ensure that all of the projects would be properly resourced after his departure.  He specifically pointed to "milestone events" and noted that Sun Inc. "must establish project plans and resourcing" to ensure the achievement of these events.  Mehta had yet to provide feedback regarding development project priorities, despite previous assurances that he would do so.

69.     On June 8, 2015, Alto sent Sundaram a memorandum regarding "Pharmalucence Business Management."  In the "New Product Development and Transfer" section of the memorandum, Alto noted that the tetrofosmin product was "down-prioritized" after a 2014 limited feasibility assessment triggered by Sun Ltd.'s urgent directive that Sellers reevaluate existing priorities to accommodate the required product transfers from the rejected Halol facility. He asked to discuss the prioritization of resource commitments for tetrofosmin with Sundaram as soon as possible.

70.     Additionally, Alto requested that Sun Inc. open negotiations to renew his employment so that successful business integration could continue, and to ensure that all

milestone projects were adequately managed.  He noted the "disagreement between the

Pharmalucence Sellers and Sun Pharma regarding milestone qualifications and triggers."

> **G.     Sun Pharma Declines To Renew Alto's Employment, Triggering The Last
>          Man Standing Provision**

71.     The following week, on June 16, 2015, Sundaram called Alto at Pharmalucence to

personally confirm that Sun Inc. would not extend Alto's employment.

72.     On July 14, 2015, Alto's employment agreement with Pharmalucence expired by

its terms.  A true and correct copy of Alto's employment agreement is attached hereto as **Exhibit**

**C.**

73.     At that time, Alto was the last Individual Seller who remained employed with

Buyer following the closing of the Pharmalucence sale.

74.     Following the expiration of Alto's employment agreement, and in tacit

recognition of the fact that Buyers did not allow Alto's employment to lapse "for cause," on July

16, 2015, Sun Pharma's counsel sent Alto an Extended Executive Employment Agreement on

behalf of Sun Inc.  She brought up the tetrofosmin business plan provided by Alto to Sun

Pharma, noting that "Sun does not wish to revisit the termination of Tetrofosmin or otherwise

move forward with the business plan as presented by Mr. Alto though you can see from the

employment agreement, Sun remains committed to the remaining Pharmalucence projects."

75.     On July 31, 2015, Alto responded to Sun Inc.'s offer for new employment by

memorandum to Sundaram.  Alto noted that Sun Inc. had previously declined to extend his

employment on numerous occasions, and that Sun Inc.'s failure to renew Alto's employment

triggered the Last Man Standing provision.  Alto also responded to the proposed terms of Sun

Inc.'s new employment offer, categorizing its provisions as either "acceptable," "not

acceptable," or "of concern."

76.     Of particular concern to Alto, Sun Inc.'s new employment offer amounted to a significant demotion.  Pre-sale, Alto was the President and CEO of Pharmalucence and, post-sale, was Vice President and General Manager, which included significant control over Pharmalucence.  The new job offer listed Alto's position and duties to be limited to overseeing the development of certain Pharmalucence milestone projects, which he was expected to do remotely.  The proposed agreement contained specific terms limiting Alto's presence at the Pharmalucence site to no more than one day per week or as scheduled in advance by the CEO of Sun Pharmaceuticals Industries, USA and in the CEO's sole discretion.

77.     On August 4, 2015, Alto sent another memorandum to Sundaram pertaining to discussions he had had with Sun Inc. regarding his potential employment.  Alto noted that his renewed employment with Pharmalucence was contingent upon Sun Inc. affirming Buyer's obligations and Sellers' rights under the EPA and the Earn-Out Schedule, as he understood them, as part of his renewed employment discussions.

**H.     Sun Inc. Withholds Payments Due Under The Earn-Out Schedule**

78.     Also, on August 4, 2015, Sellers' Counsel, Morse Barnes, sent Sun Inc. a demand letter regarding "Milestone Payments Under Schedule 2.4 to the EPA."  This letter set forth Sun Inc.'s obligations under the Earn-Out Schedule.

79.     The letter also addressed the substitution of products listed on the milestone schedule with products transferred from Buyer's Halol India production facility.  The letter noted Sun Inc.'s Milestone Payment obligations remained unaltered and that all time limitations applicable to the achievement of the milestone events had been removed in light of Alto's expired employment agreement.

80.     Sellers demanded that Buyer acknowledge its obligations under the Earn-Out Schedule, specifically that (1) the first four products filed from the Pharmalucence Facilities or

18

submitted for approval were subject to the milestone payments, and (2) Sun Inc.'s decision to transfer production of the transferred products to the Facilities from the Halol facility effected a product substitution pursuant to the Earn-Out Schedule.

81.    On September 1, 2015, Sun Inc. responded to Sellers' demand letter, rejecting all demands.

82.    On September 14, 2015, Alto sent a memorandum to Sundaram pertaining to Sun Inc.'s new employment offer.  He noted that the parties continued to disagree regarding the requirements under the Earn-Out Schedule, and proposed a mutual settlement or the implementation of a legal process.  Alto also requested clarification of the employment position proposed by Buyer in July 2015, and suggested that the Parties discuss additional product development opportunities.  Sundaram did not provide any response to this memorandum.

83.    On December 6, 2016, Sellers, through their counsel, wrote to Sun Inc. to inquire about three topics.  First, Sellers asked whether Sun Inc. had made an ANDA submission for mertiatide (generic MAG-3) with the FDA and, if so, the date of the submission and whether the submission had been accepted.  Second, Sellers asked for a status update for each of the products listed on the Earn-Out Schedule.  Finally, Sellers asked whether any other products had been filed from the Billerica facility or submitted for approval since the completion of the transaction described in the EPA, regardless of whether the production of such products was ongoing or was transferred to the Billerica facility at or since the completion of the transaction described in the EPA.

84.    Sun Inc. did not reply.  Sellers followed up on January 4, 2017 by forwarding to Buyer the December 6, 2016 letter.  Sun Inc. responded on January 5, 2017, promising to respond "shortly."

85.     Buyer responded substantively on January 18, 2017, answering Sellers' three inquiries as follows: (1) the ANDA for generic MAG-3 was submitted to the FDA on May 2, 2016 (milestone 2), and accepted under the terms of the EPA on July 8, 2016 (milestone 6); (2) development of In-11 pentetreotide (generic Octreoscan) was ongoing; (3) no substitution of any of the products listed on Schedule 2.4 had occurred; and (4) no other products had been filed or submitted for approval from the facility.  With regard to its third answer, Buyer noted that "development of tetrofosmin was halted due to the development issues communicated by Alto and there are no current plans to further pursue this product."

86.     Recognizing that the failure to renew Alto's employment triggered the Last Man Standing Provision of the Earn-Out Schedule, thereby eliminating the time limits to achieve the milestones, Sun Inc. made a milestone payment on January 18, 2017 for MAG-3, which was to be achieved by December 31, 2015.  Sun Inc.'s counsel communicated in her January 18, 2017 letter that the MAG-3 application was "'Accepted' under the terms of the EPA on July 8, 2016" – over six months after the deadline.

87.     On February 10, 2017, Sellers' Counsel sent Sun Inc. a letter proposing that the parties mediate their disagreements regarding the milestone payments.

88.     Sun Inc.'s Counsel responded on March 3, 2017, and declined to mediate the Parties' disputes regarding arising out of the EPA.

89.     On information and belief, the FDA accepted Pharmalucence's ANDA submission for In-111 pentetreotide during the first half of 2019, triggering Milestone Event four (4).

90.     On or around July 12, 2019, the FDA issued its final approval for mertiatide, triggering Milestone Event six (6).

91.     To date, Sun Inc. has not paid the amounts due upon the achievement of Milestone Events four (4) or six (6).

**COUNT I**
**Declaratory Judgment**

92.     Plaintiffs reassert and incorporate herein each of the allegations set forth in Paragraphs 1-91 above.

93.     The Earn-Out Provision of the EPA states, in relevant part, "If Buyer substitutes a product, whether that is an existing Buyer product transferred into the Facilities or a new product developed in the Facilities, those substituted products qualify for the milestone payments.  In the event a product substitution occurs, the milestone timing and milestone payments associated with the product that was replaced ("**PL Product**") apply to the product that was substituted in its place ("**Sun Replacement Product**").  For clarification *the first four products that are filed from the facility are subject to the milestones ("Product 1, Product 2, Product 3, and Product 4").*" (emphasis added).

94.     Defendant's refusal to provide written notice requirement of the reprioritization and substitution any of the products listed in the Earn-Out Schedule does not absolve Buyer of its obligations to provide milestone payments upon the filing and approval of the first four products from the facility.

95.     Defendant's counsel confirmed that the "proposed tech transfer of three of Buyer's products into the Billerica facility was not a substitution and therefore these products (whose development and regulatory filing timetable is not yet fully determined) will not automatically trigger any milestones under the EPA."

96.     Because Defendant has taken the position that written notice is required to effect a substitution under the Earn-Out Schedule and products are currently being developed, this matter is justiciable now pursuant to 28 U.S.C. § 2201.

97.     Plaintiffs are entitled to a declaration that the first four products out of the Pharmalucence facility trigger the milestone payments under the Earn-Out Schedule and that no formal written substitution need take place.

## COUNT II
### Declaratory Judgment

98.     Plaintiffs reassert and incorporate herein each of the allegations set forth in Paragraphs 1-91 above.

99.     The Last-Man Standing provision of the EPA states, in relevant part, "In the event (i) Buyer terminates the employment of the Individual Seller who remains employed with Buyer for the longest period following the Closing without Cause (as defined in the applicable Employment Agreement between Buyer and such employee), (ii) fails to renew the employment of such Individual Seller following the expiration of the term set forth in such Individual Seller's employment agreement with Buyer…then Buyer shall pay the full amount of all potential remaining Earn-Out Payments hereunder, at the time such milestones are achieved, but disregarding any time limitations on the achievement of such milestones."

100.    On July 14, 2015, Alto's employment agreement with Pharmalucence expired by its terms.

101.    On July 14, 2015, Alto was the Individual Seller who remained employed with Buyer for the longest period following the closing of the Pharmalucence sale.

102.    Further, Defendant has waived any time limitations by the payment of the second milestone.

103.     Because Defendant has taken the position that the Last Man Standing provision has not been triggered and has refused to payout the amounts due for Milestones four and six, due to Defendant's later offer of employment this matter is justiciable now pursuant to 28 U.S.C. § 2201.

104.     Plaintiffs are entitled to a declaration the Last Man Standing provision of the Earn-Out Schedule has been triggered, removing the date restriction from current and future milestone payments, including upon FDA approval of In-111 pentetreotide, at any time, which would trigger Milestone Payment eight (8).

## COUNT III
### Breach of Contract

105.     Plaintiffs reassert and incorporate herein each of the allegations set forth in Paragraphs 1-91 above.

106.     On information and belief, the FDA accepted Pharmalucence's ANDA submission for In-111 pentetreotide during the first half of 2019, triggering Milestone Event four (4).

107.     Under the terms of the Earn-Out Schedule, Plaintiffs are owed $3.125 million upon the achievement of Milestone Event four (4).

108.     To date, Defendant has not paid Plaintiffs the amount due for the achievement of Milestone Event four (4).

109.     On or around, July 19, 2019, the FDA issued its final approval for mertiatide, triggering Milestone Event six (6).

110.     Under the terms of the Earn-Out Schedule, Plaintiffs are owed $3.125 million upon the achievement of Milestone Event six (6).

111.    To date, Defendant has not paid Plaintiffs the amount due for the achievement of Milestone Event six (6).

112.    As a result, Plaintiffs are entitled to damages in an amount not less than the $6.25 million currently due under the Earn-Out Schedule.

**COUNT IV**
**Breach of Contract**

113.    Plaintiffs reassert and incorporate herein each of the allegations set forth in Paragraphs 1-91 above.

114.    Section 5.2 of the EPA provides, "Each of the parties hereto shall use commercially reasonable efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement including without limitation satisfaction, but not waiver, of the closing conditions described in Section 4 above."

115.    By refusing to develop tetrofosmin or recognize any Sun Replacement Products, Defendant has not taken commercially reasonable efforts to make effective the transactions contemplated by the EPA, including Schedule 2.4

116.    As a result, Defendant has breached Section 5.2 of the EPA.

117.    Plaintiffs are entitled to damages resulting from Defendant's breach of Section 5.2 of the EPA.

**COUNT V**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

118.    Plaintiffs reassert and incorporate herein each of the allegations set forth in Paragraphs 1-91 above.

119.    In every agreement governed by the laws of New York, there is an implied covenant that the parties will act in good faith and fairly with one another.  Contracting parties

are prohibited from behaving in a manner inconsistent with the parties' common purpose and justified expectations.

120.    In particular, parties vested with discretion under a contract are obligated to act in good faith with respect to the exercise of that discretion and are prohibited from exercising that discretion to deprive a counterparty of the substantial value of the contract.

121.    Defendant has refused to pursue the development of tetrofosmin denying Plaintiffs the right to $12.5 million in milestone payments due under the Earn-Out Schedule.

122.    Defendant's rejection of the new development plan for tetrofosmin is a breach of the covenant of good faith and fair dealing implied in every New York contract.  At no time has Defendant allocated any resources to the development of tetrofosmin.

123.    Defendant's breach of the implied covenant of good faith and fairly dealing has caused, and continues to cause, injury to Plaintiffs, including but not limited to the Milestone Payments due upon the filing and approval of tetrofosmin under the Earn-Out Schedule.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request:

A.    Actual, compensatory and consequential damages, including but not limited to the current and remaining payments, including those for the tetrofosmin products as of their deadline dates, due under the Earn-Out Schedule;

B.    Pre- and post-judgment interest at the maximum rate provided by law;

C.    A declaratory judgment that the first four products out of the Pharmalucence facility trigger the milestone payments under the Earn-Out Schedule and that no formal written substitution need take place;

D.      A declaratory judgment that the Last Man Standing provision has been triggered,

removing the date restriction from future milestone payments;

E.      Any further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Respectfully Submitted,

GLENN ALTO, EDWARD CONNOLLY, and L. WILLIAM WATERS,

By their attorneys,

*/s/ Leah R. Milbauer*

Michael T. Gass (*Pro Hac Vice forthcoming*)
Leah R. Milbauer
CHOATE HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tel: (617) 248-5000
Fax: (617) 248-4000
mgass@choate.com
lmilbauer@choate.com

Date:  October 22, 2019

# EXHIBIT A

Execution Copy

EQUITY PURCHASE AGREEMENT

BY AND AMONG

CARACO PHARMACEUTICAL LABORATORIES LTD.,

AND

THE SELLERS LISTED ON THE SIGNATURE PAGES HERETO

Dated as of May 15, 2014

{M0647321.4 }

## EQUITY PURCHASE AGREEMENT

This Equity Purchase Agreement (this "**Agreement**") is made and entered into as of May 15, 2014, by and among **CARACO PHARMACEUTICAL LABORATORIES LTD.**, a Michigan corporation (the "**Buyer**"), on the one hand, and **GLENN ALTO, EDWARD J. CONNOLLY, THE CONNOLLY 2014 GRANTOR RETAINED ANNUITY TRUST** (the "**Connolly Trust**"), **L. WILLIAM WATERS** AND **LEWIS WILLIAM WATERS III 2014 QUALIFIED ANNUITY TRUST** (the "**Waters Trust**", and together with the Connolly Trust, the "**Trusts**") (each, a "**Seller**", and collectively, "**Sellers**") on the other hand.  Buyer and each of the Sellers are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

A.      Sellers own all of the issued and outstanding Equity Securities (as defined below), of Pharmalucence, Inc., a Delaware corporation ("**Pharmalucence**").

B.      Sellers own all of the Equity Securities of PI Real Estate Ventures, LLC, a Massachusetts limited liability company ("**PIREV**").

C.      Pharmalucence is in the business of developing, making and selling Pharmalucence Existing Products and also provides manufacture and supply services as a contract manufacturer of its customers' products, and in accordance with the foregoing operates certain manufacturing facilities (the "**Business**"), and PIREV is the owner of certain real property which constitutes such manufacturing facilities.

D.      Sellers desire to sell, and Buyer desires to purchase, all of the Equity Securities of both Pharmalucence and PIREV (Pharmalucence, together with PIREV, each a "**Pharmalucence Company**", and collectively, the "**Pharmalucence Companies**") and in effect purchasing the entirety of the Pharmalucence Companies on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing, and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

## 1.      DEFINITIONS

"**Actual Cash**" has the meaning ascribed to such term in Section 2.3(a).

"**Actual Indebtedness**" has the meaning ascribed to such term in Section 2.3(a).

"**Actual Net Working Capital**" has the meaning ascribed to such term in Section 2.3(a).

"**Actual Transaction Expenses**" has the meaning ascribed to such term in Section 2.3(a).

"**ADSP**" has the meaning ascribed to such term in Section 5.9(j)(iii).

"**Affiliate**" means, with respect to any particular Person, (a) any Person controlling, controlled by or under common control with such Person, whether by ownership or control of

voting securities, by contract or otherwise, (b) any Person owning or controlling fifty percent (50%) or more of the outstanding voting securities of such other Person, (c) any partner, officer, director, employee or shareholder of such Person or any parent, spouse, child, brother, sister or other relative with a relationship (by blood, marriage or adoption) not more remote than first cousin of any of the foregoing, or (d) any liquidating trust, trustee or other similar person or entity for any Person.

"**Agency**" means the Massachusetts Development Finance Agency.

"**Agreement**" has the meaning ascribed to such term in the introductory paragraph.

"**Allocation**" has the meaning ascribed to such term in Section 5.9(f).

"**Ancillary Agreements**" has the meaning ascribed to such term in Section 3.1(b).

"**Anti-Kickback Statute**" has the meaning ascribed to such term in Section 3.2(s).

"**Antitrust Laws**" means the HSR Act, the Federal Trade Commission Act, as amended, the Sherman Act, as amended, the Clayton Act, as amended, and any applicable foreign antitrust Laws and all other applicable Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"**Arbitrator**" has the meaning ascribed to such term in Section 2.3(a).

"**Authorized Action**" has the meaning ascribed to such term in Section 8.1(d).

"**Basis**" means any past or present fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction that forms or could reasonably form the basis for any specified consequence.

"**Bedford Facility**" means the parenteral manufacturing facility located at 5 DeAngelo Drive, Bedford, MA 01730.

"**Billerica Facility**" means the parenteral manufacturing facility located at 29 Dunham Road, Billerica, MA 01821.

"**Bondholder**" has the meaning ascribed to such term in Section 4.1(f)**.**

"**Bonds**" means the $20,000,000 Agency Recovery Zone Facility Revenue Bonds, Pharmalucence Issue, Series 2010.

"**Business**" has the meaning ascribed to such term in Recital C.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which government offices are required or authorized by law to be closed in New York, New York.

"**Business Relation**" has the meaning ascribed to such term in Section 5.7(b)(ii).

"**Business Systems**" has the meaning ascribed to such term in Section 3.2(k)(vii).

"**Buyer**" has the meaning ascribed to such term in the introductory paragraph.

"**Buyer Group**" has the meaning ascribed to such term in Section 5.7(b)(ii).

"**Buyer Indemnifiable Losses Parties**" has the meaning ascribed to such term in Section 6.1(d).

"**Buyer Parties**" has the meaning ascribed to such term in Section 6.1(b)(i).

"**Cap**" means the aggregate amount of the Up-Front Payment (as adjusted by any True-Up Payment) and any Earn-Out Payment actually received by the Sellers, less the aggregate fair market value of the Facilities (which fair market value shall not include the value of any improvements made to the Facilities following the Closing), at the time any applicable claims for Losses are actually paid to Buyer.

"**Cash**" means the aggregate cash and cash equivalents (including bank account balances, marketable securities and short term investments) on a consolidated basis, of Pharmalucence Companies in each case calculated in accordance with GAAP.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.).

"**Closing**" has the meaning ascribed to such term in Section 2.6.

"**Closing Date**" has the meaning ascribed to such term in Section 2.6.

"**Closing Date Statement**" has the meaning ascribed to such term in Section 2.3(a).

"**COBRA**" has the meaning ascribed to such term in Section 3.2(p)(iv).

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Confidential Information**" means any information concerning the Business or the businesses and affairs or otherwise of any of the Pharmalucence Companies other than any such information that is generally available to or known by the public immediately prior to the time of disclosure (except through the actions or inactions of the Person to whom disclosure has been made).

"**Connolly Trust**" has the meaning ascribed to such term in the introductory paragraph.

"**Contract**" means any contract, license, sublicense, mortgage, purchase order, indenture, loan agreement, lease, sublease, arrangement, agreement or instrument or any binding commitment to enter into any of the foregoing (in each case, whether written or oral).

"**Current Assets**" means the current assets of the Pharmalucence Companies, determined on a consolidated basis in accordance with the methodology set forth in Exhibit A; provided that,

notwithstanding anything to the contrary contained herein, Current Assets shall not include (a) Cash and (b) Taxes.

"**Current Liabilities**" means the current liabilities of the Pharmalucence Companies, determined on a consolidated basis in accordance with the methodology set forth in <u>Exhibit A</u>; <u>provided</u> that, notwithstanding anything to the contrary contained herein, Current Liabilities shall not include (a) Indebtedness (including accrued interest on all Indebtedness), (b) accruals for Unit Equivalent Plan Benefits, (c) Taxes or (d) Transaction Expenses.

"**DEA**" has the meaning ascribed to such term in <u>Section 3.2(t)(ii)</u>.

"**Disclosure Schedule**" has the meaning ascribed to such term in <u>Section 3.1</u>.

"**Earn-Out Payment**" has the meaning ascribed to such term in <u>Section 2.1</u>.

"**Employment Agreement**" means an employment agreement between Pharmalucence and each Individual Seller to be entered in and effective as of the Closing.

"**Employment Laws**" has the meaning ascribed to such term in <u>Section 3.2(p)(i)</u>.

"**Employment Loss**" means the same in this Agreement as in the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq., or any comparable foreign, state or local Law.

"**Enterprise Value**" has the meaning ascribed to such term in <u>Section 2.1</u>.

"**Environmental Laws**" means, whenever in effect, all foreign, Federal, state and local laws, statutes, regulations, ordinances, rules of common law and similar provisions having the force or effect of law relating to human or worker health and safety, pollution, protection of the environment, or the restoration of natural resources, including those relating to fines, orders, injunctions, penalties, damages, contribution, cost recovery, compensation, losses, or injuries resulting from the Release or threatened release of Hazardous Materials and the generation, use, storage, transportation, or disposal of or exposure to Hazardous Materials in any manner applicable to the Business, the Pharmalucence Companies or their respective assets, including the following statutes, each as amended: CERCLA, the Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 et seq.); the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §§ 6901 et seq.); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.), the Clean Air Act (42 U.S.C. §§ 7401 et seq.); the Toxic Substances Control Act of 1976 (15 U.S.C. §§ 2601 et seq.); and the Safe Drinking Water Act (42 U.S.C. §§ 300f et seq.).

"**Equity Securities**" means any (a) units, stock, shares, partnership interests, membership interests or other equity securities or capital interests, (b) warrants, options or other rights to purchase or otherwise acquire securities described in <u>clause (a)</u> of this definition, (c) equity appreciation rights or profits interests, and (d) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into securities described in <u>clauses (a)</u>, <u>(b)</u> or <u>(c)</u> of this definition

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" means any business entity that is included in a controlled group of entities within which any of the Pharmalucence Companies is also included, as provided in Section 414(b) of the Code; or which is a trade or business under common control with any of the Pharmalucence Companies, as provided in Section 414(c) of the Code; or which constitutes a member of an affiliated service group within which any of the Pharmalucence Companies is also included, as provided in Section 414(m) of the Code; or which is required to be aggregated with any of the Pharmalucence Companies pursuant to regulations issued under Section 414(o) of the Code.

"**Escrow Account**" has the meaning ascribed to such term in Section 2.2(a).

"**Escrow Agent**" means J.P. Morgan Chase, as the Escrow Agent under the Escrow Agreement.

"**Escrow Funds**" means SEVEN MILLION DOLLARS ($7,000,000), to be held by the Escrow Agent in accordance with the terms of the Escrow Agreement.

"**Estimated Cash**" has the meaning ascribed to such term in Section 2.2(b).

"**Estimated Indebtedness**" has the meaning ascribed to such term in Section 2.2(b).

"**Estimated Net Working Capital**" has the meaning ascribed to such term in Section 2.2(b).

"**Estimated Net Working Capital Adjustment**" has the meaning ascribed to such term in Section 2.2(b).

"**Estimated Payment**" has the meaning ascribed to such term in Section 2.2(b).

"**Estimated Transaction Expenses**" has the meaning ascribed to such term in Section 2.2(b).

"**Existing Related Party Agreements**" means existing agreements (whether oral or written) by and between any of the Pharmalucence Companies (on the one hand) and the Sellers or any employee, officer, director or manager of any of the Pharmalucence Companies or any of their Affiliates (on the other hand).

"**Facilities**" means the Billerica Facility and the Bedford Facility.

"**FDA**" has the meaning ascribed to such term in Section 3.2(t)(ii).

"**FDCA**" has the meaning ascribed to such term in Section 3.2(t)(ii).

"**Federal False Claims Act**" has the meaning ascribed to such term in Section 3.2(s).

"**Final Allocations**" has the meaning ascribed to such term in Section 5.9(j)(iii).

"**Financial Statements**" has the meaning ascribed to such term in <u>Section 3.2(f)</u>.

"**Fundamental Representations**" means <u>Sections 3.1</u> (Representations and Warranties of the Sellers), <u>3.2(a)</u> (Organization, Qualification and Authority), <u>3.2(b)</u> (Authorization of Transaction), <u>3.2(c)</u> (Noncontravention), <u>3.2(d)</u> (Capitalization), <u>3.2(i)</u> (Tax Matters), <u>3.2(j)(iii)</u> (Title to Assets), <u>3.2(q)</u> (Employee Benefit Plans), <u>3.2(t)</u> (Compliance with Laws), <u>3.2(x)</u> (Broker's Fees) and <u>3.2(z)</u> (Environmental).

"**GAAP**" means United States generally accepted accounting principles as in effect from time to time, applied consistently with the principles used in preparing the Financial Statements (as defined below) for the Most Recent Fiscal Year End (as defined below).

"**Good Reason**" means: (i) a material diminution of the duties assigned to an Individual Seller in his Employment Agreement; (ii) a material reduction in an Individual Seller's Base Salary (as defined in his Employment Agreement) or other benefits provided for in such Employment Agreement; (iii) relocation of an Individual Seller to an office other than the Billerica Facility; and/or (iv) Pharmalucence's material breach of any Employment Agreement.

"**Governmental Authority**" means (a) the United States, (b) any Federal, state, provincial, municipal, local or foreign government or any governmental or quasi-governmental authority of any nature, (c) any body exercising or entitled to exercise any administrative, executive, judicial, legislative, police, standards, regulatory or taxing authority, or (d) any subdivision, agency, department, branch, official, bureau, commission, board, court, tribunal, judicial or arbitral body or other instrumentality or authority of any of the foregoing.

"**Gross-Up Amount Notice of Tax Objection**" has the meaning ascribed to such term in <u>Section 5.9(j)(vi)</u>.

"**Hazardous Materials**" means (a) any chemical, material or substance defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "medical waste," "toxic pollutants," "contaminants," "pollutants," "toxic substances," or words of similar import under any applicable Environmental Law, (b) any oil, petroleum, petroleum product, petroleum-derived substance, fraction of petroleum, any flammable substances or explosives, or any radioactive materials, (c) friable asbestos and asbestos-containing materials, (d) radon gas, urea, formaldehyde, foam insulation, dielectric fluid, and polychlorinated biphenyls, and (e) any other chemical, material or substance regulated under any applicable Environmental Law by any Governmental Authority.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**HSR Fees**" means the filing fees in connection with any filings required under the HSR Act.

"**HSR Notifications**" means the notification and report forms required to be filed under the HSR Act.

"**Income Tax Return**" means any Tax Return related to Income Taxes.

"**Income Taxes**" means Taxes imposed on net income.

"**Indebtedness**" of any Person means any of the following: (i) all obligations of such Person for borrowed money or which have been incurred in connection with the acquisition of property or assets; (ii) all Liabilities secured by any Lien upon property or assets owned by such Person, even though such Person has not assumed or become liable for the payment of such Liabilities; (iii) all Liabilities created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, notwithstanding the fact that the rights and remedies of the seller, lender or lessor under such agreement in the event of default are limited to repossession or sale of the property; (iv) all capitalized lease obligations; (v) all Liabilities with respect to interest rate or currency swaps, collars, caps and similar hedging obligations; (vi) all guaranties, surety or indemnity obligations by such Person; (vii) all Liabilities of such Person in regard to guaranties or sureties by others of such Person's Liabilities, regardless of whether by payment or performance, or whether such guaranties are in the form of, without limitation, letters of credit, deposits, bonds, insurance or other forms of security, indemnity, surety or guaranty; (viii) all Liabilities for underfunded employee pension benefit plans and similar obligations; (ix) all Liabilities classified as non current liabilities in accordance with GAAP; and (x) all Liabilities for accrued but unpaid interest and unpaid prepayment penalties or premiums, expenses or other amounts that are payable in connection with retirement or prepayment, or assumed by Buyer, in respect of any of the foregoing.  For the avoidance of doubt, "Indebtedness" shall not include any Taxes.

"**Indemnified Party**" has the meaning ascribed to such term in Section 6.2(a).

"**Indemnifying Party**" has the meaning ascribed to such term in Section 6.2(a).

"**Individual Seller**" means each of Glenn Alto, Edward J. Connolly, or L. William Waters.

"**Intellectual Property**" means all intellectual property and proprietary rights throughout the world, including all trademarks and service marks and registrations and registration applications therefor (and including the goodwill associated therewith); trade names; Internet domain name registrations; inventions (whether or not patentable), patents and patent applications, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof; copyrights and registrations and registration applications therefore, including copyrights in and software and databases; trade secrets, know-how, and confidential and proprietary information.

"**Intellectual Property Agreements**" means all Contracts related to Intellectual Property, including all:  (i) licenses of Intellectual Property by the Pharmalucence Companies to any third party (including Existing Related Party Arrangements); or (ii) licenses of Intellectual Property by any third party (including Existing Related Party Arrangements) to the Pharmalucence Companies.

"**Interim Financial Statements**" has the meaning ascribed to such term in Section 3.2(f).

"**Inventory**" means the Pharmalucence Companies' inventory (including packaging materials, raw materials, work-in-process, finished goods, and stores-and-spares) whether used in or related to the Business or otherwise, in each case, calculated in accordance with requirements of GAAP.

"**Knowledge of Sellers**", "**Sellers' Knowledge**" or any similar phrases, shall mean the actual knowledge of each or any of the Sellers or the knowledge of each such person after reasonable due inquiry by such person of any of the persons within the Pharmalucence Companies who should reasonably be expected to have such knowledge.

"**Latest Annual Balance Sheet**" has the meaning ascribed to such term in Section 3.2(f).

"**Latest Balance Sheet**" has the meaning ascribed to such term in Section 3.2(f).

"**Law**" means each provision of any Federal, state, provincial, municipal, local or foreign law, statute, ordinance, order, judgment, common law, code, rule or regulation, enacted, enforced, entered, promulgated or issued by any Governmental Authority.

"**Leased Real Property**" has the meaning ascribed to such term in Section 3.2(j)(i).

"**Leases**" means all written or oral leases, subleases, licenses, concessions and other agreements (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) pursuant to which any of the Pharmalucence Companies holds, uses, occupies or possesses any Leased Real Property, including the right to all security deposits and other amounts and instruments deposited by or on behalf of such Pharmalucence Company thereunder.

"**Liability**" means any liability (whether known or unknown, whether accrued or unaccrued, whether absolute or contingent, whether liquidated or unliquidated, and whether due or to become due), obligation or Indebtedness, including any liability for Taxes.

"**Lien**" means any mortgage, pledge, easement, security interest, charge, claim, conditional sale or other title retention agreement, lien or other encumbrance or right of any third party.

"**Listed IP**" has the meaning ascribed to such term in Section 3.2(k)(i).

"**Losses**" means all charges, complaints, actions, suits, proceedings, hearings, investigations, claims, demands, costs of defense, judgments, orders, decrees, stipulations, injunctions, damages, dues, penalties, fines, costs (including costs of actions taken to bring the Business into compliance with applicable Laws), amounts paid in settlement, Liabilities, Taxes, Liens, losses, expenses, and fees, including all reasonable attorneys' fees and court costs.

"**Material Adverse Effect**" means any event, change or occurrence that, individually or together with any one or more other events, changes or occurrences, has had, or could reasonably be expected to have, a material adverse effect or impact upon the assets, condition (financial or otherwise), results of operations, business or earnings of either of the Pharmalucence Companies, or on the ability of any of the Parties to consummate the transactions contemplated hereby.

"**Material Contracts**" has the meaning ascribed to such term in Section 3.2(l).

"**Most Recent Fiscal Year End**" has the meaning ascribed to such term in Section 3.2(f).

"**Net Working Capital**" shall mean the resulting amount calculated by subtracting (a) Current Liabilities from (b) Current Assets.

"**Non-Competition Period**" has the meaning ascribed to such term in Section 5.7(b)(i).

"**Nondisclosure Contract**" has the meaning ascribed to such term in Section 3.2(l)(xxi).

"**Notice**" has the meaning ascribed to such term in Section 2.3(a).

"**Notice Period**" has the meaning ascribed to such term in Section 2.3(a).

"**Offsite Location**" means real property other than real property which is Leased Real Property, Owned Real Property, or real property on which either of the Facilities is located.

"**Ordinary Course of Business**" means an action that is in the ordinary course of business consistent with the past custom and practice of the Pharmalucence Companies.

"**Organizational Documents**" means: (i) with respect to a corporation, the certificate or articles of incorporation and bylaws; (ii) with respect to any other entity, each charter, certificate of formation, partnership agreement, joint venture agreement, operating agreement and similar document, as applicable, adopted or filed in connection with the creation, formation or organization of such entity; and (iii) any amendment to any of the foregoing.

"**Outside Date**" has the meaning ascribed to such term in Section 7.1(b).

"**Owned Real Property**" has the meaning ascribed to such term in Section 3.2(j)(ii).

"**Party(ies)**" has the meaning ascribed to such term in the introductory paragraph.

"**Permits**" has the meaning ascribed to such term in Section 3.2(r).

"**Permitted Liens**" means, in each case arising out of or incurred in the Ordinary Course of Business, (i) Liens for Taxes or other governmental charges, assessments or levies that are not delinquent, (ii) landlord's, mechanic's, carrier's, workmen's, repairmen's or other similar Liens for amounts not yet due and payable which are not material, individually or in the aggregate, and (iii) zoning, entitlement, building and other land use regulations imposed by Governmental Authorities having jurisdiction over the Leased Real Property or Owned Real Property which are not violated by the current or contemplated occupation and use of the Leased Real Property Owned Real Property and which do not, individually or in the aggregate, cause or have a Material Adverse Effect, and (iv) Liens securing the payment obligations of the Pharmalucence Companies under the Bonds in favor of the Bondholder.  Notwithstanding the foregoing, except with respect to the Liens securing the Bonds, any Lien securing Indebtedness as of the Closing will not be a Permitted Lien.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or Governmental Authority (whether foreign, Federal, state, county, city or otherwise, including, without limitation, any instrumentality, division, agency or department thereof).

"**Pharmalucence**" has the meaning ascribed to such term in Recital A.

"**Pharmalucence Company(ies)**" has the meaning ascribed to such term in Recital D.

"**Pharmalucence Existing Product(s)**" means the products, as of the date of this Agreement, for which Pharmalucence holds the applicable Regulatory Approvals as set forth on Schedule 1.

"**Pharmalucence Intellectual Property**" has the meaning ascribed to such term in Section 3.2(k)(ii).

"**Pharmalucence Owned Intellectual Property**" has the meaning ascribed to such term in Section 3.2(k)(iii).

"**PIREV**" has the meaning ascribed to such term in Recital B.

"**PIREV Purchase Price**" means TWENTY ONE MILLION ONE HUNDRED THOUSAND DOLLARS ($21,100,000).

"**Plan**" means: (i) each "employee benefit plan," as defined in Section 3(3) of ERISA, including any "multiemployer plan" as defined in Section 3(37) of ERISA and "multiple employer plan" as defined in Section 413(c) of the Code, each determined without regard to whether such plan is subject to ERISA; and (ii) any other plan, fund, policy, program, arrangement or scheme, qualified or nonqualified, whether or not considered legally binding, that involves any pension, retirement, thrift, saving, profit sharing, welfare, wellness, medical, voluntary employees' beneficiary association or related trust, disability, group insurance, life insurance, severance pay, compensation, deferred compensation, flexible benefit, excess or supplemental benefit, vacation, summer hours, stock-related, stock option, phantom stock, supplemental unemployment, layoff, "golden parachute", retention, fringe benefit or incentives, in either case which pertains to any employee, former employee, member, manager, director, officer, or equityholder of any of the Pharmalucence Companies or any ERISA Affiliate and (a) to which any of the Pharmalucence Companies or any ERISA Affiliate is or has been a party or sponsoring, participating or contributing employer or by which any of them is bound as of the date of this Agreement or (b) to which any of the Pharmalucence Companies or any ERISA Affiliate may otherwise have any Liability, whether direct or indirect (including any such plan or arrangement formerly maintained by or participated in or contributed to by any of the Pharmalucence Companies or any ERISA Affiliate).

"**Pre-Closing Tax Period**" has the meaning ascribed to such term in Section 5.9(a).

"**Preliminary ADSP**" has the meaning ascribed to such term in Section 5.9(j)(iii).

"**Preliminary Proposed Allocations**" has the meaning ascribed to such term in Section 5.9(j)(iii).

"**Pro Rata Portion**" means, as to each Seller, that percentage set forth next to such Seller's name on Schedule 2.2(a)(iii).

"**Program Fraud Civil Remedies Act**" has the meaning ascribed to such term in Section 3.2(s).

"**Proposed Allocations**" has the meaning ascribed to such term in Section 5.9(j)(iii).

"**RE Insurance Policies**" has the meaning ascribed to such term in Section 3.2(j)(ii).

"**Registration Application**" means an application for Regulatory Approval (as defined below) required to be approved before manufacture, importation, or commercial sale, marketing and promotion or use of a product as a drug in the U.S., including:  (a) a New Drug Application, as defined in the FDCA, and applicable regulations promulgated thereunder by the FDA and all supplements filed pursuant to the requirements of the FDA (including all documents, data and other information concerning a product that are necessary for, or included in, FDA approval to market a product); (b) an application filed under Section 505(b)(2) of the FDCA, or (c) an Abbreviated New Drug Application filed with the FDA including an application under 21 U.S.C. Section 355(j), 21 C.F.R. 505(j).

"**Regulated Company Products**" has the meaning ascribed to such term in Section 3.2(t)(ii).

"**Regulatory Approval**" means an approval of the FDA necessary for the commercial manufacture, use, storage, import, export, transport, promotion, commercialization, supply or sale of a product in the U.S.

"**Release(s)**" has the same meaning as used in CERCLA.

"**Released Claims**" has the meaning ascribed to such term in Section 5.8.

"**Released Parties**" has the meaning ascribed to such term in Section 5.8.

"**Releasing Parties**" has the meaning ascribed to such term in Section 5.8.

"**Resolution Period**" has the meaning ascribed to such term in Section 2.3(a).

"**Restricted Parties**" has the meaning ascribed to such term in Section 5.7(b)(i).

"**Reviewed Financial Statements**" has the meaning ascribed to such term in Section 3.2(f).

"**Section 338(h)(10) Allocation Forms**" has the meaning ascribed to such term in Section 5.9(j)(iii).

"**Section 338(h)(10) Election Forms**" has the meaning ascribed to such term in <u>Section 5.9(j)(ii)</u>.

"**Section 338(h)(10) Elections**" has the meaning ascribed to such term in <u>Section 5.9(j)(i)</u>.

"**Seller(s)**" has the meaning ascribed to such term in the introductory paragraph.  For the sake of clarity, the term Seller(s) shall also include the estate of each Individual Seller in the event of the death of such Individual Seller.

"**Seller Indemnifiable Losses**" has the meaning ascribed to such term in <u>Section 6.1(d)</u>.

"**Seller Representative**" has the meaning ascribed to such term in <u>Section 8.1(a)</u>.

"**Stark Law**" has the meaning ascribed to such term in <u>Section 3.2(t)(viii)</u>.

"**Straddle Period**" has the meaning ascribed to such term in <u>Section 5.9(b)</u>.

"**Survival Period**" has the meaning ascribed to such term in <u>Section 6.1(a)(v)</u>.

"**Target Net Working Capital**" means an amount equal to THREE MILLION SIX HUNDRED THOUSAND DOLLARS ($3,600,000).

"**Tax**" and "**Taxes**" means any (a) taxes, charges, withholdings, fees, penalties, additions, interest or other assessments of any kind whatsoever imposed by any Taxing Authority, including those related to income, gross receipts, gross income, premium, windfall profits, environmental, customs duties, stamp, severance, profits, withholding, payroll, employment, occupation, sales, use, value added, alternative or add-on minimum, estimated, excise, services, valuation, social security (or similar), unemployment, disability, real property, personal property, transfer or franchise, (b) liability of the Pharmalucence Companies for the payment of any amounts of the type described in <u>clause (a)</u> above arising as a result of being (or ceasing to be) a member of any affiliated group (or being included (or required to be included) in any Tax Return relating thereto), and (c) liability of the Pharmalucence Companies for the payment of any amounts of the type described in <u>clause (a)</u> above as a result of any obligation to indemnify or otherwise assume or succeed to the liability of any other Person.

"**Tax Gross-Up Deficit**" has the meaning ascribed to such term in <u>Section 5.9(j)(vii)</u>.

"**Tax Gross-Up Excess**" has the meaning ascribed to such term in <u>Section 5.9(j)(vii)</u>.

"**Tax Returns**" means all tax returns, declarations, statements, forms or other documents required to be filed with or supplied to any Taxing Authority.

"**Taxing Authority**" means any Governmental Authority having jurisdiction over the assessment, determination, collection, or other imposition of any Tax.

"**Third Party Claim**" has the meaning ascribed to such term in <u>Section 6.3(a)</u>.

"**Top Customers**" has the meaning ascribed to such term in Section 3.2(u)(i).

"**Top Suppliers**" has the meaning ascribed to such term in Section 3.2(u)(ii).

"**Transaction Expenses**" means the aggregate amount of all fees, costs and expenses, incurred by or on behalf of the Pharmalucence Companies in connection with the process of selling the Pharmalucence Companies or otherwise relating to the negotiation, preparation or execution of this Agreement or any documents or agreements contemplated hereby or the performance or consummation of the transactions contemplated hereby or thereby or relating to bonuses, in each case, that have not been paid, including, without limitation, (A) all investment banking, legal and accounting fees, costs and expenses, (B) any fees and expenses associated with obtaining necessary or appropriate consents or approvals of any Governmental Authority, (C) any fees or expenses associated with obtaining the release and termination of any Liens, (D) all brokers' or finders' fees, (E) all sale, change-of-control, "stay-around," retention, or similar bonuses, compensation or payments to current or former managers, directors, employees and other service providers of the Pharmalucence Companies paid or payable as a result of or in connection with the transactions contemplated hereby and in existence as of the date hereof, and (F) any Taxes borne or to be borne by the Pharmalucence Companies (including any Taxes incurred in connection with the exercise of, or payments made in respect of, any equity incentive compensation, Taxes payable directly or indirectly pursuant to Code Sections 280G or 4999) or the net loss of any Tax benefit to the Pharmalucence Companies, in each case as a result of the disallowance of any expenses pursuant to Code Sections 280G or 4999.

"**True-Up Calculation**" has the meaning ascribed to such term in Section 5.9(j)(vii).

"**Transfer Taxes**" has the meaning ascribed to such term in Section 5.9(e).

"**True-Up Escrow Amount**" means THREE AND ONE-HALF MILLION DOLLARS ($3,500,000).

**True-Up Notice of Tax Objection**" has the meaning ascribed to such term in Section 5.9(j)(vii).

"**True-Up Payments**" has the meaning ascribed to such term in Section 2.3(c).

"**Trusts**" has the meaning ascribed to such term in the introductory paragraph.

"**Unit Equivalent Plan**" means the Pharmalucence, Inc. Unit Equivalent Plan, as amended from time to time.

"**Unit Equivalent Plan Benefit**" means the total benefit due and owing by Pharmalucence to certain Pharmalucence employees under the Unit Equivalent Plan as a result of the transactions contemplated by this Agreement.

"**Unit Equivalent Plan Closing Payments**" means the portion of the Unit Equivalent Plan Benefit which remains unpaid as of the Closing.

"**Up-front Payment**" has the meaning ascribed to such term in Section 2.1.

"**Updated Disclosures**" has the meaning ascribed to such term in Section 5.5(a).

"**Waters Trust**" has the meaning ascribed to such term in the introductory paragraph.

## 2.    PURCHASE AND SALE

2.1    Purchase and Sale.    Subject to the provisions of this Agreement, Buyer will purchase, and the Sellers will sell, transfer and assign to Buyer, free and clear of any and all Liens, (i) all the Equity Securities of Pharmalucence owned by all the Sellers, which in the aggregate represent One Hundred Percent (100%) of the Equity Securities and interests of Pharmalucence and (ii) all the Equity Securities of PIREV owned by all the Sellers, which in the aggregate represent One Hundred Percent (100%) of the Equity Securities and interests of PIREV. As consideration for the purchase of the Equity Securities at the Closing, subject to the provisions of this Agreement and the adjustments and payments set forth in Sections 2.2, and 2.3 Buyer shall pay up to an aggregate amount of ONE HUNDRED MILLION DOLLARS ($100,000,000) (the "**Enterprise Value**"), consisting of an up-front payment of SEVENTY MILLION DOLLARS ($70,000,000) ("**Up-front Payment**") to be paid in accordance with Section 2.2 and (ii) and contingent payments equaling, in the aggregate, the amount of THIRTY MILLION DOLLARS ($30,000,000) (the "**Earn-Out Payment**") to be paid in accordance with Section 2.4.

2.2    Payments at Closing.

(a)    Subject to adjustment pursuant to this Section 2.2 and Section 2.3, at the Closing, Buyer shall (i) pay to Pharmalucence by wire transfer of immediately available funds the aggregate amount of the Unit Equivalent Plan Closing Payments; provided, following receipt from Buyer, Pharmalucence shall pay such Unit Equivalent Plan Closing Payments (net of all applicable withholding taxes) to the applicable participants of the Unit Equivalent Plan who have executed receipt and termination agreements, (ii) pay by wire transfer of immediately available funds to an account or accounts to pay the Escrow Funds and True-Up Escrow Amount to an account designated by the Escrow Agent (the "**Escrow Account**"), (iii) pay to the Sellers the Estimated Payment (as hereinafter defined) by wire transfer of immediately available funds to an account or accounts designated by Sellers set forth in Schedule 2.2(a)(iii).  The "**Estimated Payment**" shall be an amount equal to Seventy Million Dollars ($70,000,000) plus or minus the Estimated Net Working Capital Adjustment, less the Estimated Indebtedness, plus the Estimated Cash, less the Estimated Transaction Expenses, less the aggregate amount of the Unit Equivalent Plan Closing Payments, less the True-Up Escrow Amount, less the Escrow Funds, as such capitalized terms are hereinafter defined in 2.2(b).

(b)    Not less than four (4) Business Days prior to the Closing Date, the Seller Representative shall provide Buyer with a good faith estimate (subject to Buyer's review and consent) of: (i) Net Working Capital as of the Closing ("**Estimated Net Working Capital**"), (ii) the amount of Indebtedness as of the Closing ("**Estimated Indebtedness**"), (iii) the Unit Equivalent Plan Benefit and the Unit Equivalent Plan Closing Payments, (iv) the amount of Cash as of the Closing ("**Estimated Cash**"), and (v) the amount of Transaction Expenses as of the Closing ("**Estimated Transaction Expenses**").  If the Estimated Net Working Capital exceeds the Target Net Working Capital, the Estimated Payment shall be increased by an amount equal to

such difference, and if the Target Net Working Capital exceeds the Estimated Net Working Capital, the Estimated Payment shall be reduced by an amount equal to such difference (such increase or reduction, the "**Estimated Net Working Capital Adjustment**").

       2.3    <u>Post-Closing Adjustments</u>.

       (a)    Within sixty (60) days after the Closing Date, Buyer shall deliver to the Seller Representative a statement ("**Closing Date Statement**") setting forth a calculation of (i) the actual Net Working Capital as of the Closing ("**Actual Net Working Capital**"), (ii) the actual amount of Indebtedness as of the Closing ("**Actual Indebtedness**"), (iii) the actual amount of Cash as of the Closing ("**Actual Cash**"), and (iv) the actual amount of Transaction Expenses as of the Closing ("**Actual Transaction Expenses**").  The Actual Net Working Capital shall be calculated in accordance with the methodology set forth on <u>Exhibit A</u>. If the Seller Representative has any objections to the Closing Date Statement as prepared by Buyer, the Seller Representative shall, within thirty (30) days after the Seller Representative's receipt thereof (the "**Notice Period**"), give written notice (the "**Notice**") to Buyer specifying in reasonable detail such objections and the basis therefor, and calculations which the Seller Representative has determined in good faith are necessary to eliminate such objections.  If the Seller Representative does not deliver the Notice within the Notice Period, Buyer's determinations on the Closing Date Statement shall be final, binding and conclusive on Sellers and Buyer.  If the Seller Representative provides a Notice within the Notice Period, the Seller Representative and Buyer shall negotiate in good faith during the fifteen (15) Business Day period (the "**Resolution Period**") after the date of Buyer's receipt of the Notice to resolve any disputes regarding the Closing Date Statement.  If the Seller Representative and Buyer are unable to resolve all such disputes within the Resolution Period, then within fifteen (15) Business Days after the expiration of the Resolution Period, all unresolved disputes shall be submitted to an internationally recognized accounting firm mutually acceptable to Buyer and the Seller Representative (the "**Arbitrator**"), who shall be engaged to provide a final, binding and conclusive resolution of all such unresolved disputes within thirty (30) Business Days after such engagement.  The Arbitrator shall act as an independent arbitrator to determine, based solely on the presentations by the Seller Representative and Buyer and not by independent review, only those issues that remain in dispute.  Upon final resolution of all disputed items, the Arbitrator shall issue a report showing its final calculation of such disputed items.  The determination of the Arbitrator shall be final, binding and conclusive on Sellers and Buyer, and the fees and expenses of the Arbitrator shall be borne by Sellers (on the one hand) and Buyer (on the other hand) in proportion to the amounts by which their proposals differed from the Arbitrator's final determination.  In connection with the resolution of any dispute, each Party (Sellers on one hand and Buyer on the other) shall pay its own fees and expenses, including without limitation, legal, accounting and consultant fees and expenses.  Notwithstanding anything to the contrary in this Agreement, any disputes regarding amounts shown in the Closing Date Statement shall be resolved as set forth in this <u>Section 2.3</u>.

       (b)    The post-Closing adjustments to the Estimated Payment shall be made as follows:

           (i)    If the Estimated Net Working Capital is greater than the Actual Net Working Capital, then Sellers shall pay to Buyer an amount equal to the difference between the Estimated Net Working Capital and the Actual Net Working Capital.  If the

Actual Net Working Capital is greater than the Estimated Net Working Capital, then Buyer shall pay to Sellers an amount equal to the difference between the Actual Net Working Capital and the Estimated Net Working Capital.

(ii)     If the Estimated Indebtedness is greater than the Actual Indebtedness, then Buyer shall pay to Sellers an amount equal to the difference between the Estimated Indebtedness and the Actual Indebtedness.  If the Actual Indebtedness is greater than the Estimated Indebtedness, then Sellers shall pay to Buyer an amount equal to the difference between the Actual Indebtedness and the Estimated Indebtedness.

(iii)    If the Estimated Transaction Expenses are greater than the Actual Transaction Expenses, then Buyer shall pay to Sellers an amount equal to the difference between the Estimated Transaction Expenses and the Actual Transaction Expenses.  If the Actual Transaction Expenses are greater than the Estimated Transaction Expenses, then Sellers shall pay to Buyer an amount equal to the difference between the Actual Transaction Expenses and the Estimated Transaction Expenses.

(iv)    If the Estimated Cash is greater than the Actual Cash, then Sellers shall pay to Buyer an amount equal to the difference between the Estimated Cash and the Actual Cash.  If the Actual Cash is greater than the Estimated Cash, then Buyer shall pay to Sellers an amount equal to the difference between the Actual Cash and the Estimated Cash.

(c)     Any payments required to be made pursuant to Section 2.3(b)(i) through (iv) above shall be defined as "**True-Up Payments**".  Undisputed True-Up Payments shall be made within five (5) Business Days after delivery of the Notice (or, if no Notice is delivered within the Notice Period with respect to the amounts governing such True-Up Payment, then five (5) Business Days after the last day of the Notice Period).  Disputed True-Up Payments shall be made within five (5) Business Days after resolution of the amount of such True-Up Payment during the Resolution Period or resolution by the Arbitrator, as applicable. All True-Up Payments shall be made by wire transfer of immediately available funds to a bank account designated by the recipient party (or, if wire transfer instructions are not provided prior to such payment, by checks payable in immediately available funds). Pursuant to the terms of the Escrow Agreement, the Escrow Agent shall pay to Buyer from the True-Up Escrow Amount any True-Up Payments in favor of Buyer. The Seller agrees to pay any True-Up Payments to the extent the True-Up Payments in favor of Buyer exceed the True-Up Escrow Amount, and Buyer shall have the right, but shall not be obligated, to obtain payment of such excess amount from the Escrow Funds or by setting off such amounts from any Earn-Out Payment, in Buyer's sole discretion. To the extent the True-Up Payments in favor of Buyer do not exceed the True-Up Escrow Amount, following final resolution of all disputes relating to the True-Up Payments and final payment of all True-Up Payments from the True-Up Escrow Amount, the remaining amount of the True-Up Escrow Amount shall be disbursed to Sellers in accordance with the Escrow Agreement.

2.4     Earn-Out Payments.  Following the Closing, Buyer shall pay to Sellers the amounts set forth in Schedule 2.4, minus any amounts determined to be due to Buyer pursuant to Section 2.3 or Section 6 and not otherwise paid to Sellers before any such amounts on Schedule 2.4 (if any) become payable pursuant to Schedule 2.4. Except as set forth on Schedule 2.4, to the

extent any milestone set forth on Schedule 2.4 is not attained, Buyer shall have no obligation to pay, and Sellers shall have no right to receive any portion of the Earn-Out Payment subject to the attainment of such milestone.

2.5     Pro Rata Portions.  An amount equal to the PIREV Purchase Price shall be payable to the Sellers in accordance with their respective interests in PIREV, as set forth on Schedule 2.2(a)(iii).  All other payments to Sellers under this Section 2, and all obligations of Sellers pursuant to this Section 2, shall be allocated among Sellers in accordance with their Pro Rata Portions.

2.6     Closing.

(a)     Closing Date.  Subject to the terms and conditions of this Agreement, the closing (the "**Closing**") will be directed from the offices of Reed Smith LLP, 1717 Arch Street, Suite 3100, Philadelphia, PA 19103 as soon as practicable but no later than two (2) Business Days after the date on which all conditions to the Closing (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions) will have been satisfied or waived, or at such other time, place and date as Buyer and Seller may mutually agree.  The date on which the Closing occurs is referred to as the "**Closing Date**." The Closing shall be effective as of 11:59 pm local Philadelphia time on the Closing Date.

(b)     Closing Deliveries.

(i)     At the Closing, the Sellers will deliver or cause to be delivered to Buyer the following items:

(A)     original certificates evidencing all of the Pharmalucence and PIREV Equity Securities (to the extent certificated), together with assignments separate from certificate or other transfer documents from each of the Sellers relating to such Equity Securities in a form reasonably satisfactory to Buyer;

(B)     executed receipt and termination agreements with respect to the Unit Equivalent Plan Benefits, duly executed by Pharmalucence and each holder thereof, in form and substance acceptable to Buyer, in its sole discretion;

(C)     the Escrow Agreement, which shall provide for the Escrow Agent to hold (i) the Escrow Funds, such funds to be released twenty-four (24) months following the Closing Date (subject to any claims thereon), and (ii) the True-Up Escrow Amount, which shall be released in accordance with Section 2.3, such Escrow Agreement to otherwise be in the form mutually agreed upon between the Sellers and the Buyer, executed by the Seller Representative and the Escrow Agent;

(D)     (i) a copy of the resolutions and/or written consents by which all actions on the part of the Pharmalucence Companies necessary to approve this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby were taken, certified by the Secretary or an authorized officer of each of the Pharmalucence Companies; (ii) an incumbency certificate signed by an officer or officers of each of the Pharmalucence Companies certifying the signature and office

of each officer executing this Agreement, the Ancillary Agreements or any other agreement, certificate or other instrument executed pursuant hereto or thereto; (iii) a copy of each Pharmalucence Company's Organizational Documents that are filed with any Governmental Authority, certified by the applicable Governmental Authority as of a date which is no more than seven (7) Business Days before the Closing Date; (iv) a copy of each Pharmalucence Company's other Organizational Documents, certified by the Secretary or an authorized officer of such Pharmalucence Company; and (v) good standing certificates or the applicable equivalent document for each of the Pharmalucence Companies, issued as of a date which is no more than seven (7) Business Days before the Closing Date, by the applicable Governmental Authority and any other jurisdiction in which any of the Pharmalucence Companies is required to be qualified to do business as a foreign entity;

 (E) a non-foreign affidavit from each Seller dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Code Section 1445 stating that such Seller is not a "foreign person" as defined in Code Section 1445;

 (F) certificates, in form and substance reasonably satisfactory to Buyer, signed by an officer of each of the Pharmalucence Companies, dated as of the Closing Date, identifying the following documents to be delivered therewith: (i) the minute books of each of the Pharmalucence Companies, which shall contain minutes of all meetings (or consents to action in lieu thereof) of the managers or directors and equityholders of each of the Pharmalucence Companies (or the equivalent documents) through and including the Closing Date; (ii) all equity certificate books and equity ledgers of each of the Pharmalucence Companies; and (iii) such other documents or instruments as Buyer may reasonably request to carry out the intents and purposes of this Agreement, and such minute books, records and other documents shall be complete, accurate and sufficient, to the satisfaction of Buyer and its counsel;

 (G) resignations effective as of the Closing of the officers, directors and managers of the Pharmalucence Companies identified by Buyer prior to the Closing Date;

 (H) the certificates, in form and substance reasonably satisfactory to Buyer, required by <u>Section 4.1</u> herein;  and

 (I) such other certificates, documents and/or instruments as Buyer may reasonably request.

 (ii) At the Closing, Buyer will deliver or cause to be delivered to Sellers or other designated Person the following items:

 (A) the Escrow Agreement, executed by Buyer;

(B)     the Escrow Funds and the True-Up Escrow Amount in cash by wire transfer of immediately available funds to an account designated by the Escrow Agent;

(C)     to the payees thereof, cash by wire transfer of immediately available funds to accounts designated by the payees thereof, in an amount sufficient to pay the Estimated Transaction Expenses;

(D)     to Sellers, cash by wire transfer of immediately available funds to an account or accounts designated by Sellers, in an amount equal to the Estimated Payment;

(E)     the certificates, in form and substance reasonably satisfactory to the Seller Representative, required by Section 4.2 herein;

(F)     a copy of the resolutions and/or written consents by which all actions on the part of Buyer necessary to approve this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby were taken, certified by the Secretary or an authorized officer of Buyer.

### 3.     REPRESENTATIONS AND WARRANTIES

3.1     Representations and Warranties of Sellers.  As a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated hereby, each Seller hereby represents and warrants to Buyer, on a several and not joint basis, that all of the statements contained in this Section 3.1 are correct and complete as of the date of this Agreement and on each day up to the Closing Date, except as set forth in Section 3.1 of the disclosure schedule attached to this Agreement setting forth exceptions to the representations and warranties set forth herein (the "**Disclosure Schedule**").  The Disclosure Schedule will be arranged in sections corresponding to the numbered and lettered sections contained in this Section 3.1.

(a)     Securities. Each Seller is the record owner of the Equity Securities as set forth in Section 3.1(a) of the Disclosure Schedule.  Each Seller has good and marketable title to the Equity Securities which are to be sold by each Seller pursuant to this Agreement, free and clear of any and all Liens, options or similar rights of any nature. Sellers collectively own and control one hundred percent (100%) of the Equity Securities, ownership rights and interests of the Pharmalucence Companies.

(b)     Authorization of Transaction. Each Individual Seller, the Connolly Trust and the Waters Trust have the full right, capacity, power (trust power, as applicable), and authority to execute and deliver this Agreement and all other agreements, documents and instruments relating hereto (the "**Ancillary Agreements**") entered into by each Individual Seller, the Connolly Trust and/or the Waters Trust and to perform each such Individual Seller's, the Connolly Trust's and/or the Waters Trust's obligations hereunder and thereunder. This Agreement and each of the Ancillary Agreements, as applicable, to which such Seller is a party, have been duly executed and delivered by such Seller and, assuming the due authorization, execution and delivery by the other Parties hereto or

thereto, constitute legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their terms.

(c)    <u>Noncontravention</u>. Provided the filings, authorizations, consents or approvals listed in Section 3.1(c) of the Disclosure Schedule have been made or obtained neither the execution and the delivery of this Agreement or the Ancillary Agreements, nor the consummation of the transactions contemplated hereby or thereby will violate or conflict in any way with any applicable Law of any Governmental Authority to which each Individual Seller and each of the Trusts is subject, and in the case of the Trusts, with any establishing documents of such Trusts, including any trust agreements or other trust organizational documents, or result in the creation of any Lien upon any assets of such Seller pursuant to the terms thereof, or (ii) conflict with, result in a breach of, constitute a default under (with or without notice or lapse of time, or both), result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, require any notice under, or result in the creation of any Lien upon any asset of such Seller pursuant to the terms of, any contract, agreement, lease, sublease, license, sublicense, franchise, permit, indenture, agreement for borrowed money, instrument of Indebtedness, Lien or other arrangement to which such Seller is a party or by which such Seller is bound or to which any of such Seller's assets are subject.  Except for (i) such filings, authorizations, consents or approvals as the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect and  (ii) those filings, authorizations, consents or approvals set forth in <u>Section 3.1(c)</u> of the Disclosure Schedule, such Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority or any other Person in order for the Parties to consummate the transactions contemplated by this Agreement and in order that such transactions not constitute a breach or violation of, or result in a right of termination or acceleration or any encumbrance on such Seller's assets pursuant to the provisions of, any agreement, arrangement or understanding or any license, franchise or permit.

(d)    <u>No Injunctions</u>. Each Seller is not a party to, subject to or bound by any agreement or any judgment, order, writ, prohibition, injunction or decree of any Governmental Authority which would prevent the execution or delivery of this Agreement or the Ancillary Agreements by such Seller, or the sale of the Equity Securities pursuant hereto.

(e)    <u>Brokers' Fees</u>. Except as set forth in <u>Section 3.1(e)</u> of the Disclosure Schedule, such Seller has no Liability to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

3.2    <u>Representations and Warranties Concerning the Pharmalucence Companies</u>.  As a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated hereby, each of the Sellers hereby represents and warrants to Buyer, on a joint and several basis, that all of the statements contained in this <u>Section 3.2</u> are correct and complete as of the date of this Agreement and as of the Closing Date, except as set forth in <u>Section 3.2</u> of the Disclosure Schedule attached to this Agreement setting forth exceptions to the representations and warranties set forth herein.   The Disclosure Schedule will be arranged in sections corresponding to the numbered and lettered sections contained in this <u>Section 3.2</u>.

      (a)    <u>Organization, Qualification and Authority</u>.  Each of the Pharmalucence Companies (i) is a corporation or limited liability company, as applicable, duly incorporated, validly existing and in good standing under the Laws of the jurisdiction of its organization, (ii) has all requisite corporate or limited liability company, as applicable, power and authority to own, lease and operate its assets and conduct its business as they are now being operated and conducted, and (iii) is in good standing and is duly qualified to conduct business as a foreign entity under the Laws of the jurisdictions listed on <u>Section 3.2(a)</u> of the Disclosure Schedule, which are all the jurisdictions in which the failure to be so qualified could reasonably be expected to have a Material Adverse Effect on such Pharmalucence Company.  True and correct copies of each Pharmalucence Company's Organizational Documents, in each case as amended to date, have been delivered to Buyer.  <u>Section 3.2(a)</u> of the Disclosure Schedule sets forth a correct and complete list of the officers, directors, managers and/or similar functionaries of each of the Pharmalucence Companies.

      (b)    <u>Authorization of Transaction</u>.  The execution, delivery and performance of this Agreement and the Ancillary Agreements by the Pharmalucence Companies and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action, and no other proceedings on such Pharmalucence Company's part are necessary to authorize the execution, delivery or performance of this Agreement or the Ancillary Agreements.  This Agreement and each of the Ancillary Agreements, as applicable, to which each of the Pharmalucence Companies is a party have been duly executed and delivered by such Pharmalucence Company and, assuming the due authorization, execution and delivery by the other parties hereto or thereto, constitute legal, valid and binding obligations of such Pharmalucence Company, enforceable against such Pharmalucence Company in accordance with their terms.

      (c)    <u>Noncontravention</u>. Provided the filings, authorizations, consents or approvals listed in <u>Section 3.2(c)</u> of the Disclosure Schedule have been made or obtained, neither the execution and the delivery of this Agreement or the Ancillary Agreements, nor the consummation of the transactions contemplated hereby or thereby will (i) violate or conflict in any way with any applicable Law of any Governmental Authority to which any of the Pharmalucence Companies is subject or any provision of the Organizational Documents of any of the Pharmalucence Companies, or result in the creation of any Lien upon any assets of any of the Pharmalucence Companies pursuant to the terms thereof, or (ii) conflict with, result in a breach of, constitute a default under (with or without notice or lapse of time, or both), result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, require any notice under, or result in the creation of any Lien upon any asset of any of the Pharmalucence Companies pursuant to the terms of, any contract, agreement, lease, sublease, license, sublicense, franchise, permit, indenture, agreement for borrowed money, instrument of Indebtedness, Lien or other arrangement to which such Pharmalucence Company is a party or by which such Pharmalucence Company is bound or to which any of its assets are subject.  Except for (i) such filings, authorizations, consents or approvals as the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect and  (ii) those filings, authorizations, consents or approvals disclosed in <u>Section 3.2(c)</u> of the Disclosure Schedule, the Pharmalucence Companies are not required to give any notice to, make any filing with, or obtain any authorization, consent,

or approval of any Governmental Authority or any other Person in order for the Parties to consummate the transactions contemplated by this Agreement and in order that such transactions not constitute a breach or violation of, or result in a right of termination or acceleration or any encumbrance on the Pharmalucence Companies' assets pursuant to the provisions of, any agreement, arrangement or understanding or any license, franchise or permit.

(d)     <u>Capitalization</u>. <u>Section 3.2(d)</u> of the Disclosure Schedule sets forth (i) the number of authorized Equity Securities of each of the Pharmalucence Companies, and (ii) the number of issued and outstanding Equity Securities of each of the Pharmalucence Companies, and the holders of such Equity Securities.  No current or former manager, director, officer, or equityholder of any of the Pharmalucence Companies has asserted or, to Sellers' Knowledge, threatened, any claim, suit, action or proceeding against the Pharmalucence Companies or any other manager, officer or director thereof.  The Pharmalucence Companies have never authorized, offered, sold or issued any Equity Securities other than the Equity Securities of the Pharmalucence Companies.  All offerings, sales and issuances by the Pharmalucence Companies of any Equity Securities have been properly conducted in full compliance with, in accordance with or in reliance upon exemptions from all applicable foreign Federal and state securities Laws and all applicable state corporation Laws.  All of the Equity Securities have been duly authorized, validly issued, fully paid, and nonassessable, and are not subject to any preemptive rights that Sellers, the Pharmalucence Companies and any other applicable party have not waived. Except as disclosed in <u>Section 3.2(d)</u> of the Disclosure Schedule, there are no currently outstanding or authorized options, warrants, rights, contracts, rights of first refusal or first offer, calls, puts, rights to subscribe, conversion rights, or other agreements or commitments to which any of the Pharmalucence Companies is a party or which are binding upon the Pharmalucence Companies providing for the issuance, disposition, or acquisition of any of the Equity Securities of the Pharmalucence Companies.  Except as disclosed in <u>Section 3.2(d)</u> of the Disclosure Schedule, there are no outstanding or authorized equity appreciation, phantom equity, or similar rights with respect to the Pharmalucence Companies, and there are no contractual or statutory preemptive rights or similar restrictions with respect to the issuance or transfer of any Equity Securities of the Pharmalucence Companies.  Except as disclosed in <u>Section 3.2(d)</u> of the Disclosure Schedule, there are no voting trusts, proxies, or any other agreements, restrictions or understandings with respect to the voting of any of the Equity Securities of the Pharmalucence Companies.

(e)     <u>Subsidiaries</u>.  None of the Pharmalucence Companies owns or holds the right to acquire any stock, membership interest, partnership interest, joint venture interest or other Equity Securities in any other Person.

(f)     <u>Financial Statements; Books and Records</u>.

(i)     Attached hereto as <u>Section 3.2(f)</u> of the Disclosure Schedule are correct and complete copies of: (a) the reviewed consolidated balance sheet of each of the Pharmalucence Companies as at December 31, 2013 (the "**Most Recent Fiscal Year End**") (such balance sheet, the "**Latest Annual Balance Sheet**") and at December 31, 2012, and the related reviewed consolidated

statements of income, stockholders' equity and cash flow of the Pharmalucence Companies for the fiscal years ended December 31, 2013 and December 31, 2012 (collectively, the "**Reviewed Financial Statements**"); and (b) the unaudited consolidated balance sheet of the Pharmalucence Companies as at April 30, 2014 (such balance sheet, the "**Latest Balance Sheet**") and the related unaudited consolidated statement of income of the Pharmalucence Companies for the four (4) month fiscal period then ended (collectively, the "**Interim Financial Statements**"). The Reviewed Financial Statements and the Interim Financial Statements are herein sometimes collectively referred to as the "**Financial Statements**." Each of the Financial Statements was prepared on the basis of and in accordance with the books and records of the Pharmalucence Companies kept in the Ordinary Course of Business (which books and records are accurate and complete in all material respects), and fairly presents in all material respects the financial condition of the Pharmalucence Companies on a consolidated basis as of its respective date, and the consolidated results of operations and cash flows of the Pharmalucence Companies for the periods related thereto, in each case in accordance with GAAP, using the same accounting methods, policies, practices and procedures, with consistent classifications, judgments and estimation methodology, as were used in the preparation of the Latest Annual Balance Sheet, except in the case of the Interim Financial Statements for the absence of footnote disclosure and year-end adjustments, none of which would be material, individually or in the aggregate.

(ii) The books and records of the Pharmalucence Companies are and have been properly prepared and maintained in form and substance adequate for preparing reviewed financial statements in accordance with GAAP and accurately reflect all contracts and transactions to which any of the Pharmalucence Companies is or was a party or by which any of the Pharmalucence Companies or any of their businesses or assets are or were affected. The minute books of the Pharmalucence Companies correctly reflect all resolutions adopted and all other material actions taken at all meetings or through written consents of the governing bodies (including committees thereof) and the equityholders of the Pharmalucence Companies. The equity transfer book and/or equity ledger of each of the Pharmalucence Companies is complete and correctly reflects all issuances and transfers of the Equity Securities of the Pharmalucence Companies. All title deeds relating to the assets of the Pharmalucence Companies, and executed copies of all agreements to which the any of the Pharmalucence Companies is a party, and the original copies of all other documents which are related in any manner to the Business (including a copy of every note, lien, charge, mortgage, or other instrument evidencing or creating any Lien over any property of the Pharmalucence Companies) are in the possession of the Pharmalucence Companies.

(iii) The Pharmalucence Companies do not have any Liabilities not otherwise reflected in the Financial Statements, relating to state and federal Medicaid/Medicare rebates and payments, credits, chargebacks, rebates, discounts, allowances, incentives, price adjustments, returns or allowances

granted or credited for returns from customers of rejected, damaged, defective or outdated product, or any other similar payments in connection with the sale of any products by or on behalf of Pharmalucence or its Affiliates.

(g)     Recent Events.     Since the Most Recent Fiscal Year End, none of the Pharmalucence Companies has experienced or suffered, and there is no Basis to believe any of the Pharmalucence Companies may experience or suffer, any Material Adverse Effect.  Without limiting the generality of the foregoing, except as reflected on the Latest Balance Sheet, since the Most Recent Fiscal Year End, none of the Pharmalucence Companies has, other than as set forth in Section 3.2(g) of the Disclosure Schedule:

(i)     sold, leased, transferred or assigned any of its assets, tangible or intangible, other than in the Ordinary Course of Business;

(ii)     accelerated, terminated, modified, canceled or committed any breach of any contract, lease, sublease, license, or sublicense (or series of related contracts, leases, subleases, licenses, and sublicenses) either involving more than $25,000 or otherwise outside the Ordinary Course of Business;

(iii)     canceled, compromised, waived, or released any right or claim (or series of related rights and claims) either involving more than $25,000 or outside the Ordinary Course of Business;

(iv)     experienced any damage, destruction, or loss to its property in excess of $25,000 in the aggregate (whether or not covered by insurance);

(v)     created or suffered to exist any Lien upon any of its assets, tangible or intangible, outside the Ordinary Course of Business or securing any Liability in excess of $25,000;

(vi)     issued, sold, or otherwise disposed of any Equity Securities;

(vii)     declared, set aside, or paid any dividend or distribution with respect to its Equity Securities (whether in cash or in kind) or redeemed, purchased, or otherwise acquired any Equity Securities;

(viii)     entered into any transaction, arrangement or contract with, or distributed or transferred any property or other assets to, any manager, officer, director, equityholder or other insider or Affiliate of such Pharmalucence Company (other than salaries and employee benefits in the Ordinary Course of Business);

(ix)     made or committed to make any capital expenditures or entered into any other material transaction outside the Ordinary Course of Business or involving an expenditure in excess of $25,000;

(x)     entered into, amended or modified in any respect (beyond any amendments and modifications reflected in true and complete copies of such Plans delivered

to Buyer) any Plan, or announced or otherwise committed to any such entry, amendment or modification;

(xi)   entered into or engaged in any negotiations to enter into any employment agreement or collective bargaining agreement, made or granted any wage or salary increase in excess of $25,000 for any management or any non-management employee or paid or committed to pay any bonus to any officer or employee, or announced or otherwise committed to any such entry, increase or payment;

(xii)   changed the manner in which the Business has been conducted, including, without limitation, collection of accounts receivable, purchases of raw materials and other Inventory or payment of accounts payable;

(xiii)   changed the accounting principles, methods or practices or any change in the depreciation or amortization policies or rates;

(xiv)   changed the relationship with any customer or supplier which might reasonably be expected to result in a Material Adverse Effect;

(xv)   agreed to any changes with respect to the documents or financial matters relating to the Bonds; or

(xvi)   committed (orally or in writing) to any of the foregoing.

(h)   Indebtedness; Undisclosed Liabilities.

(i)   Set forth in Section 3.2(h) of the Disclosure Schedule is a true and complete list of (A) all Contracts relating to Indebtedness to which any of the Pharmalucence Companies is a party or guarantor, and (B) in each case, the amounts outstanding in respect of such Indebtedness as of the Latest Balance Sheet Date (and, at Closing, as of the Closing Date).   Except as set forth in Section 3.2(h), none of the obligations pursuant to such Contracts are subject to acceleration by reason of the consummation of the transactions contemplated hereby or by any of the Ancillary Agreements, nor would the execution of this Agreement or the consummation of the transactions contemplated hereby or by any of the Ancillary Agreements result in any default under such Contracts.

(ii)   The Pharmalucence Companies do not have any Liabilities (whether accrued, absolute, contingent, unliquidated or otherwise, whether known or unknown, whether due or to become due and regardless of when asserted), and there is no Basis for any present or future charge, complaint, action, suit, proceeding, hearing, investigation, claim, or demand against the Pharmalucence Companies giving rise to any such Liabilities, except for: (A) Liabilities set forth on the Latest Balance Sheet; (B) Liabilities which have arisen after the date of the Latest Balance Sheet in the Ordinary Course of Business (none of which relates to any breach of contract, breach of warranty, tort, infringement, or violation of law or arose out of any charge, complaint, action, suit, proceeding, hearing, investigation, claim, or demand); (C) Liabilities under Material Contracts (as defined below) (in each case,

none of which is a Liability resulting from breach of such Material Contract); and (D) Liabilities for Transaction Expenses.

(i)     Tax Matters.

(i)     The Pharmalucence Companies have timely filed, or have timely filed for extensions to file, all Tax Returns required to be filed thereby through the Closing Date.  Such Tax Returns are (a) true and (B) correct and complete in all material respects and the Pharmalucence Companies have timely paid and discharged all Taxes whether or not shown as due on such Tax Returns.  The Pharmalucence Companies have withheld, collected and paid over to the appropriate Governmental Authorities or are properly holding for such payment all Taxes required by Law to be withheld or collected.

(ii)    No Pharmalucence Company is or was a member of an affiliated group within the meaning of Section 1504(a) of the Code (or any similar group defined under a similar provision of state, local, or foreign Law) filing a consolidated Federal Income Tax Return, nor does any Pharmalucence Company have any liability for the Taxes of any Person (other than the Pharmalucence Companies) under Treasury Regulation Section 1.1502-6 or any analogous or similar provision of Law.

(iii)   No action, suit, proceeding or audit by any Taxing Authority is pending against or with respect to any Pharmalucence Company regarding Taxes or has been threatened against or with respect to any Pharmalucence Company regarding Taxes.

(iv)    No Pharmalucence Company is a party to or bound by any Tax allocation or Tax sharing agreement with any Person, and no Pharmalucence Company has any current or potential contractual obligation to indemnify any other Person with respect to Taxes.

(v)     No claim has ever been made in writing by a Taxing Authority in a jurisdiction where a Pharmalucence Company does not file Tax Returns that such Pharmalucence Company is or may be subject to taxation by such jurisdiction.

(vi)    No claim has been made, asserted or threatened in writing, by the Internal Revenue Service that interest on the Bonds is not exempt from federal income taxation.

(vii)   Section 3.2(i)(vi) of the Disclosure Schedule lists all Federal, state, local, and foreign Tax Returns filed (or required to be filed) with respect to the Pharmalucence Companies for taxable periods ending on or after January 1, 2011, indicates those Tax Returns that have been audited, and indicates those Tax Returns that currently are the subject of audit. Buyer has been provided correct and complete copies of all Income Tax Returns, examination reports, and statements of deficiencies assessed against, or agreed to by any of the Pharmalucence Companies since January 1, 2012.  No Pharmalucence Company has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, which waiver or agreement is still in effect.

(viii)    The unpaid Taxes of the Pharmalucence Companies (A) did not, as of the date of the Latest Balance Sheet, exceed the reserve for Tax liability set forth on the face of the Latest Balance Sheet (rather than in any notes thereto) and (B) do not exceed that reserve as adjusted for operations and transactions through the Closing Date (other than the transactions contemplated by this Agreement) in accordance with the past custom and practice of the Pharmalucence Companies in filing their Tax Returns.

(ix)    There are no Liens for Taxes (other than for Taxes not yet due and payable) upon the assets of any Pharmalucence Company.

(x)    No Pharmalucence Company will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any (A) change in method of accounting for a taxable period ending on or prior to the Closing Date under Code Section 481(c) (or any corresponding or similar provision of state, local or foreign law); (B) "closing agreement" as described in Code Section 7121 (or any corresponding or similar provision of state, local or foreign law); (C) deferred intercompany gain or any excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding or similar provision of state, local or foreign law); (D) installment sale made prior to the Closing Date; (E) prepaid amount received on or prior to the Closing Date; or (F) election under Code Section 108(i).

(xi)    Pharmalucence has been a validly electing S corporation within the meaning of Sections 1361 and 1362 of the Code (and any corresponding provisions of state Law) since January 1, 2008, and will continue to be a validly electing S corporation up to and including the Closing Date.

(xii)    PIREV is treated as a partnership for federal income tax purposes within the meaning of Treasury Regulation Section 301.7701-3.

(xiii)    Pharmalucence has not in the past 10 years (A) acquired assets from another corporation in a transaction in which the Pharmalucence Tax basis for the acquired assets was determined, in whole or in part, by reference to the Tax basis of the acquired assets (or any other property) in the hands of the transferor or (B) acquired the stock of any corporation that is a qualified subchapter S subsidiary.

(xiv)    Within the past three (3) years, no Pharmalucence Company has distributed Equity Securities of another Person, or has had its Equity Securities distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Sections 355 or 361 of the Code.

(xv)    No Pharmalucence Company is or has been a party to any "reportable transaction," as defined in Section 6707A(a) of the Code and Section 1.6011-4(b) of the Treasury Regulations.

(xvi)    No Pharmalucence Company is a party to any Contract or Plan that has resulted or would result, separately or in the aggregate, in the payment of any "excess

parachute payment" within the meaning of Code Section 280G (or any corresponding provision of state, local or foreign Law).

(xvii)   No amount that could be received (whether in case or property or the vesting of property), as a result of the consummation of the transactions contemplated by this Agreement would not be deductible by reason of Code Section 280G or would be subject to an excise tax under Code Section 4999.

(j)   Title and Condition of Properties.

(i)   Leased Real Property. Section 3.2(j)(i) of the Disclosure Schedule sets forth a brief description of all leasehold or subleasehold estates and other rights to hold, use, possess or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by any of the Pharmalucence Companies (the "**Leased Real Property**"), and all Leases relating thereto.  Except as set forth in Section 3.2(j)(i) of the Disclosure Schedule, other than the Leased Real Property, the Pharmalucence Companies have never leased any real property for manufacturing or other operational purposes.  Except as set forth in Section 3.2(j)(i) of the Disclosure Schedule: (A) all Leases relating to the Leased Real Property are legal, valid, binding and enforceable and in full force and effect, subject to proper authorization and execution of such Lease by the other party and the application of any bankruptcy or creditor's rights Laws; (B) the transactions contemplated by this Agreement do not require the consent to assignment of any other party to any of the Leases, will not result in a breach or default under any of the Leases, and will not otherwise cause any of the Leases to cease to be enforceable and in full force and effect on identical terms following the Closing; (C) the Pharmalucence Companies are not and no other party is in breach or default under any such Lease; (D) such Lease has not been assigned by the Pharmalucence Companies (other than collaterally, by the landlord thereunder), supplemented, or amended except as set forth in Section 3.2(j)(i) of the Disclosure Schedule; (E) the Pharmalucence Companies have not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; (F) (x) the current uses of and existing structures located on the Leased Real Property are in material compliance with all applicable zoning and other land use or occupancy requirements, and any covenants, conditions or agreements affecting the Leased Real Property, and (y) the Pharmalucence Companies, to the extent required by any applicable Laws, are in possession of all material certificates of occupancy with respect to the Leased Real Property issued by the appropriate Governmental Authorities; (G) no construction, alteration, or other leasehold improvement work with respect to such Lease remains to be paid for or performed by any party to such Lease except for any such work required by the parties thereunder as part of the maintenance, repair and replacement obligations, including without limitation with respect to casualty damage; (H) the improvements located on the Leased Real Property are in good condition and are structurally sound, and all mechanical and other systems located therein are in an operating condition good for the use to which the same are put by the Pharmalucence Companies in the current operation of the Business, subject to normal wear, and no condition exists requiring material repairs, alterations or corrections, and no maintenance or repairs to the improvements or the mechanical or other systems located therein have been unreasonably deferred; and (I) the Pharmalucence Companies

have all necessary access to and from the Leased Real Property as is reasonably adequate for the current operation thereof. The Pharmalucence Companies hold, subject to the terms and conditions of the Leases described on <u>Section 3.2(j)(i)</u> of the Disclosure Schedule, good leasehold title to, and actual and exclusive possession of, the Leased Real Property, free and clear of Liens other than Permitted Liens. The Pharmalucence Companies have delivered or made available to Buyer complete and accurate copies of each of the Leases for the Leased Real Property, and none of the Leases have been modified in any material respect or extended, except to the extent that such modifications or extensions are disclosed by the copies delivered or made available to Buyer.

(ii)     <u>Owned Real Property</u>.     <u>Section 3.2(j)(ii)</u> of the Disclosure Schedule sets forth a brief description of all real property of PIREV (such real property, collectively, the "**Owned Real Property**"). PIREV has good and marketable fee simple (or reasonably equivalent) title to each parcel of Owned Real Property listed as owned by it on <u>Section 3.2(j)(ii)</u> of the Seller Disclosure Schedule, free and clear of all Liens, other than Permitted Liens. Sellers have not received written notice of any pending condemnation proceeding, and to the Knowledge of Sellers, there is no condemnation proceeding threatened in writing, with respect to any of the Owned Real Property on which any manufacturing facilities of Pharmalucence are located. Sellers now have in full force and effect insurance coverages relating to the Owned Real Property as set forth on <u>Section 3.2(v)</u> of the Disclosure Schedule (the "**RE Insurance Policies**"), and Sellers are current on the payment of all policy premiums with respect thereto. Neither of the Pharmalucence Companies nor the Sellers have received any written notice from any insurance carrier alleging any defects or inadequacies with respect to any Owned Real Property that, if not corrected, would result in termination or cancellation of insurance coverage or increase in the normal and customary cost of any or all of the RE Insurance Policies. Except as set forth in <u>Section 3.2(j)(ii)</u> of the Disclosure Schedule: (A) Neither Sellers nor the Pharmalucence Companies have leased, licensed, contracted to sell, or otherwise granted to any Person (other than intercompany leases) the right to use, occupy or acquire any parcel of Owned Real Property (B) all title relating to the Owned Real Property are legal, valid, binding and enforceable and in full force and effect, subject to the application of any bankruptcy or creditor's rights Laws; (C) title to all or any portion of such Owned Real Property has not been assigned by PIREV; (D) the Pharmalucence Companies have not leased, licensed or otherwise granted any Person the right to use or occupy such Owned Real Property or any portion thereof; (E) (x) the current uses of and existing structures located on the Owned Real Property are in material compliance with all applicable zoning ordinances and regulations and other land use or occupancy requirements, and any covenants, conditions, permits, approvals, or agreements affecting the Owned Real Property; (y) there are no outstanding notices of uncorrected violations of or defaults under any laws, statutes, ordinances, rules, regulations, other land use or occupancy requirements, covenants, conditions, permits, approvals or agreements with regard to the Owned Real Property, and the Pharmalucence Companies, to the extent required by any applicable Laws, are in possession of all material certificates of occupancy with respect to the Owned Real Property issued by the appropriate Governmental Authorities, and Sellers have received no written notice to the contrary; (F) the improvements located on the Owned Real Property are in good order, condition and repair and are structurally sound, and all mechanical and other systems located

therein are in an operating condition good for the use to which the same are put by the Pharmalucence Companies in the current operation of the Business, subject to normal wear, and no condition exists requiring material repairs, alterations or corrections, and no maintenance or repairs to the improvements or the mechanical or other systems located therein have been unreasonably deferred; (G) all Owned Real Property abuts a public way or ways the Pharmalucence Companies have all necessary access to and from the Owned Real Property as is reasonably adequate or legally required for the current operation thereof.  The Pharmalucence Companies have delivered or made available to Buyer complete and accurate copies of each of the deeds for the Owned Real Property, and none of the deeds have been modified in any material respect, except to the extent that any such amendments are disclosed by the copies delivered or made available to Buyer; (H) there are no actions, suits or proceedings pending, or to the Sellers' Knowledge, threatened by any organization, person, individual, company or Governmental Authority against Sellers or otherwise affecting the Owned Real Property; (I) neither Seller has granted any unexpired option, right of first refusal, right of first offer or any other unexpired right in favor of any person or entity to purchase, lease or otherwise own or control the Owned Real Property and, to the Sellers' Knowledge, no person or entity has any such right with respect to the Owned Real Property; and (J) Sellers have not entered into, permitted, or consented to, and to the Sellers' Knowledge, no other party has entered into, permitted or consented to, any agreements, with a municipality or any other governmental entity or a private party that would affect or impair the development of the Owned Real Property or increase the cost of owning or developing the Owned Real Property.

> (iii)     <u>Title to Assets</u>. The Pharmalucence Companies own good and marketable title, free and clear of all Liens (other than Permitted Liens), to all of the personal property and assets reflected on the Latest Balance Sheet or acquired by any of them after the Latest Balance Sheet Date, except for (1) assets which have been sold to customers since the Latest Balance Sheet Date in the Ordinary Course of Business; (2) assets which have been sold outside the Ordinary Course of Business as disclosed on <u>Section 3.2(g) of the Disclosure Schedule;</u> and (3) Liens securing Liabilities reflected on the Latest Balance Sheet (which will be released at Closing).

> (iv)     <u>Inventories</u>.  All Inventory of the Pharmalucence Companies consists of items of a quantity and quality useable and/or saleable in the Ordinary Course of Business, except for items of obsolete material and materials below standard quality, all of which have been written down on the Latest Balance Sheet to estimated realizable market value and which items, prior to being written down, did not (and do not now) constitute a material portion of the Inventory either in quantity or value and all such write downs did not materially and adversely affect the financial condition or earnings of the Pharmalucence Companies.  With the exception of items of below standard quality which have been written down to their estimated realizable market value, the Inventory is free from material defects in materials and/or workmanship.   The product mix of the Inventory is not materially out of balance in relation to prior years and is consistent with the Pharmalucence Companies' expectations of the demands of their customers.  Since the Latest Balance Sheet Date, there has not been a material change in the level of the Inventory other than in the Ordinary Course of Business, or the method of valuing the

Inventory.  All Inventory (other than Inventory in transit) is located at a Leased Real Property or Owned Real Property location.

(v)     Condition and Sufficiency of Assets.     All of the Pharmalucence Companies' equipment, tooling and other tangible personal property and assets are in good condition and repair, except for ordinary wear and tear not caused by neglect, and are useable in the Ordinary Course of Business and have been maintained and serviced in the Ordinary Course of Business.  Except as set forth on Section 3.2(j)(v) of the Disclosure Schedule, to the Sellers' Knowledge there is no material item of plant, machinery or equipment which is reasonably expected to require replacement in the twelve month period following the Closing Date. The personal property and assets shown on the Latest Balance Sheet or acquired after the date of the Latest Balance Sheet, the lease rights under the leases of personal property and the Intellectual Property owned or used by the Pharmalucence Companies under valid license, constitute all the assets and services used by the Pharmalucence Companies in operating their business as it is currently operated by the Pharmalucence Companies, and all such assets are located at the Leased Real Property or Owned Real Property locations.  Except as set forth in Section 3.2(j)(v) of the Disclosure Schedule, neither Sellers nor any other employees, officers, managers, directors or independent contractors of any of the Pharmalucence Companies nor their respective Affiliates owns any rights in any assets, tangible or intangible, which are used by the Business.

(k)     Intellectual Property.

(i)     Section 3.2(k)(i) of the Disclosure Schedule sets forth a list of all (A) trademark and service mark registrations and pending registration applications, and Internet domain name registrations, (B) patents and pending patent applications, and (C) copyright registrations and pending registration applications, in each case, which are owned by the Pharmalucence Companies ("**Listed IP**"), including, to the extent applicable, the registration or application number for each item and the jurisdiction in which the item has been registered or applied for.  All renewal and maintenance filings and fees in respect of the Listed IP that are due prior to the Closing Date (if applicable) have been, or will be made or paid, and all registrations therefor are valid and enforceable.

(ii)     Except as set forth on Section 3.2(k)(ii) of the Disclosure Schedule, the Pharmalucence Companies own, or have the right to use pursuant to an Intellectual Property Agreement, all Intellectual Property necessary for the operation of the Business ("**Pharmalucence Intellectual Property**"), and all Pharmalucence Intellectual Property will, immediately subsequent to the Closing Date, continue to be owned and/or used by the Pharmalucence Companies on terms which are identical to those pursuant to which the Pharmalucence Companies, immediately prior to the Closing Date, own and/or have the right to use such item.

(iii)     Except for Intellectual Property which is, in whole or in part, owned by third parties and subject to an Intellectual Property Agreement or in the public domain, the Pharmalucence Companies are the sole and exclusive owners, with all right,

title and interest in and to, the Pharmalucence Intellectual Property, free and clear of any Liens other than Permitted Liens. All such owned Pharmalucence Intellectual Property is herein referred to as "**Pharmalucence Owned Intellectual Property**."

(iv)    Except as set forth on Section 3.2(k)(iv) of the Disclosure Schedule, each Intellectual Property Agreement is in full force and effect and there is no default or breach thereunder by the Pharmalucence Companies, as applicable, or, to Sellers' Knowledge, any other party which could reasonably be expected to have a Material Adverse Effect.

(v)    Except as set forth on Section 3.2(k)(v) of the Disclosure Schedule: (A) to Sellers' Knowledge the Pharmalucence Companies have not infringed, misappropriated, diluted or otherwise violated, and are not now infringing, misappropriating, diluting or otherwise violating, the Intellectual Property of any third parties; (B) there is no claim pending or threatened against the Pharmalucence Companies with respect to the alleged infringement, misappropriation, dilution or other violation by the Pharmalucence Companies of the Intellectual Property of any third parties; and (C) to Sellers' Knowledge, no third party is infringing, misappropriating, diluting or otherwise violating any Pharmalucence Owned Intellectual Property and no claim against a third party with respect to the alleged infringement, misappropriation, dilution or other violation of any Pharmalucence Owned Intellectual Property is currently pending or, to Sellers' Knowledge, threatened.

(vi)    The Pharmalucence Companies have taken commercially reasonable actions to maintain the confidentiality of their trade secrets and Confidential Information.

(vii)    The computer systems, including software, presently used by the Pharmalucence Companies in the conduct of their Businesses (collectively, the "**Business Systems**") are sufficient for the needs of the Business as presently conducted. The Pharmalucence Companies maintain data recovery, security, disaster recovery, and business continuity plans, procedures and facilities as set forth on Section 3.2(k)(vii) of the Disclosure Schedule.  In the last twelve (12) months, there has not been any material failure with respect to any of the Business Systems that has not been remedied or replaced in all material respects.

(l)    Contracts. Section 3.2(l) of the Disclosure Schedule lists each of the following Contracts to which any of the Pharmalucence Companies is a party ("**Material Contracts**"):

(i)    any Contract (or group of related Contracts) for the lease of personal property from or to third parties with annual payments exceeding $25,000 or with a term exceeding one year;

(ii)    any Contract concerning a partnership, distributorship, agency, marketing agreement or joint venture;

(iii)    any Contract (or group of related Contracts) under which any of the Pharmalucence Companies has (A) created, incurred, assumed, or guaranteed (or may create, incur, assume, or guarantee) Indebtedness, or (B) imposed (or may impose) a Lien on any of such entity's assets, tangible or intangible;

(iv)    all Contracts under which a material amount of work by any of the Pharmalucence Companies is not yet complete, or under which such Pharmalucence Company otherwise has ongoing material obligations;

(v)    all Contracts with any Affiliates of the Pharmalucence Companies (other than the Pharmalucence Companies themselves), Sellers, or any of their respective Affiliates or any of their respective managers, directors or officers;

(vi)    all collective bargaining agreements, labor contracts, or other agreements or understandings with any labor organization or labor union;

(vii)    all agreements with any officer, manager, individual employee, consultant, independent contractor or other Person that (A) describes any terms or conditions of employment or engagement of such Person for the performance of services, including but not limited to any employment agreement, retention agreement, severance agreement, compensation agreement, change of control agreement, consulting agreement, bonus agreement and independent contractor agreement, (B) imposes upon any officer, manager, individual employee, consultant, independent contractor or other Person any obligation with respect to the assignment of inventions or the nondisclosure or confidentiality of proprietary or confidential information or trade secrets, or (C) restricts the activities of any officer, manager, individual employee, consultant, independent contractor or other Person during or after his or her employment or engagement by such Pharmalucence Company, including any agreement that restricts any such Person's ability to compete with any Person, provide services to any Person, solicit any Person's employees, or solicit any Person's actual or prospective customers, suppliers, or vendors;

(viii)    any guaranty of any obligation for borrowed money or otherwise, other than endorsements made for collection in the Ordinary Course of Business, or any agreement or commitment with respect to the lending or investing of funds to or in other Persons;

(ix)    any Contract or group of related Contracts with the same party (or group of related parties) either (A) requiring payments after the date hereof to or by such Pharmalucence Company of more than $25,000 or (B) not terminable by such Pharmalucence Company on sixty (60) days or less notice;

(x)    any Contract, the benefits of which are contingent or the terms of which are materially altered upon the occurrence of a transaction of the nature contemplated by this Agreement involving such Pharmalucence Company;

(xi)    any other Contract or group of related Contracts not entered into in the Ordinary Course of Business or the breach, default or termination of which would have a Material Adverse Effect;

(xii)   any Contract to which such Pharmalucence Company is a party which is capable of being terminated by the other party upon the occurrence of a transaction of the nature contemplated by this Agreement;

(xiii)   any Contract that restricts the right of the Pharmalucence Companies to engage in any line of business or compete with any Person or otherwise to freely engage in operations anywhere in the world (including any Contract providing for non-solicitation or employees or other business relations, providing for exclusivity or requirements supply terms or for "most favored nation" pricing or other terms),

(xiv)   any Contract related to Intellectual Property (other than licenses of generally available, non-customized computer software granted to the Pharmalucence Companies with a total replacement cost of less than $25,000);

(xv)   any Contract which involves payment by any party of amounts determined by reference to fluctuations in any retail prices or other index or in the rate of exchange for any currency;

(xvi)   any Contract with any (A) Governmental Authority, or (B) Top Customer or Top Supplier (as such terms are defined below); or

(xvii)  any Contract which cannot be fulfilled or performed in the Ordinary Course of Business by such Pharmalucence Company on time;

(xviii)  any Contract requiring indemnification of another Person;

(xix)   any Contract requiring consent from, or including a notifying obligation, to a third party in the event of a change-in-control of either Pharmalucence Company;

(xx)    any Contract which, as of the date hereof and as of the Closing, is of a loss-making nature (that is, likely to result in a loss to such Pharmalucence Company) on completion of performance ascertained by reference to gross margin (being sales less attributable labor, materials and overheads in accordance with GAAP); and

(xxi)   any other Contract the termination of which would reasonably be expected to have a Material Adverse Effect.

The Pharmalucence Companies have delivered or otherwise made available to Buyer a correct and complete copy of each written Material Contract (including all amendments thereto).  With respect to each written Material Contract or any contract that contains a confidentiality or nondisclosure obligation ("**Nondisclosure Contract**"):  (A) the Material Contract and Non-Disclosure Contract is legal, valid, binding, enforceable, and in full force and effect; (B) the Material Contract and Nondisclosure Contract will continue to be legal, valid, binding, and enforceable and in full force and effect on identical terms immediately after the Closing Date; (C) none of the Pharmalucence Companies nor, to the Knowledge of Sellers, any other party to the Material Contract or Nondisclosure Contract, is in material breach or default (including, with respect to any

express or implied warranty), and no event has occurred which with notice or lapse of time or both would constitute a material breach or default or permit termination, modification, or acceleration, under the Material Contract; and (D) no party has repudiated any provision of any such Material Contract or Nondisclosure Contract. Section 3.2(l) of the Disclosure Schedule sets forth a description of all of the material terms of each oral Contract which, if reduced to written form, would be required to be listed in the Disclosure Schedule under the terms of this Section 3.2(l), and all such oral Contracts shall be deemed to be included in Material Contracts.  Correct and complete copies of the general forms of purchase or (for goods and services) sale used by the Pharmalucence Companies have been delivered to Buyer, along with a description of any variances therefrom or modifications thereto. Section 3.2(1) of the Disclosure Schedule sets forth the full amount of payments to the Pharmalucence Companies with respect to products not yet completed and delivered and services not yet performed by the Pharmalucence Companies.

(m)    Notes and Accounts Receivable.  All notes and accounts receivable of the Pharmalucence Companies are reflected properly on the Pharmalucence Companies' books and records, such receivables are valid receivables, and subject to no set-offs or counterclaims, and are current and collectible in the aggregate amount shown and will be collected in accordance with their terms at their recorded amounts, subject only to the reserve for bad debts set forth on the face of the Latest Balance Sheet, as adjusted for operations and transactions in accordance with the past custom and practice of the Pharmalucence Companies.  Since the date of the Latest Balance Sheet, there has not been a material change in the aggregate amount of, or the aging thereof, of the accounts receivable of the Pharmalucence Companies.

(n)    Powers of Attorney.  There are no outstanding powers of attorney executed by or on behalf of any of the Pharmalucence Companies except as set forth in Section 3.2(n) of the Disclosure Schedule.

(o)    Litigation.  Section 3.2(o) of the Disclosure Schedule sets forth each instance in which any of the Pharmalucence Companies: (i) is (or within the past five (5) years has been) subject to any unsatisfied judgment, order, decree, stipulation, injunction or charge; or (ii) is (or within the past five (5) years has been) a party to or, to the Knowledge of Sellers, is threatened to be made a party to, any charge, complaint, action, suit, proceeding, hearing, or investigation of or in any court or quasi-judicial or administrative agency of any Federal, state, local, or foreign jurisdiction or before any arbitrator.  None of the charges, complaints, actions, suits, proceedings, hearings, and investigations set forth in Section 3.2(o) of the Disclosure Schedule could reasonably be expected to result in material Liability for the Pharmalucence Companies.  To Seller's Knowledge, there exists no Basis on which any such charge, complaint, action, suit, proceeding, hearing, or investigation that could reasonably be expected to result in material Liability may be brought or threatened against any of the Pharmalucence Companies.

(p)    Employees; Employment Matters.

(i)      No group of employees has informed any of the Pharmalucence Companies, any of the Sellers or any manager, officer or director of the Pharmalucence Companies of any plans to terminate his, her or their employment with the Pharmalucence Companies generally or as a result of the transactions contemplated hereby or otherwise.  Except as set forth on <u>Section 3.2(p)(i)</u> of the Disclosure Schedule, none of the Pharmalucence Companies is party to or bound by, nor in the past three (3) year period have any of the Pharmalucence Companies been a party or bound by, any collective bargaining agreement, labor contract, or other oral or written agreement or understanding with a labor organization or labor union.  Except as set forth on <u>Section 3.2(p)(i)</u> of the Disclosure Schedule, during the three (3) year period ending on the Closing Date, with respect to the Pharmalucence Companies: (A) there has not been (and to the Knowledge of Sellers, is not now threatened) any strike, lockout, picketing, handbilling, primary or secondary boycott, work stoppage or slowdown, labor dispute, or similar labor activity, involving any of the Pharmalucence Companies; (B) no employees of any of the Pharmalucence Companies have been represented by a labor union or labor organization with respect to their employment by any of the Pharmalucence Companies; (C) none of the Pharmalucence Companies has been a party to or negotiated any collective bargaining agreement, labor contract, or other written or oral agreement or understanding with any labor union or labor organization; (D) no labor organization, labor union, or employee of any of the Pharmalucence Companies has attempted to organize any employees of any of the Pharmalucence Companies, made a demand for voluntary recognition, presented any of the Pharmalucence Companies with any petitions or authorization cards seeking to have a labor organization or labor union represent any group of employees, filed any representation petition with the National Labor Relations Board, or given any of the Pharmalucence Companies notice of any election of a collective bargaining representative (nor, to the Knowledge of Sellers, has any of these actions been threatened); (E) none of the Pharmalucence Companies has authorized any employer or multiemployer association or organization to represent any of the Pharmalucence Companies in collective bargaining with any labor organization or labor union; (F) no grievance or arbitration proceeding arising out of or under any collective bargaining agreement has been filed against any of the Pharmalucence Companies, nor, to the Knowledge of Sellers, is any now threatened; (G) no claim has been filed with any Governmental Authority alleging that any of the Pharmalucence Companies has violated any Law related to employment or termination of employment, employment policies or practices, terms and conditions of employment, employment standards, workers classification, compensation and wages, hours, collective bargaining, labor or employee relations, equal employment opportunity, fair employment practices, whistle-blowing, retaliation, employee safety or health, employee rights, employee benefits, unemployment insurance, immigration, discrimination, workers' compensation, protection from retaliation, and pay equity   ("**Employment Laws**") nor, to the Knowledge of Sellers, is any now threatened, and Pharmalucence has no Knowledge of any Basis for any such claim; and (H) none of the Pharmalucence Companies has received any written notice that any Governmental Authority responsible for the enforcement of any Employment Law sought or intended to conduct any inspection, investigation, audit, or compliance review pertaining to any employees or contractors of any of the Pharmalucence Companies.

(ii)     Section 3.2(p)(ii) of the Disclosure Schedule sets forth the following: a true, complete and accurate list of each employee or consultant of each of the Pharmalucence Companies, his or her date(s) of hire or engagement by such Pharmalucence Company, position and title (if any), current rate of compensation (including bonuses, commissions and incentive compensation, if any), and in the case of an employee, whether such employee is hourly or salaried, whether such employee is exempt or non-exempt, the number of such employee's accrued sick days and vacation days, immigration or visa status, whether such employee is absent from active employment and, if so, the date such employee became inactive, the reason for such inactive status and, if applicable, the anticipated date of return to active employment. Except as disclosed on Section 3.2(p)(ii) of the Disclosure Schedule, none of the Pharmalucence Companies has any unsatisfied Liability to any previously terminated or current employee or independent contractor.  The Pharmalucence Companies have disclosed to Buyer all of their written employee handbooks, policies, practices, programs and arrangements, and have provided Buyer with a written summary of all of their material oral employee handbooks, policies, practices, programs and arrangements.

(iii)     Except as set forth on Section 3.2(p)(iii) of the Disclosure Schedule, (A) all Persons employed by any of the Pharmalucence Companies are employees at will or otherwise employed such that such Pharmalucence Company may lawfully terminate their employment, without Liability, at any time, with or without cause, and to Sellers' Knowledge, (B) each Person is legally authorized to work in the United States, and has satisfied all pre-employment and/or pre-retention screening requirements of the Pharmalucence Companies, including any drug testing, reference and background check requirements that were in effect at the time of their hiring or retention, (C) to Sellers' Knowledge no employee of any of the Pharmalucence Companies has or would have any Basis for a cause of action against any of the Pharmalucence Companies arising from the terms and conditions of employment, the termination of such employee, or any Employment Laws and (D) the termination of the employment of any Person or the engagement of any contractor will not give rise to any contractual Liability of the Pharmalucence Companies.

(iv)     The Pharmalucence Companies have complied in all material respects with all applicable Employment Laws, including but not limited to any provisions thereof relating to wages, hours, withholding, immigration, termination pay, vacation pay, employee and fringe benefits, pension plans, collective bargaining labor relations, employment standards, employment practices, terms and conditions of employment, employee rights, health and safety, workplace safety, unemployment insurance, worker classification, discrimination, workers' compensation, protection from retaliation, whistleblowing, and pay equity and the Plans and the payment and/or accrual of the same and all Taxes, insurance and all other costs and expenses applicable thereto, and the Pharmalucence Companies are not liable for any arrearage, or any Taxes, costs or penalties for failure to comply with any of the foregoing. Without limiting the generality of the foregoing, the Pharmalucence Companies have not incurred a violation of Part 6 of Subtitle B of Title I of ERISA ("**COBRA**") or other applicable state insurance continuation Law.  No material COBRA or other state insurance continuation Law violation relating to benefits continuation exists or will exist with respect to any

employees of any of the Pharmalucence Companies prior to and including the Closing Date, nor will any such violation occur as a result of the transactions contemplated hereby. The Pharmalucence Companies have not previously incurred any Liability, penalty or other charge under the Workers Adjustment Retraining and Notification Act, 29 U.S.C. § 2101 et seq., or any comparable state or local Law.

(v) Each Person whom any of the Pharmalucence Companies currently retains as a consultant or previously retained as a consultant qualifies, or at all times while performing services for such Pharmalucence Company qualified, as an independent contractor and not as an employee of such Pharmalucence Company under the Code or applicable Law. None of the Pharmalucence Companies has any Liability, whether absolute or contingent, including any obligations under any Plans, with respect to any misclassification of an individual performing services for any one of the Pharmalucence Companies as an independent contractor or consultant rather than as an employee. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby shall cause any of the Pharmalucence Companies to be in breach of any agreement with any employee, contractor or consultant or cause the Pharmalucence Companies or any of their Affiliates to be liable to pay any severance or other amount to any employee, contractor or consultant of any of the Pharmalucence Companies.

(vi) None of the Pharmalucence Companies has incurred, and to the Knowledge of Sellers, no circumstances exist under which any of the Pharmalucence Companies could incur, any Liability for the misclassification of employees as exempt or non-exempt, the misclassification of interns, the misclassification of employees as consultants or independent contractors, or the hiring of illegal aliens. None of the Pharmalucence Companies has been the subject of an immigration compliance, inspection or investigation or employment visit from, nor have any of the Pharmalucence Companies been assessed any fine or penalty by, or been the subject of any order or directive of, the United States Department of Labor or the Attorney General of the United States (Immigration and Naturalization Service) or any comparable foreign Governmental Authority.

(vii) To Sellers' Knowledge no Person who is an employee or who any of the Pharmalucence Companies currently retains as a consultant or previously retained as a consultant is a party to any noncompetition agreement or other similar contractual obligation of any kind that (i) prohibits or otherwise limits in any way (or purports to prohibit or otherwise limit in any way) him or her from performing his or her assigned duties, (ii) restricts or limits in any way the scope or type of work in which he or she may be engaged, or (iii) requires him or her to transfer, assign or disclose information concerning his or her work on behalf of the Pharmalucence Companies to any third party.

(viii) Section 3.2(p)(vii) of the Disclosure Schedule lists each employee of any of the Pharmalucence Companies who suffered an Employment Loss with such Pharmalucence Company in the ninety (90) calendar days ending on the Closing Date, including each such employee's name, employer as of the Employment Loss, job title as of the Employment Loss, work location as of the Employment Loss, date of the

Employment Loss, and type of Employment Loss (termination, layoff, or reduction in work hours).

(q)     Employee Benefit Plans.  Except as set forth in Section 3.2(q) of the Disclosure Schedule: (i) none of the Pharmalucence Companies nor any ERISA Affiliate maintains, contributes to, or has any Liability (whether direct or indirect) with respect to any past or present Plans; (ii) each Plan is, in terms and operation, in compliance in all material respects with the Plan documents and all applicable Laws; and all reporting, disclosure, and notice requirements of ERISA, the Code and other applicable laws have been satisfied with respect to each Plan in all material respects; (iii) there are no pending, or to the Knowledge of Sellers, threatened or unresolved private or governmental actions, claims or proceedings with respect to any Plan, and no Plan has within the three (3) years prior to the date hereof been subject to an examination or audit by a Governmental Authority or is the subject of an application or filing under, or is a participant in, an amnesty, voluntary compliance, self-correction or similar program sponsored by any Governmental Authority (other than claims in the Ordinary Course of Business); (iv) all contributions, premiums and other payments required to be made by the Pharmalucence Companies or any ERISA Affiliate to or under the Plans have been made timely and all such contributions, premiums and other payments not yet due have been properly accrued on the books of the Pharmalucence Companies and in accordance with the Pharmalucence Companies' usual accounting practice; (v) all Plans that provide health and welfare benefits are fully insured; (vi) there have been no "prohibited transactions" (within the meaning of Code Section 4975 or ERISA Section 406) or breaches of fiduciary duty with respect to any Plan for which any Liability, correction or reporting obligation remains outstanding, or that could result in any Liability, direct or indirect, for Buyer or any of its Affiliates; (vii) none of the Plans provide or promise welfare benefits to any retirees other than to the extent required by COBRA or similar state insurance laws; (viii) all of the Plans which are intended to be tax-qualified have received current favorable determination or opinion letters from the Internal Revenue Service, as applicable, or a timely application for such letter is pending; (ix) timely notice was provided to the Department of Labor of the existence of all Plans which are or were intended to be ERISA-exempt top hat plans in accordance with applicable ERISA Regulations; and (x) none of the Plans are multiple employer plans or multiple employer welfare benefit arrangements.  Copies of all documents constituting a Plan currently in effect, including but not limited to, plan documents, trust agreements, insurance policies, service agreements, and formal and informal amendments thereto, and where a Plan has not been reduced to writing, a written summary of all material plan terms, have been provided to Buyer or made reasonably available to Buyer prior to the Closing, along with current summary plan descriptions and the most recent Form 5500 for the past three (3) complete plan years for each of the Plans, where applicable.  All Plans subject to Section 409A of the Code are in documentary and operational compliance with the requirements of Section 409A of the Code and its underlying regulations and guidance.  None of the Pharmalucence Companies nor any ERISA Affiliate has any benefit obligations (or tax reimbursement obligations with respect to noncompliance with Section 409A of the Code) not expressed in the terms of the Plans.  This transaction will not trigger any funding, benefit payment or benefit acceleration rights (including acceleration of vesting) or obligations (including any excess parachute payments under Code Section 280G)

under any Plans, including any employment or similar agreements.  None of the Pharmalucence Companies nor any ERISA Affiliate currently sponsors, maintains or contributes to, or has ever sponsored, maintained or contributed to, or otherwise has or has had any Liability (whether direct or indirect, absolute or contingent) with respect to, any employee benefit plan that (i) provides for defined benefit pension benefits or is subject to Title IV of ERISA; (ii) is a "multiemployer plan" (as defined in Section 3(37) of ERISA); (iii) is a "multiple employer plan" (as defined in Section 413(c) of the Code); or (iv) is a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA).

(r)     Licenses, Permits and Approvals.  Section 3.2(r) of the Disclosure Schedule lists all material domestic and foreign governmental, regulatory and industry licenses, permits, certifications and approvals necessary to or used in the Business as presently conducted (the "**Permits**").  All such Permits held by one of the Pharmalucence Companies including those required pursuant to any state wholesale distributor and pharmacy requirements, are in full force and effect. There are no material violations by any of the Pharmalucence Companies of, or any claims or proceedings, pending or threatened, challenging the validity of or seeking to discontinue, any such Permits.

(s)     Unlawful Payments.  No payments of either cash or other consideration have been made to any Person by any of the Pharmalucence Companies or Sellers or on behalf of such Pharmalucence Companies or Sellers by any agent, employee, officer, manager, director, or equityholder of such Pharmalucence Company or any other Person, that were unlawful under the Laws of the United States or any state or any other foreign or municipal Governmental Authority. Neither Sellers nor any Pharmalucence Company has (i) knowingly or willfully solicited, received, paid or offered to pay any remuneration, directly or indirectly, overtly or covertly, in cash or kind, for the purpose of making or receiving any referral, purchase, lease, order, or recommendation of a purchase, lease, or order, which violated any applicable anti-kickback or similar law, including the Anti-Kickback Statute (as defined below), or any applicable state anti-kickback law, or (ii) submitted or caused to be submitted any claim for payment to any payment program in violation of any laws relating to false claims or fraud, including the Federal False Claim Act, 31 U.S.C. § 3729 and 18 U.S.C. § 287 (the "**Federal False Claims Act**"), the Program Fraud Civil Remedies Act, 31 U.S.C. § 3802 (the "**Program Fraud Civil Remedies Act**"), or any applicable state false claim or fraud law.   Neither Sellers nor any Pharmalucence Company have received any information or notice that states, suggests, or could reasonably be interpreted to mean that any Seller or Pharmalucence Company is subject to any pending or, to the Knowledge of Sellers, threatened investigation by (A) the FDA, (B) Department of Health and Human Services Office of Inspector General or Department of Justice pursuant to the Federal Healthcare Program Anti-Kickback Statute (42 U.S.C. §1320a-7b(b) (known as the "**Anti-Kickback Statute**")), the Federal False Claims Act, or the Program Fraud Civil Remedies Act, or (C) any equivalent statute of similar foreign regulatory or governmental entity.

(t)     Compliance with Laws and Regulations.

(i)       The Pharmalucence Companies are in compliance with and have not in the past violated in any material manner any applicable Law, and no notice, claim, charge, complaint, action, suit, proceeding, investigation or hearing has been received by any of the Pharmalucence Companies, or filed, commenced or to the Knowledge of Sellers threatened against any of the Pharmalucence Companies alleging any such violation.

(ii)       The Pharmalucence Companies are in compliance in all material respects with all applicable laws, rules, regulations, guidances and orders relating to the manufacturing, processing, distribution, labeling, storage, testing, specifications, advertising and promotion, adverse event reporting, sale or marketing of any product by or on behalf of the Pharmalucence Companies, including the U.S. Federal Food, Drug, and Cosmetic Act ("**FDCA**") and its applicable implementing regulations, all applicable comparable state laws, and all other applicable laws enforced by the U.S. Food and Drug Administration ("**FDA**") or Drug Enforcement Administration ("**DEA**"), any applicable comparable state or local Government Authority in each jurisdiction where any drug or biologic products and/or product candidates are (or are currently proposed to be) developed, processed, tested, manufactured, labeled, stored, distributed, sold, or marketed by or on behalf of Pharmalucence (the "**Regulated Company Products**").

(iii)       The Pharmalucence Companies are not excluded or restricted in any manner from participation in, any government program related to any drug products or any government funded health care program and, to its knowledge, does not employ or use and has not at any time employed or used the services of any individual who is (or during the time when such person or entity was employed by or providing services to the Pharmalucence Companies) debarred or otherwise excluded or restricted.

(iv)       Pharmalucence has obtained all approvals and authorizations and has entered into all contracts for participation in any federal, state and other third party reimbursement, rebate and payment programs for Regulated Company Products sold by Pharmalucence and its distributors as required under any such applicable federal or state programs that are necessary to conduct the Business as presently being conducted by Pharmalucence, and all such permits, authorizations and contracts are in full force and effect, including those required under the federal Medicare and  Medicaid rebate statute, 42 U.S.C. § 1396r-8, Section 340B of the Public Health Service Act, 42 U.S.C. § 256b and Section 602 of the Veterans Health Care Act, 38 U.S.C. § 8126 .

(v)       All manufacturing operations conducted or sponsored by or for the benefit of Pharmalucence have been and are being conducted in compliance, in all material respects, with the FDA's current Good Manufacturing Practices regulations, policies, and requirements for Regulated Company Products.  In addition, Pharmalucence is in material compliance with all applicable registration and listing requirements set forth in 21 U.S.C. §360 and 21 CFR Part 207 and all similar applicable laws and regulations. Pharmalucence has paid any and all establishment fees due under, and is otherwise in compliance with, the Prescription Drug User Fee Act. Except as set forth on Section 3.2(t) of the Disclosure Schedule, neither Sellers nor Pharmalucence, to the Knowledge of Sellers, any licensee of any Regulated Company Products has received an FDA Form 483 notice or similar notice with respect to alleged violation of, or non-compliance with, any

laws or regulations in connection with any facility for any Regulated Company Products since January 1, 2010. The Pharmalucence Companies have not received any information from the FDA or any other Governmental Authority that states, suggests, or would reasonably be interpreted to mean that any application for marketing approval currently pending before the FDA or any other Governmental Authority may not receive approval. Additionally, the Pharmalucence Companies have not received any communication from the FDA that adversely relates to either of the Facilities.

(vi)    Neither of the Pharmalucence Companies nor any of their respective representatives, nor, to the Knowledge of Sellers, any licensee or assignee of any Regulated Company Products or Pharmalucence Intellectual Property has received any notice that the FDA or any other Governmental Authority or governmental entity has initiated, or threatened to initiate, any action (i) to suspend any clinical trial, suspend or terminate any Investigational New Drug Application sponsored by Sellers or the Pharmalucence Companies or otherwise restrict the preclinical research on or clinical study of any Regulated Company Products or any drug or biological product being developed by any licensee or assignee of any Regulated Company Products or Pharmalucence Intellectual Property based on such product or intellectual property, or (ii) to recall, suspend or otherwise restrict the manufacture, sale, or distribution of any Regulated Company Products. Except as set forth on Section 3.2(t) of the Disclosure Schedule, there are no pending or, to the Knowledge of Sellers, threatened civil, criminal or administrative actions, suits, demands, claims, hearings, investigations, proceedings, complaints or requests for information, voluntary or involuntary market withdrawals, field corrective actions (including recalls), safety alerts, Letters to Healthcare Providers, destruction orders, seizures, injunctions, or other regulatory enforcement actions related to any Regulated Company Products since January 1, 2010. To the Knowledge of Sellers, there is no act, omission, event, or circumstance that would reasonably be expected to give rise to any such action.

(vii)    Neither of the Pharmalucence Companies has failed to comply with any applicable security and privacy standard regarding protected health information under the Health Insurance Portability and Accountability Act of 1996, including the regulations promulgated thereunder, or any applicable state privacy, data security, and data security breach notification laws, or contractual obligations undertaken by the Pharmalucence Companies pursuant to any such laws or regulations.

(viii)    Neither of the Pharmalucence Companies has submitted or caused to be submitted any claim to any government-funded health care program in connection with any referrals that violated any applicable self-referral law, including the Federal Ethics in Patient Referrals Act, 42 U.S.C. § 1395nn (known as the "**Stark Law**"), or any applicable state self-referral law. Except as set forth in Section 3.2(t) of the Disclosure Schedule, neither of the Pharmalucence Companies has generated proceeds from referrals by physicians who have, or whose immediate family members have, a financial interest in the Pharmalucence Companies. To the Knowledge of Sellers, neither of the Pharmalucence Companies has failed to comply with any disclosure requirements of any applicable self-referral law, including the Stark Law or any applicable state or foreign self-referral law.

(ix)    Neither of the Pharmalucence Companies has, to the Knowledge of Sellers, any of their respective officers, directors or employees, acting in their capacities as such, is or has been involved in any activities which are, or are alleged in writing by any qui tam relator or Governmental Authority to be, prohibited under the federal Medicare and Medicaid statutes, including 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a-7b, 1395nn, 31 U.S.C. § 3802, 18 U.S.C. §1347, § 287, §1001, and § 1035, or the federal CHAMPUS/TRICARE statute, or the regulations promulgated pursuant to such federal statutes.

(x)    The Pharmalucence Companies have at all times been in compliance with any U.S. federal, state, local, foreign, criminal or civil laws that (i) require companies to adopt or maintain a compliance program or marketing code of conduct that relates to payments made to healthcare professionals, (ii) limit the payments that may be provided to healthcare professionals, or (iii) require certain payments provided to healthcare professionals to be reported or disclosed, including without limitation, Mass.Gen.Law Chp. 111N and 105 CMR 970.00, 18 V.S.A. § 4601-4634 and Vt. Admin. Code 20-4-1400:9.19 and Vt. Admin. Code 12-7-7:7701, Cal. Hsc. Code § 119400-119402, and the US Federal Sunshine Act, as applicable.

(xi)    The Pharmalucence Companies have complied in all respects with all federal tax and other governmental obligations relating to the Bonds.

(u)    Suppliers and Customers.

(i)    Section 3.2(u)(i) of the Disclosure Schedule sets forth a true and complete list of the top ten (10) customers of the Pharmalucence Companies on a consolidated basis (by revenue for the twelve (12)-month period ending December 31, 2013) (the "**Top Customers**").  Since January 1, 2013, no Top Customer has provided the Pharmalucence Companies with any notice of dispute or terminated or materially reduced, restricted or suspended, or given written notice of an intent to terminate or materially reduce, restrict or suspend, its relationship with the Pharmalucence Companies.

(ii)    Section 3.2(u)(ii) of the Disclosure Schedule sets forth a true and complete list of the top ten (10) suppliers of the Pharmalucence Companies on a consolidated basis (by revenue for the twelve (12)-month period ending December 31, 2013) (the "**Top Suppliers**").  Since January 1, 2013, no Top Supplier has provided the Pharmalucence Companies with any notice of dispute or terminated or materially reduced, restricted or suspended, or given written notice of an intent to terminate or materially reduce, restrict or suspend, its relationship with the Pharmalucence Companies.

(v)    Insurance. Section 3.2(v) of the Disclosure Schedule sets forth each insurance policy (including policies providing property, casualty, Liability, and workers' compensation coverage and bond and surety arrangements) to which any of the Pharmalucence Companies is or within the past three (3) years has been a party, a named insured, or otherwise the beneficiary of coverage at any time.  With respect to each such

insurance policy: (A) the policy is legal, valid, binding, enforceable, and in full force and effect; (B) the policy will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms immediately following the consummation of the transactions contemplated hereby; (C) none of the Pharmalucence Companies nor to the Knowledge of Sellers, any other party to the policy is in breach or default, and no event has occurred which, with notice or the lapse of time, or both, would constitute such a breach or default, or permit termination or modification under the policy; and (D) no party to the policy has repudiated any provision thereof. Section 3.2(v) of the Disclosure Schedule sets forth descriptions of all claims submitted by or on behalf of the Pharmalucence Companies pursuant to such insurance policies (as in effect on the date hereof or for the past three (3) years), and the Pharmalucence Companies have provided proper and timely notice of all such claims in accordance with the terms of all such policies.

(w)     Products Warranty; Product Liability.

(i)     Each product manufactured, sold, leased, or delivered by the Pharmalucence Companies and each service performed thereby has been in material conformity with all applicable contractual commitments, all industry association and other certified standards, and all express and implied warranties, and none of the Pharmalucence Companies has any Liability for replacement or repair thereof or other damages in connection therewith arising out of ownership and operation of the Business. Neither any product manufactured, sold, licensed, or delivered nor any service performed by the Pharmalucence Companies is subject to any guaranty, warranty, or other indemnity beyond the applicable standard terms and conditions of sale or license set forth in Section 3.2(w) of the Disclosure Schedule.

(ii)     None of the Pharmalucence Companies has any material Liability arising out of any injury to individuals or property as a result of the ownership, possession, or use of any product manufactured, sold, leased, or delivered or any service provided in connection with the Business. In the three (3) year period prior to the Closing Date, there have been no recalls relating to products manufactured or sold or services provided by the Pharmalucence Companies, and there are no pending, or to Sellers' Knowledge, threatened recalls relating to products manufactured, distributed or sold or services provided by the Pharmalucence Companies.

(x)     Broker's Fees. Except as set forth in Section 3.2(x) of the Disclosure Schedule, neither the Pharmalucence Companies have any Liability to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

(y)     Potential Conflicts of Interest. Except as set forth in Section 3.2(y) of the Disclosure Schedule, no officer, director, manager or equityholder of any of the Pharmalucence Companies: (i) owns, directly or indirectly, any interest in or is an officer, director, manager, employee or consultant of any Person which is a competitor, lessor, lessee, customer or supplier of any of the Pharmalucence Companies; (ii) owns, directly or indirectly, in whole or in part, any interest in Pharmalucence Intellectual Property; (iii) has any loan outstanding to or cause of action or other claim whatsoever against any of the

Pharmalucence Companies, except for claims in the Ordinary Course of Business, for accrued salary, bonus, vacation pay, and benefits under Plans; or (iv) has made, on behalf of any of the Pharmalucence Companies, any payment or commitment to pay any commission, fee or other amount to, or purchase or obtain or otherwise contract to purchase or obtain any goods or services from, any Person of which any officer, director or manager of such Pharmalucence Company or relative of any of the foregoing, is a partner or equityholder.

(z)     Environmental.  Except as set forth in Section 3.2(z) of the Disclosure Schedule,

(i)     the Pharmalucence Companies are and have been at all times in compliance in all material respects with all Environmental Laws and are in possession of, and in compliance with, all Permits required under Environmental Laws to carry on and conduct the Business as presently conducted, and a complete list of such Permits is listed in Section 3.2(z)(i) of the Disclosure Schedule;

(ii)     no notice, demand, claim or request for information has been received by or served on any of the Pharmalucence Companies, nor to the Knowledge of Sellers on any current or previous owner, manager or tenant of the Leased Real Property or Owned Real Property, from or by any Person claiming or asserting any violation of, potential Liability under, or Liability under Environmental Laws, or demanding payment, contribution, indemnification, remedial action, removal action or any other action or inaction with respect to any actual or alleged environmental damage or injury to persons, property or natural resources, or seeking information about the generation, use, treatment, storage or disposal of any Hazardous Materials during the operation of any part of the Business;

(iii)     to Sellers' Knowledge there are no conditions, occurrences, Releases of Hazardous Materials, or threats of such Releases on, in, at, or under any of the Leased Real Property, the Owned Real Property, the Bedford Facility or the Billerica Facility that have given rise to, or that could give rise to Liability of the Pharmalucence Companies under Environmental Laws;

(iv)     there has been no spill, discharge, Release, or threat of Release of Hazardous Material on, at, about, under or from the Leased Real Property, the Owned Real Property, the Bedford Facility, or the Billerica Facility during the period of the Pharmalucence Companies' ownership or use of the Owned Real Property, the Leased Real Property, the Bedford Facility or the Billerica Facility, including, but not limited to, any spill, discharge or Release that (A) requires investigation or remediation under Environmental Laws; or, (B) has resulted or could result in any material Liability under Environmental Laws;

(v)     to Sellers' Knowledge, no building, equipment or other improvement on any Leased Real Property, Owned Real Property, the Bedford Facility, or the Billerica Facility contains any (A) asbestos-containing materials; (B) polychlorinated biphenyls; or (C) underground storage tank for which any of the Pharmalucence Companies has any Liability or responsibility, including under any lease document;

(vi)     any storage, recycling, treatment, or disposal by any of the Pharmalucence Companies of any Hazardous Materials at either of the Facilities or for the Business, and any transportation to an Offsite Location of any Hazardous Materials generated or produced by any of the Pharmalucence Companies, is and always has been, conducted in compliance in all material respects with Environmental Laws;

(vii)     none of the Offsite Locations, a complete list of which is presented in Section 3.2(z)(vii) of the Disclosure Schedule, to which Hazardous Materials related in any way to any of the Pharmalucence Companies' operations have been transported for treatment, storage, or disposal, are on, or are proposed for listing on, any governmental or regulatory list of abandoned, unpermitted or non-complying disposal sites, including in the U.S., the National Priorities List established and maintained pursuant to CERCLA, or any analogous foreign, state, local, provincial, cantonical or other Governmental Authority list or otherwise are subject to legal or regulatory action that could result in any material Liability to Buyer or any of the Pharmalucence Companies under any Environmental Law;

(viii)     the Pharmalucence Companies do not have any environmental studies, reports, data and assessments or investigations, including any Phase I or Phase II environmental site assessments, related to the environmental condition or compliance status of the Leased Real Property, the Owned Real Property, either of the Facilities or any Offsite Location, which have been conducted, produced or undertaken by or on behalf of any of the Pharmalucence Companies, and Sellers have furnished to Buyer correct and complete copies of any environmental studies, reports, data and assessments or investigations of such locations which are in the possession of Sellers and were not undertaken on behalf of any of the Pharmalucence Companies; and

(ix)     no, penalty, fine, investigation, judicial order, administrative order, administrative order by consent, consent order, agreement, litigation or settlement is proposed or in existence, or to the Knowledge of Sellers threatened or anticipated, regarding or arising from any environmental, health or safety aspects of the Leased Real Property, the Owned Real Property, or any of the Facilities; in any way related to any Hazardous Materials at, on or about the Leased Real Property , the Owned Real Property, or any of the Facilities; or concerning any Offsite Location to which any Hazardous Materials generated or produced at any time by one of the Pharmalucence Companies or a predecessor of such Pharmalucence Company have been transported for any purpose; and

(x)     the transactions contemplated by this Agreement may be consummated, and this Agreement may be executed, by Sellers without prior notice from Sellers or any of the Pharmalucence Companies to, or receipt by Seller or any of the Pharmalucence Companies of any approval from, a Governmental Authority acting under any of the Environmental Laws.

(aa)     Restrictions on Business Activities.  There is no judgment, injunction, order, decree, proceeding to which any of the Pharmalucence Companies is a party or, to the Knowledge of Sellers, by which any of the Pharmalucence Companies or their assets are or may be bound, which prohibits or impairs the conduct of the Business by such

Pharmalucence Companies as it is currently conducted, nor, to the Knowledge of Sellers, is there any claim or proceeding pending or threatened with respect thereto.

(bb)   Billerica Facility.  The Pharmalucence Companies have not received any communication from the FDA, and no other information exists, that suggests the Billerica Facility will not receive manufacturing site transfer approval from the FDA.  In addition, there has not been any significant quality event or deviation affecting the Billerica Facility, and there is no reason to believe that the Billerica Facility will not complete successful media fills.

(cc)   Pharmalucence Existing Products.  Schedule 1 is a current, complete and accurate list of the Pharmalucence Existing Products.

3.3   Representations and Warranties of Buyer. As a material inducement to Sellers to enter into this Agreement and consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Sellers that all of the statements contained in this Section 3.3 are correct and complete as of the date of this Agreement and as of the Closing Date, except as set forth in Section 3.3 of the Disclosure Schedule attached to this Agreement setting forth exceptions to the representations and warranties set forth herein.  The Disclosure Schedule will be arranged in sections corresponding to the numbered and lettered sections contained in this Section 3.3.

(a)   Organization and Authority.  Buyer (i) is a corporation, duly incorporated with requisite corporate powers, validly existing and in good standing under the Laws of the jurisdiction of its organization, and (ii) has all requisite power and authority to own, lease and operate its assets and conduct its business as they are now being operated and conducted.

(b)   Authorization of Transaction. The execution, delivery and performance of this Agreement and the Ancillary Agreements by Buyer and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action, and no other proceedings on such Buyer's part are necessary to authorize the execution, delivery or performance of this Agreement or the Ancillary Agreements. This Agreement and each of the Ancillary Agreements, as applicable, to which Buyer is a party have been duly executed and delivered by Buyer and, assuming the due authorization, execution and delivery by the other parties hereto or thereto, constitute legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their terms.

(c)   Noncontravention. Provided the filings, authorizations, consents or approvals listed in Section 3.3(c) of the Disclosure Schedule have been made or obtained, neither the execution and the delivery of this Agreement or the Ancillary Agreements, nor the consummation of the transactions contemplated hereby or thereby will (i) violate or conflict in any way with any applicable Law of any Governmental Authority to which Buyer is subject or any provision of the Organizational Documents of Buyer, or result in the creation of any Lien upon any assets of Buyer pursuant to the terms thereof, or (ii) conflict with, result in a breach of, constitute a default under (with or without notice or lapse of time, or both), result in the acceleration of, create in any party the right to accelerate, terminate,

modify or cancel, require any notice under, or result in the creation of any Lien upon any asset of Buyer pursuant to the terms of, any contract, agreement, lease, sublease, license, sublicense, franchise, permit, indenture, agreement for borrowed money, instrument of Indebtedness, Lien or other arrangement to which Buyer is a party or by which Buyer is bound or to which any of its assets are subject.  Except for (i) such filings, authorizations, consents or approvals as the failure of which to obtain or make would not reasonably be expected to materially delay the Closing and (ii) those filings, authorizations, consents or approvals disclosed in <u>Section 3.3(c)</u> of the Disclosure Schedule, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority or any other Person in order for the Parties to consummate the transactions contemplated by this Agreement and in order that such transactions not constitute a breach or violation of, or result in a right of termination or acceleration or any encumbrance on Buyer's assets pursuant to the provisions of, any agreement, arrangement or understanding or any license, franchise or permit.

(d)    <u>Broker's Fees</u>.  Buyer does not have any Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

## 4.    CLOSING CONDITIONS

4.1    <u>Conditions to Obligation of Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated hereby are subject to satisfaction at or prior to the Closing Date of the following conditions:

(a)    The representations and warranties set forth in <u>Sections 3.1</u> and <u>3.2</u> which are not qualified by materiality or Material Adverse Effect shall be true and correct in all material respects at and as of the Closing Date, and the representations and warranties set forth in <u>Sections 3.1</u> and <u>3.2</u> which are qualified by materiality or Material Adverse Effect shall be true and correct in all respects at and as of the Closing Date;

(b)    Pharmalucence and Sellers shall have performed and complied in all respects with all of their respective covenants hereunder through the Closing Date;

(c)    Pharmalucence and each of the Sellers shall have delivered to Buyer a certificate signed by an officer of the Pharmalucence Companies or such Seller (as the case may be) to the effect that each of the conditions set forth in <u>Sections 4.1(a)</u> and <u>(b)</u> have been satisfied in all respects;

(d)    The waiting period applicable under the HSR Act and any agreement with any Governmental Authority not to consummate the transactions contemplated hereby will have expired or been terminated, and all required notices, reports, registrations and other filings with, and all consents, approvals and authorizations from, any Governmental Authority will have been made or obtained, as the case may be, except for any such notices, reports, registrations, filings, consents, approvals and authorizations the failure of which to make or obtain would not, individually or in the aggregate, prohibit, restrict or

delay, in any material respect, the performance by Buyer of Buyer's obligations hereunder.

(e)      There shall not have been, since the Latest Balance Sheet Date, any change in or effect on the Pharmalucence Companies' assets, financial condition, operating results, customer or employee relations or financial statements theretofore supplied by the Pharmalucence Companies or Sellers to Buyer which is or may reasonably be expected to result, in a Material Adverse Effect;

(f)      Buyer shall have obtained, for each of the Facilities, a written report of a Phase I environmental site assessment which has been prepared for Buyer at Buyer's sole expense in accordance with ASTM Standard E1527-13 and which indicates to Buyer's satisfaction that no recognized environmental condition exists at either the Bedford Facility or the Billerica Facility, as appropriate, which merits further investigation, provided, however, that Buyer shall promptly provide to Seller a copy of the Phase I environmental assessments obtained by Buyer, and shall promptly notify Sellers if such any such assessment is unsatisfactory and merits further investigation;

(g)      Buyer shall have obtained from the Massachusetts Department of Public Health, Bureau of Environmental Health, Radiation Control Program assurance satisfactory to Buyer and in accordance with Massachusetts Department of Public Health Guidelines for Material Licensing Cases Involving Change of Ownership MA-98-02 that any transfer of control over Materials License 20-9732, as amended and issued to Pharmalucence, Inc., which is contemplated upon consummation of this Agreement may occur in accordance with all provisions of Massachusetts law governing such license and without application to the Massachusetts Department of Public Health for amendment to or replacement of such license;

(h)      Each of the deliveries contemplated by Section 2.6(b)(i) shall have been made;

(i)      No action, suit, notice of violation or noncompliance, or proceeding involving greater than $25,000 in the aggregate shall be pending or threatened before any Governmental Authority which would prevent or inhibit the consummation of the transactions contemplated hereby or seek to impose any Liability on any Party as a result of the consummation of the transactions contemplated hereby, and all necessary regulatory approvals shall have been obtained;

(j)      No FDA inspection with respect to the Bedford Facility shall be continuing, and with respect to any such FDA inspection that has concluded Sellers shall have received a notice that no further action on the part of the FDA will be forthcoming, and any right of the Buyer to terminate this Agreement pursuant to Section 5.12 shall have expired.

(k)      Each of the Individual Sellers shall have entered into an Employment Agreement with Buyer, in a form acceptable to the Sellers, to be effective as of the Closing.

(l)     Sellers shall have taken such actions as Buyer may require to confirm that Buyer and its affiliates (including Pharmalucence and the Individual Sellers) shall not be subject to or bound by any restrictions on competition set forth in that certain Asset Purchase Agreement dated August 11, 2008 between Pharmalucence and Biodex Medical Systems, Inc.

4.2     <u>Conditions to Obligations of Sellers</u>.  The obligations of Sellers to consummate the transactions contemplated hereby are subject to satisfaction at or prior to the Closing Date of the following conditions:

(a)     The representations and warranties set forth in <u>Section 3.3</u> above which are not qualified by materiality shall be true and correct in all material respects at and as of the Closing Date, and the representations and warranties set forth in <u>Section 3.3</u> which are qualified by materiality shall be true and correct in all respects at and as of the Closing Date;

(b)     Buyer shall have performed and complied in all material respects with all of its covenants hereunder through the Closing Date;

(c)     Buyer shall have delivered to the Seller Representative a certificate signed by an officer of Buyer to the effect that each of the conditions specified in <u>Sections 4.2(a)</u> and <u>(b)</u> are satisfied in all respects;

(d)     The waiting period under the HSR Act and any agreement with any Governmental Authority not to consummate the transactions contemplated hereby will have expired or been terminated, and all required notices, reports, registrations and other filings with, and all consents, approvals and authorizations from, any Governmental Authorities will have been made or obtained, as the case may be, except for any such notices, reports, registrations, filings, consents, approvals and authorizations the failure of which to make or obtain would not, individually or in the aggregate, prohibit, restrict or delay, in any material respect, the performance by Seller of Seller's obligations hereunder.

(e)     The personal guaranties executed by Sellers with respect to the Bonds shall have been released by the Bondholder;

(f)     Each of the Individual Sellers shall have entered into an Employment Agreement with Buyer, in a form acceptable to the Sellers, to be effective as of the Closing;

(g)     Each of the deliveries contemplated by <u>Section 2.6(b)(ii)</u> shall have been made; and

(h)     No action, suit or proceeding involving greater than $25,000 shall be pending or threatened before any Governmental Authority which would prevent or inhibit the consummation of the transaction contemplated hereby or seek to impose any Liability on any Party as a result of the consummation of the transactions contemplated hereby, and all necessary regulatory approvals shall have been obtained.

4.3   No Waiver. Notwithstanding anything to the contrary set forth herein, if any of the conditions set forth in Section 4.1 have not been satisfied, Buyer shall have the right to proceed with the transactions contemplated hereby without waiving any of its rights hereunder, and if the conditions specified in Section 4.2 shall not have been satisfied, Sellers shall have the right to proceed with the transactions contemplated hereby without waiving any of their rights hereunder.

## 5.   ADDITIONAL AGREEMENTS

5.1   Operation of the Business Prior to Closing. Except as expressly set forth in this Agreement, as expressly set forth on Schedule 5.1 or as otherwise consented to previously in writing by Buyer, from the date hereof through the Closing, each of the Sellers and the Seller Representative covenants and agrees (x) to maintain and preserve substantially intact each Pharmalucence Company's business organization and use its commercially reasonable efforts to maintain and preserve each Pharmalucence Company's advantageous business relationships and to retain the services of its officers and employees and (y) to cause each of the Pharmalucence Companies not to:

(a)   (i) increase in any manner any compensation of, or enter into any new bonus or incentive agreement or arrangement with, any of its employees, directors or consultants, (ii) enter into any employment, severance, consulting, or other compensation agreement with any employee, director or consultant, (iii) make any change in the key management structure, including the hiring of additional officers or the termination of existing officers or (iv) amend or enter into a new Plan;

(b)   conduct the Business other than in the Ordinary Course of Business, provided, however, that the Pharmalucence Companies shall be permitted to make annual tax distributions to each of the Sellers, conforming with past practice;

(c)   engage in any agreement by and between any of the Pharmalucence Companies (on the one hand) and the Sellers or any employee, officer, director or manager of any of the Pharmalucence Companies (on the other hand);

(d)   deposit or maintain any surplus funds in any accounts or investments which are inconsistent with existing, ordinary course cash management practices;

(e)   issue, deliver or sell, or authorize or propose the issuance, delivery or sale of (i) any Equity Securities, (ii) any securities convertible into Equity Securities, or (iii) any rights, warrants, calls, subscriptions or options to acquire Equity Securities;

(f)   amend any of its Organizational Documents;

(g)   (i) sell, lease, license, encumber or otherwise dispose of, or agree to sell, lease, license, encumber or otherwise dispose of, any of its assets other than in the Ordinary Course of Business or (ii) acquire by merger or consolidation with, or merge or consolidate with, or purchase substantially all of the assets of, any corporation, partnership, association, joint venture or other business organization or division thereof;

(h)    incur any indebtedness for borrowed money except in the Ordinary Course of Business, or guarantee any such indebtedness or issue or sell any debt securities or warrants or rights to acquire any debt securities of such party or guarantee any debt securities of others;

(i)    enter into, modify or terminate any Contract of a type required to be listed on Section 3.2(l) of the Disclosure Schedule;

(j)    (i) commence or settle any litigation, arbitration or proceeding except for any matter involving less than $25,000 in the aggregate, (ii) implement or adopt any change in its accounting principles (iii)  make or change any election, adopt or change any accounting method, file or amend any Tax Return, enter into any closing agreement, settle any Tax claim or assessment, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, or take any other similar action relating to the filing of any Tax Return or the payment of any Tax, or (iv) change its method of accounting for income Tax purposes;

(k)    modify its existing cash management, credit collection and payment policies, procedures and practices (including, without limitation, any acceleration in the collection of accounts receivable, delay in the payment of accounts payable or change in the maintenance of working capital balances); or

(l)    enter into any Contract, or otherwise become obligated, to do any action (i) that would have required disclosure pursuant to Section 3.2(g) if it had occurred prior to the date of this Agreement or (ii) prohibited under this Section 5.1.

5.2    General.  Each of the parties hereto shall use commercially reasonable efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement including without limitation satisfaction, but not waiver, of the closing conditions described in Section 4 above.

5.3    Governmental Filings. As promptly as reasonably practicable following the date of this Agreement, each of Buyer and the Sellers (as applicable) shall cooperate with one another, and use all commercially reasonable efforts, (a) to procure all necessary and appropriate consents and authorizations from Governmental Authorities, complete and file all necessary and appropriate applications, notifications, filings and certifications, and satisfy all requirements prescribed by law for, and all conditions set forth in this Agreement to, the consummation of the transactions, and (b) to effect the transactions at the earliest practicable date consistent with the terms hereof.  Without limiting the generality of the foregoing, each such Party shall supply as promptly as reasonably practicable any additional information and documentary material that may be requested pursuant to the HSR Act, and shall use their respective commercially reasonable efforts to obtain the approvals of the appropriate Governmental Authorities.  Buyer and Sellers will, and Sellers will cause Pharmalucence to cooperate in good faith and take all actions necessary, appropriate or advisable to file expeditiously and diligently their respective HSR Notifications with the Federal Trade Commission and the Department of Justice pursuant to the HSR Act promptly, and shall request an early termination of the waiting period thereunder. In addition, except as prohibited by Law, Buyer and Sellers will use commercially reasonable

efforts to (i) cooperate in all respects with each other in connection with any filing or submission and in connection with any investigation or other inquiry regarding the transactions contemplated hereby; (ii) subject to applicable legal limitations and the instructions of any Governmental Authority, keep the other Party reasonably informed of any communication received by such Party from, or given by such Party to, any Governmental Authority regarding any of the transactions contemplated hereby; and (iii) subject to applicable legal limitations and the instructions of any Governmental Authority, permit the other Party to review in advance any communication (provided that the Parties may redact (x) references to the value of this transaction or alternatives to this transaction; (y) as necessary to comply with contractual arrangements or applicable Laws; and (z) as necessary to address reasonable privilege or confidentiality concerns) to be given by it to, and consult with each other in advance of any substantive meeting or discussion with, any Governmental Authority, and to the extent permitted by the applicable Governmental Authority or other Person, give the other Party the opportunity to attend and participate in such meetings and discussions. Nothing in this Section 5.3 or otherwise in this Agreement shall require Buyer or any Buyer Affiliate to propose, negotiate, effect or agree to, the sale, divestiture, license or other disposition of any assets or businesses of Buyer or any Buyer Affiliate (including the Business) or otherwise take any action that limits the freedom of action with respect to, or its ability to retain any of the businesses, product lines or assets of Buyer or any Buyer Affiliate (including the Business). In the event that an applicable Governmental Authority asserts an objection under Antitrust Law that impedes the ability of the parties hereto to consummate the transaction contemplated hereby, Buyer, may, in its sole discretion, consent, to sell, license, assign, transfer, divest, hold separate or otherwise dispose of any of Buyer's respective assets, properties or businesses or of the assets, properties or businesses to be acquired pursuant to this Agreement. Notwithstanding anything herein to the contrary, all HSR Fees payable, shall be paid by Buyer.

5.4    No Solicitation. From and after the date of this Agreement until the earlier of the termination of this Agreement or the Closing Date, each of the Sellers and the Seller Representative will not, and will not permit the Pharmalucence Companies or its or their directors, officers, members, managers, employees or representatives to, directly or indirectly, (i) solicit, initiate, or encourage any Acquisition Proposals, (ii) engage in negotiations or discussions concerning, or provide any information to any Person in connection with, any Acquisition Proposal, or (iii) agree to or approve any Acquisition Proposal. As used herein, the term "Acquisition Proposal" shall mean any proposal relating to a possible (A) merger, consolidation or similar transaction involving any Pharmalucence Company, (B) sale, lease or other disposition, directly or indirectly, by merger, consolidation, share exchange or otherwise, of any assets of any Pharmalucence Company, (C) issuance, sale or other disposition of (including by way of merger, consolidation, share exchange or any similar transaction) Equity Securities of any Pharmalucence Company, (D) liquidation, dissolution, or other similar type of transaction with respect to any Pharmalucence Company, or (E) transaction which is similar in form, substance or purpose to any of the foregoing transactions; provided, however, that the term "Acquisition Proposal" shall not include the transactions contemplated hereby. Each of the Sellers, the Seller Representative and Pharmalucence will immediately (a) cease any and all existing activities, discussions or negotiations with any parties conducted heretofore with respect to any of the foregoing and (b) notify Buyer in writing in the event that any of the foregoing receives any requests for information or proposals relating to any Acquisition Proposal (including the terms of any such proposal and the identity of the maker thereof).

5.5     Updated Disclosures; Interim Financial Statements.

(a)     From and after the date of this Agreement until the earlier of the termination of this Agreement or the Closing Date, Pharmalucence shall disclose to Buyer in writing promptly upon discovery thereof (a) (in the form of updated Disclosure Schedules) any material variances from the representations and warranties contained in Sections 3.1 or 3.2 (the "**Updated Disclosures**"), (b) if the employment of any group of employees of any Pharmalucence Company is terminated for any reason, whether by such Pharmalucence Company or by such group of employees, (c) of any written notice or other communication from any third party relating to a default or event which, with notice or lapse of time or both, would become a default, received subsequent to the date of this Agreement, under any Contract to which any Pharmalucence Company is a party or is subject, or (d) of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; provided, that, except as set forth in Section 5.12, such disclosure shall not limit or otherwise affect the remedies available hereunder to Buyer (including any rights to indemnification under Section 6.1(b)(i) for any breach of the representations and warranties contained in Sections 3.1 or 3.2 as of the date hereof), or the conditions to the obligation Buyer to consummate the transactions contemplated by this Agreement.

(b)     From the date hereof until the Closing Date, Pharmalucence shall promptly deliver to Buyer copies of the monthly consolidated financial statements of the Pharmalucence Companies (in conformance with the delivery and presentation requirements contained in Section 3.2(f)(i)) as they are finalized, but in no event later than tenth (10th) day following the last date of such month.  Such financial statements shall be considered to be "Interim Financial Statements" for the purposes of the representations and warranties set forth in Section 3.2(f)(i) as and when so delivered.

5.6     Reasonable Access.  From the date of this Agreement until the Closing or the earlier termination of this Agreement, Sellers shall afford Buyer, its officers, representatives, accountants, advisors, financing sources, legal counsel and agents free and full access, during normal business hours and upon prior notice, to the offices, plants, properties, customers and vendors, appropriate employees, books and records and financial and related data and calculations of the Pharmalucence Companies in order that Buyer may have full opportunity to make such investigations of the Business, operations, assets, liabilities, properties and legal and financial condition of the Pharmalucence Companies as Buyer deems reasonably necessary or desirable, and the officers of Pharmalucence shall furnish Buyer with such additional financial and operating data and other information relating to the business operations, assets, properties and legal and financial condition of the Pharmalucence Companies as Buyer shall from time to time reasonably request.  Nothing contained in this Section 5.6 shall obligate Sellers or the Pharmalucence Companies to (i) violate any applicable Law, (ii) breach any duty of confidentiality owed to any person whether such duty arises contractually, statutorily or otherwise or (iii) jeopardize the protection of any attorney-client or attorney work product privilege or similar privilege.

5.7     Post-Closing Covenants.  The Parties agree as follows with respect to the period following the Closing Date:

(a)     General.  If at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification with respect to such matter under Sections 5.9 or 6).

(b)     Non-Competition. In consideration of the transactions contemplated by this Agreement and in order to preserve and protect the goodwill and value of the Pharmalucence Companies and the Business conveyed hereunder, Sellers hereby agree as follows:

(i)     During the period beginning on the Closing and ending on the fifth (5th) anniversary of the Closing (the "**Non-Competition Period**"), each of the Sellers will not, and will not cause or permit any of such Seller's agents or Affiliates (the "**Restricted Parties**"), either directly or indirectly, to participate in any Restricted Business.  For purposes of this Agreement, (A) the term "Participate" means to have any direct or indirect interest, whether as an officer, director, manager, employee, partner, sole proprietor, agent, representative, independent contractor, consultant, franchisor, franchisee, creditor, owner or otherwise; provided, however, that the term "Participate" shall not include a cumulative ownership of less than two percent (2%) of a class of stock of a publicly-held corporation which is traded on a national securities exchange or in the over-the-counter market, so long as such Restricted Party does not have any active participation in the business or management of such entity; and (B) the term "Restricted Business" means any enterprise, business or venture anywhere within North America, and/or any other geographic areas in which any of the Pharmalucence Companies transacted business within the twenty-four (24) month period prior to Closing, which is engaged in or which proposes to engage in the manufacture and sale of radiopharmaceutical kits.

(ii)     During the Non-Competition Period the Restricted Parties will not (A) induce or attempt to induce any employee of Buyer or the Pharmalucence Companies or any of their respective Affiliates (the "**Buyer Group**") to leave such entity's employ or in any way interfere with the relationship between any member of the Buyer Group and any of their employees, or actually hire any of the Buyer Group's employees, or (B) call on, solicit or service any supplier, licensee, licensor, franchisee, customer or other business relation of the Business ("**Business Relation**") in any way that interferes with the relationship between any member of the Buyer Group and any such Business Relation related to the manufacture and sale of radiopharmaceutical kits.

(iii)     Each Seller shall not make any statement, public or private, oral or written, to any Person that disparages Buyer, the Pharmalucence Companies, any of their Affiliates, or any of their respective managers, directors, officers, employees, equityholders, products or services.

(iv)     The Parties hereby agree and acknowledge that Buyer would suffer irreparable harm from a breach by the Restricted Parties of any of the covenants or agreements contained in this <u>Section 5.7(b)</u>.  In the event of an alleged or threatened breach by the Restricted Parties of any of the provisions of this <u>Section 5.7(b)</u>, Buyer may, in addition to all other rights and remedies existing in its favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof, in each case without the requirement of posting a bond or proving actual damages, and the Non-Competition Period described above will be tolled until such alleged breach or violation is resolved. Sellers agree that the restrictions in this <u>Section 5.7(b)</u> are reasonable protections under the circumstances of the sale of the Equity Securities to Buyer.  If, at the time of enforcement of any of the provisions of this <u>Section 5.7(b)</u>, a court holds that the restrictions stated herein are unreasonable under the circumstances then existing, Sellers agree that the maximum period, scope or geographical area reasonable under such circumstances will be substituted for the stated period, scope or area.

(c)     <u>Confidentiality</u>.  Sellers will treat and hold as confidential all of the Confidential Information, refrain from using any of the Confidential Information (except, as applicable, as directed by Buyer) and shall deliver promptly to Buyer or destroy, at the request and option of Buyer, all tangible embodiments (and all copies) of the Confidential Information which are in Sellers' possession.  In the event that Sellers are requested or required (by oral question or written request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, Sellers will notify Buyer promptly of the request or requirement so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this <u>Section 5.7(c)</u>.

5.8     <u>Waiver and Release</u>.  Effective as of the Closing, each Seller, on behalf of itself and its successors and assigns (collectively, the "**Releasing Parties**"), irrevocably and unconditionally waives and releases any and all rights with respect to, and releases, forever acquits and discharges each of the Pharmalucence Companies and their respective managers, directors, officers, employees, agents and other representatives, and their respective heirs, executors, administrators, successors and assigns ("**Released Parties**") with respect to, each and all claims, demands, charges, complaints, obligations, causes of action, suits, liabilities, indebtedness, sums of money, covenants, agreements, instruments, contracts (written or oral, express or implied), controversies, promises, fees, expenses (including attorneys' fees, costs and expenses), damages and judgments, at law or in equity, in contract or tort, in United States, state, foreign or other judicial, administrative, arbitration or other proceedings, of any nature whatsoever, known or unknown, suspected or unsuspected, previously, now or hereafter arising, in each case which arise out of, are based upon or are connected with facts or events occurring or in existence on or prior to the Closing Date ("**Released Claims**").  Each Seller further represents and warrants that it has not assigned or otherwise transferred any right or interest in or to any of the Released Claims.  Each Seller further acknowledges that such Seller is aware that statutes exist that render null and void releases and discharges of any claims, rights, demands, liabilities, action and causes of action which are unknown to the releasing or discharging party at the time of execution of the release and discharge.  Each Seller hereby expressly waives, surrenders and agrees to forego any protection to which such Seller would otherwise be entitled by virtue of the

existence of any such statute in any jurisdiction.  This Section 5.8 shall not apply to claims against Buyer for the breach of any representations, warranties or covenants set forth herein, to the extent applicable.

5.9     Tax Matters.

(a)     Tax Indemnification.  From and after the Closing, the Buyer Indemnified Parties shall be indemnified and held harmless by Sellers, on a joint and several basis, from and against any liability for Taxes of the Pharmalucence Companies for all taxable periods ending on or before the Closing Date and the portion of any Straddle Period through the close of business on the Closing Date (a "**Pre-Closing Tax Period**"); provided, that Sellers will have no obligation to indemnify Buyer against any Losses consisting of, or relating to, Taxes resulting from (A) any transactions occurring on the Closing Date (including taxes attributable to the Section 338(h)(10) Elections), or (B) any breach of Sections 5.9(c)(ii), 5.9(i) or 5.9(j) of this Agreement; or (C) any claim(s) that the Bonds are not exempt from federal income taxation as a result of any action or omission occurring prior to Closing, whether or not any such claim is asserted prior to or after Closing.

(b)     Straddle Period.  In the case of any taxable period that includes (but does not end on) the Closing Date (a "**Straddle Period**"), (i) the amount of any Taxes based upon or measured by income or receipts of the Pharmalucence Companies for the Pre-Closing Tax Period shall be determined based on an interim closing of the books as of the close of business on the Closing Date (and for such purpose, the taxable period of any partnership or other pass-through entity in which a Pharmalucence Company holds a beneficial interest shall be deemed to terminate at such time), and (ii) the amount of other Taxes of the Pharmalucence Companies for a Straddle Period which relate to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the Straddle Period.

(c)     Responsibility for Filing Tax Returns.

(i)     Buyer shall prepare and file or cause to be prepared and filed all Tax Returns for the Pharmalucence Companies (other than Income Tax Returns for taxable periods ending on or before the Closing Date) that are filed after the Closing Date. All such Tax Returns which are Straddle Period Income Tax Returns shall be prepared in accordance with applicable Law and in a manner consistent with the prior practice of the Pharmalucence Companies to the extent in compliance with applicable Law. If any Tax Return described in the first sentence above relates to Income Taxes for any Straddle Period, Buyer shall permit the Seller Representative to review and comment on each such Income Tax Return prior to filing such Income Tax Return and shall make such revisions to such Income Tax Returns as are reasonably requested by the Seller Representative.  The portion of any Income Taxes shown on any Income Tax Return for any Straddle Period that is attributable to any Pre-Closing Tax Period (determined as provided in Section 5.9(b) and subject to Section 5.9(a)), shall be paid by Sellers.

(ii)     Sellers shall prepare and file or cause to be prepared and filed all Income Tax Returns for the Pharmalucence Companies for the Pre-Closing Tax Period. Sellers shall permit Buyer to review, comment on and approve each such Income Tax Return described in the preceding sentence prior to filing such Income Tax Return and shall consider such revisions to such Income Tax Returns as are reasonably requested by Buyer.  All Income Taxes shown to be payable on any Income Tax Return filed pursuant to this Section 5.9(c)(ii) shall be paid by Sellers.  With respect to any Tax Return for a Pre-Closing Tax Period that the Pharmalucence Companies are required to file after the Closing Date pursuant to this Section 5.9(c)(ii), Buyer shall duly complete and execute a power of attorney naming the Pharmalucence Companies or its designee Buyer's authorized representative and authorizing the Pharmalucence Companies or its designee to take any actions the Pharmalucence Companies or its designee deems necessary or appropriate to file or cause to be filed such Tax Return.  Buyer shall not file any Tax Return for a Pre-Closing Tax Period or amend any Tax Return for a Pre-Closing Tax Period without the prior written consent of the Seller Representative.

(iii)     Except with respect to the Section 338(h)(10) Elections, Buyer, and Sellers agree to report all transactions not in the Ordinary Course of Business occurring on the Closing Date following the transfer of the Equity  Securities on Buyer's income Tax Returns to the extent permitted by Treasury Regulation Section 1.1502-76(b)(1)(ii)(B) (or any analogous or similar state, local, or non-U.S. Law).  Buyer agrees to indemnify Sellers for any additional Tax owed by Seller (including Tax owed by Sellers due to this indemnification payment) resulting from any transaction engaged in by Buyer or Sellers not in the Ordinary Course of Business occurring on the Closing Date following the transfer of Equity Securities.

(d)     Cooperation and Records Retention.  Sellers and Buyer shall (i) each provide the other, and Buyer shall cause the Pharmalucence Companies to provide Sellers, with such assistance as may be reasonably requested by any of them in connection with the preparation of any Tax Return, audit, or other examination by any Taxing Authority or judicial or administrative proceedings relating to liability for Taxes, (ii) each retain and provide the other, and Buyer shall cause the Pharmalucence Companies to retain and provide Sellers with, any records or other information that may be relevant to such Tax Return, audit or examination, proceeding, or determination, and (iii) each provide the other with any final determination of any such audit or examination, proceeding, or determination that affects any amount required to be shown on any Tax Return of the Pharmalucence Companies for any period.  Without limiting the generality of the foregoing, Buyer shall retain, and shall cause the Pharmalucence Companies to retain, and Sellers shall retain, until the applicable statutes of limitations (including any extensions) have expired, copies of all Tax Returns, supporting work schedules, and other records or information that may be relevant to such returns for all Tax periods or portions thereof ending before or including the Closing Date and shall not destroy or otherwise dispose of any such records without first providing the other Party with a reasonable opportunity to review and copy the same.  Each Party shall bear its own expenses in complying with the foregoing provisions.

(e) <u>Transfer Taxes</u>. Sellers shall pay all transfer, sales, use, gains, documentary, stamp, registration and other similar Taxes, and all conveyance fees, recording charges and other fees and charges imposed as a result of the transactions contemplated by this Agreement (collectively, "**Transfer Taxes**"), and any penalties or interest with respect to Transfer Taxes.

(f) <u>Allocation</u>. Buyer and Sellers agree that the a portion of the purchase price payable hereunder equal to the PIREV Purchase Price shall be allocated to PIREV and the remainder of the purchase price payable hereunder and all other capitalizable costs shall be allocated to Pharmalucence. Buyer and Sellers agree that the portion of the purchase price and all other capitalizable costs that are allocated to the acquisition of Pharmalucence will be allocated among the assets of Pharmalucence for all purposes (including Tax and financial accounting) in a manner consistent with Code §1060 and regulations thereunder and consistent the methodology set forth on Exhibit B as of the Closing (the "**Allocation**"). Consistent with Code §1060 and the regulations thereunder, Buyer shall prepare the Allocation and deliver the Allocation to the Seller Representative for its review, comment and approval following the Closing Date. If the Seller Representative notifies Buyer that the Seller Representative is disputing the Allocation within ten (10) days following the Seller Representative's receipt of the Allocation, the Seller Representative and Buyer shall mutually negotiate the Allocation in good faith. If the Seller Representative fails to notify Buyer that the Seller Representative is disputing the Allocation within such ten (10) day period, Sellers shall be deemed to have accepted the Allocation. If the Seller Representative disputes the Allocation in a timely manner and the Seller Representative and Buyer cannot agree on the Allocation within thirty (30) days following the Buyer's receipt of such notice of dispute, then the dispute shall be submitted for resolution to the Arbitrator. Buyer, the Pharmalucence Companies and the Seller Representative shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with such Allocation.

(g) <u>Tax Proceedings</u>. With respect to the handling, disposition, and settlement of any governmental inquiry, examination, or proceeding involving Taxes that could result in an indemnification payment being made under this <u>Section 5.9</u> in connection therewith, each such matter shall be subject to the control of Sellers; <u>provided</u> that (i) Sellers' counsel is reasonably satisfactory to Buyer, (ii) Sellers shall thereafter consult with Buyer upon Buyer's reasonable request for such consultation from time to time with respect to such inquiry, examination or proceeding (including any Tax audit), and (iii) Sellers shall not, without Buyer's consent (which consent shall not be unreasonably withheld, conditioned or delayed), agree to any settlement with respect to any Tax if such settlement could adversely affect the Tax liability of Buyer, any of its Affiliates or the Pharmalucence Companies. Buyer shall notify Sellers in writing within ten (10) days after learning of any such inquiry, examination, or proceeding. Buyer shall cooperate with Sellers, as Sellers may reasonably request, in any such inquiry, examination or proceeding.

(h) <u>Withholding</u>. Notwithstanding any other provision in this Agreement, Buyer shall have the right to deduct and withhold any required Taxes from any payments to be made hereunder. To the extent that amounts are so withheld and paid to the

appropriate Taxing Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been delivered and paid to the applicable recipient of payment in respect of which such deduction and withholding was made.

(i)        Adjustments to Purchase Price.  The Parties agree to treat any amounts payable after the Closing Date by Sellers to Buyer (or by Buyer to Sellers) pursuant to this Agreement as an adjustment to the purchase price payable hereunder, unless otherwise required by Law or the good faith resolution of an audit.

(j)        §338(h)(10) Election.

(i)        At Buyer's option,  Sellers and Buyer will join in making an election under Section 338(h)(10) of the Code (and any corresponding elections under state or local Tax Law) (collectively, the "**Section 338(h)(10) Elections**") with respect to the purchase and sale of the Equity Securities of Pharmalucence.

(ii)        Within the earlier of (A) thirty (30) calendar days after the Closing Date and (B) the final resolution of Net Working Capital pursuant to Section 2.3, Buyer will prepare an IRS Form 8023 and any similar forms necessary to effectuate the Section 338(h)(10) Elections under applicable state and local Tax Laws (collectively, the "**Section 338(h)(10) Election Forms**").  Sellers will cooperate with Buyer in the preparation of the Section 338(h)(10) Election Forms and will timely deliver to Buyer duly completed, executed copies thereof.  Buyer and Seller will cooperate with each other and take all actions necessary and appropriate (including filing such additional forms, Tax Returns, elections, schedules, and other documents as may be required) to effect and preserve the Section 338(h)(10) Elections in accordance with the provisions of Treasury Regulations Section 1.338(h)(10)-1 and comparable provisions of applicable state and local Tax Laws.

(iii)        Not less than four (4) Business Days prior to Closing, Sellers shall provide Buyer (X) a preliminary determination of the Aggregate Deemed Sales Price (as defined in the applicable Treasury Regulations promulgated under Section 338) with respect to the purchase and sale of the Equity Securities of Pharmalucence (the "**Preliminary ADSP**")) and (Y) a preliminary proposed allocation of the ADSP among the assets of the Pharmalucence in a manner consistent with Sections 338 and 1060 of the Code and the Treasury Regulations promulgated thereunder (the "**Preliminary Proposed Allocations**").  Within the later of (A) one hundred twenty (120) calendar days after the Closing Date and (B) the final resolution of Actual Net Working Capital pursuant to Section 2.3, Buyer will prepare (X) its determination of the Aggregate Deemed Sales Price (as defined in the applicable Treasury Regulations promulgated under Section 338) with respect to the purchase and sale of the Equity Securities of Pharmalucence (the "**ADSP**")) and (Y) its proposed allocation of the ADSP among the assets of the Pharmalucence in a manner consistent with Sections 338 and 1060 of the Code and the Treasury Regulations promulgated thereunder (the "**Proposed Allocations**") and will deliver the Proposed Allocations and the calculation of net working capital Buyer prepared pursuant to Section 5.9(f) to Seller.  Buyer and Sellers will consult in good faith with regard to the determination of the ADSPs and the Proposed Allocations and any

differences between the Preliminary ADSPs and the Preliminary Proposed Allocations and Buyer will incorporate any comments as reasonably requested by Sellers (as finally determined, the "**Final Allocations**").  As soon as practicable after the determination of the Final Allocations, Buyer will prepare consistently therewith IRS Form 8883s and any similar forms required by applicable state and local Tax Laws (collectively, the "**Section 338(h)(10) Allocation Forms**"), and promptly deliver copies of the Section 338(h)(10) Allocation Forms to Sellers.

        (iv)    Buyer and Sellers will file all Tax Returns (including the Section 338(h)(10) Election Forms and the Section 338(h)(10) Allocation Forms) consistent with the Final Allocations and will not voluntarily take any action inconsistent therewith or with respect to the Section 338(h)(10) Elections upon any audit or examination of any Tax Return or in any other filing or proceeding relating to Taxes unless required pursuant to a determination as defined in Section 1313(a) of the Code or any similar provision of any applicable state or local Tax Law.

        (v)    Each of Buyer and Sellers will bear its respective costs and expenses of preparing and reviewing the Section 338(h)(10) Election Forms, the Proposed Allocations, the Final Allocations, and the Section 338(h)(10) Allocation Forms.

        (vi)    Within thirty days after the determination of the Final Allocations under Section 5.9(j)(iii) hereof, Seller Representative will prepare and submit to Buyer an estimated calculation of the Tax Gross-Up Amount for Buyer's review and approval. The "Tax Gross-Up Amount" shall equal to the lesser of (A) FOUR MILLION FOUR HUNDRED THOUSAND DOLLARS ($4,400,000), or (B) the amount by which (x) the aggregate amount of U.S. federal, state, local and any other Taxes incurred by Sellers with respect to the disposition of the Equity Securities of Pharmalucence pursuant to this Agreement in the manner specified by the Section 338(h)(10) Election, including any Tax imposed on Sellers on amounts paid by Buyer pursuant to this Section 5.9(j)(vi) exceeds (y) the aggregate amount of U.S. federal, state, local and any other Taxes that would have been incurred by Seller with respect to the disposition of the Equity Securities of Pharmalucence pursuant to the Agreement, assuming that no Section 338(h)(10) Election was made.  To the extent Taxes imposed under Section 1374 of the Code are allotted to Buyer or Company, rather than to Sellers, the amount set forth in clause (A) of the preceding sentence shall be subject to an a dollar-for-dollar adjustment downward in the amount of such imposed Tax liability. Buyer shall have thirty (30) calendar days to review the calculation of the Estimated Tax Gross-Up Amount. If Buyer determines that the calculation of the Estimated Tax Gross-Up Amount has not been determined in accordance with this Section 5.9(j), or if a disagreement between Seller Representative and Buyer remains unresolved with respect to the calculation of the Estimated Tax Gross-Up Amount, then in either case, Buyer shall inform Seller Representative on or before the last day of such thirty (30) day period by delivering a written notice to Seller Representative ("**Gross-Up Amount Notice of Tax Objection**") setting forth a specific and detailed description of the basis of Buyer's objection and proposed good faith adjustments to the calculation of the Estimated Tax Gross-Up Amount. After receipt of the Gross-Up Amount Notice of Tax Objection, Seller Representative shall then have thirty (30) days to review and respond to the Gross-Up Amount Notice of Tax Objection. Seller Representative and its representatives shall

have access to all relevant information used in connection with the preparation of the Gross-Up Amount Notice of Tax Objection. Buyer and Seller Representative shall seek in good faith to mutually resolve any differences which they may have with respect to any matter specified in the Gross-Up Amount Notice of Tax Objection. If Buyer does not properly and timely deliver a Gross-Up Amount Notice of Tax Objection, Buyer shall conclusively be deemed to have accepted the calculation of the Estimated Tax Gross-Up Amount. If any disagreement between Buyer and Seller Representative with respect to the calculation of the Estimated Tax Gross-Up Amount remains unresolved as of thirty (30) days following Buyer's delivery of the Gross-Up Amount Notice of Tax Objection, then Buyer and Seller Representative shall refer the matter to an Arbitrator for resolution in accordance with the procedure described in Section 2.3(a) hereof and, upon the final determination of the Estimated Tax Gross-Up Amount (by failure of Buyer to properly and timely deliver a Gross-Up Amount Notice of Tax Objection, written agreement of Buyer and Seller Representative and/or by determination of the Arbitrator), Buyer shall pay the Estimated Tax Gross-Up Amount to Sellers.

(vii)     Within sixty (60) days after the filing of all Tax Returns of Sellers for the year in which the Closing occurs, Seller Representative shall prepare and deliver to Buyer a written calculation (the "**True-Up Calculation**") of the Tax Gross-Up Amount (the "Actual Tax Gross-Up Amount") and any excess of the Actual Tax Gross-Up Amount over the Estimated Tax Goss-Up Amount ("**Tax Gross-Up Excess**") or any deficit in the amount of the Actual Tax Gross-Up Amount compared to the Estimated Tax Goss-Up Amount ("**Tax Gross-Up Deficit**"). Buyer shall have access to all relevant information of Sellers used in connection with the determination of the Actual Tax Gross-Up Amount. Buyer shall, within thirty (30) days after delivery by Seller Representative of the True‑Up Calculation, complete its review of the True‑Up Calculation. If Buyer determines that the True-Up Calculation has not been determined in accordance with this Section 5.9(j), or if a disagreement between Seller Representative and Buyer remains unresolved with respect to the True-Up Calculation, then in either case, Buyer shall inform Seller Representative on or before the last day of such thirty (30) day period by delivering a written notice to Seller Representative ("**True-Up Notice of Tax Objection**") setting forth a specific and detailed description of the basis of Buyer's objection and proposed good faith adjustments to the True-Up Calculation. After receipt of the True-Up Notice of Tax Objection, Seller Representative shall then have thirty (30) days to review and respond to the True-Up Notice of Tax Objection. Seller Representative and its representatives shall have access to all relevant information used in connection with the preparation of the True-Up Notice of Tax Objection. Buyer and Seller Representative shall seek in good faith to mutually resolve any differences which they may have with respect to any matter specified in the True-Up Notice of Tax Objection. If Buyer does not properly and timely deliver a True-Up Notice of Tax Objection, Buyer shall conclusively be deemed to have accepted the True-Up Calculation. If any disagreement between Buyer and Seller Representative with respect to the determination of the Actual Tax Gross-Up Amount remains unresolved as of thirty (30) days following Buyer's delivery of the True-Up Notice of Tax Objection, then Buyer and Seller Representative shall refer the matter to an Arbitrator to be resolved in accordance with the procedure described in Section 2.3(a) hereof and, upon the final determination of the Actual Tax Gross-Up Amount (by failure of Buyer to properly and timely deliver a True-Up Notice of Tax Objection, written agreement of Buyer and Seller Representative and/or by determination of the Determining

Party); Sellers shall pay to Buyer the amount of any Tax Gross-Up Excess or Buyer shall pay to Sellers the amount of any Tax Gross-Up Deficit.

(viii)   Notwithstanding anything to the contrary contained herein, it is agreed and understood by the Parties that any liability for U.S. federal, state, local and any other Taxes of the Company resulting from making the Section 338(h)(10) Election (including, but not limited to, taxes imposed under Section 1374 of the Code and the Massachusetts entity tax on S-Corporations) will remain a liability of the Company and Sellers will not indemnify Buyer hereunder with respect to such Tax liability of the Company.

(k)    Deduction for Unit Equivalent Plan Benefits.  It is agreed and understood by the Parties that any deduction for purposes of U.S. federal, state, local and any other Taxes for the payment of the Unit Equivalent Plan Benefits will be claimed by the Company on its final S corporation tax return.

(l)    S Corporation Status. Sellers shall not revoke Pharmalucence's election to be taxed as an S corporation within the meaning of Code §§1361 and 1362. Sellers shall not take or allow any action that would result in the termination of Pharmalucence's status as a validly electing S corporation within the meaning of Code §§1361 and 1362.

(m)    Limited Liability Company. Sellers shall not revoke PIREV's election to be taxed as partnership within the meaning of Code §§ 761 and 7701. Sellers shall not take or allow any action that would result in the termination of PIREV''s status as a validly electing partnership within the meaning of Code §§ 761 and 7701.

5.10    Bond Transfer.  Prior to the Closing, Sellers shall use commercially reasonable efforts to assist Buyer to enter into agreements or other instruments with TD Bank, National Association ("**Bondholder**") and the Agency which allow the Bonds to remain outstanding in accordance with their original terms or terms otherwise acceptable to Buyer in its sole discretion.

5.11    Confidentiality Agreements.  Prior to the Closing, Sellers shall deliver to the Buyer copies of all Contracts regarding confidentiality or non-disclosure to which any of the Pharmalucence Companies is a party.

5.12    Inspections.  Sellers agree to (i) promptly notify Buyer in the event Sellers or any Pharmalucence Company receives notice that the FDA intends to initiate any inspection of the Bedford Facility prior to Closing and (ii) to the extent permitted by the FDA, (i) give Buyer and its representatives access to the Bedford Facility during such inspection and (ii) permit Buyer to participate in the Pharmalucence Companies' handing of such audit.  In the event the FDA issues a 483 which is deemed OAI (Official Action Initiated) or which is deemed VAI (Voluntary Action Initiated) and which is material to the business of the Pharmalucence Companies, Buyer shall have the right to terminate this Agreement by providing written notice to the Sellers, provided that Buyer's right to terminate shall expire five (5) days following the delivery by the Sellers to Buyer of the response letter of the Pharmalucence Companies to the FDA regarding the proposed corrective action.  In the event that Buyer elects not to terminate this Agreement, pursuant to this Section 5.12, then Buyer shall be deemed to have waived any and all breaches of representations and warranties in Section 3.2 which are revealed by or related to such inspections

or which arise as a direct consequence thereof, and Buyer shall not have any right to indemnification or any other remedy therefor.

## 6.     INDEMNIFICATION

6.1     <u>Indemnification</u>.

(a)     <u>Survival Periods Generally</u>.

(i)     All of the representations and warranties of Sellers under <u>Sections 3.1</u> (Representations and Warranties of Sellers), <u>3.2(a)</u> (Organization, Qualification and Authority), <u>3.2(b)</u> (Authorization of Transaction) and <u>3.2(d)</u> (Capitalization), and all representations and warranties of Buyer under <u>Sections 3.3(a)</u> (Organization and Authority) and <u>3.3(b)</u> (Authorization of Transaction), shall survive the Closing indefinitely and shall continue in full force and effect thereafter.

(ii)     All of the representations and warranties of Sellers under <u>Sections 3.2(c)</u> (Noncontravention), <u>3.2(i)</u> (Tax Matters), <u>3.2(j)(iii)</u> (Title to Assets), <u>3.2(q)</u> (Employee Benefit Plans), <u>3.2(t)</u> (Compliance with Laws), <u>3.2(x),</u> (Broker's Fees) and <u>3.2(z)</u> (Environmental), and all representations and warranties of Buyer under <u>Sections 3.3(c)</u> (Noncontravention) and <u>3.3(d)</u> (Broker's Fees), shall survive the Closing, and shall continue in full force and effect until the expiration of the applicable statute of limitations relating thereto (including any extensions thereof), after which period such representations and warranties shall terminate and have no further force or effect.

(iii)     All other representations and warranties of Sellers under <u>Section 3.2</u> of this Agreement shall survive the Closing, and shall continue in full force and effect for a period of twenty-four (24) months thereafter, after which period such representations and warranties shall terminate and have no further force or effect.

(iv)     All covenants of the Parties under <u>Sections 2.3</u>, <u>5.7</u>, <u>5.8</u>, and <u>5.9</u> shall survive the Closing and shall continue in full force and effect in accordance with their terms.

(v)     Each of the periods referred to in this <u>Section 6.1(a)</u> is referred to as a **"Survival Period."**

(vi)     Notwithstanding anything in this <u>Section 6.1(a)</u> to the contrary, in the event that any breach of any representation or warranty by any of the Sellers constitutes an intentional misstatement or omission made with the Knowledge of the Sellers ("**Fraud**") or willful misconduct, such representation or warranty shall survive the consummation of the transactions contemplated in this Agreement and continue in full force and effect without any time limitation with respect to such breach.

(b)     <u>Indemnification by Sellers</u>.

(i)     Each Seller shall indemnify, protect, defend and hold and save Buyer and its Affiliates and each of their respective equityholders, managers, directors, officers, employees and agents (collectively, the "**Buyer Parties**") harmless from and

against the entirety of any Losses any of the Buyer Parties may suffer, sustain or become subject to, through and after the date of the claim for indemnification resulting from, arising from or out of directly or indirectly, relating to, in the nature of, or caused by any breach or inaccuracy of any representation or warranty of such Seller in Section 3.1 of this Agreement, or any breach or non-fulfillment of any covenant or agreement of such Seller set forth in this Agreement; provided that, with respect to any breach or inaccuracy of a representation or warrant by either the Connolly  Trust on one hand, or the Waters Trust, on the other hand, Mr. Connolly will be jointly and severally liable with the Connolly Trust for any such breach or inaccuracy of the Connolly Trust and Mr. Waters will be jointly and severally liable with the Waters Trust for any such breach or inaccuracy of the Waters Trust.

(ii)     Sellers shall release, indemnify, protect, defend and hold and save the Buyer Parties harmless, from and against the entirety of any Losses any of the Buyer Parties may suffer, sustain or become subject to, through and after the date of the claim for indemnification, including without limitation any Losses any of the Buyer Parties may suffer after the end of the Survival Period (if applicable) if notice of a claim is delivered in compliance with Section 8.8 before the end of the Survival Period, resulting from, arising from or out of, relating to, in the nature of, or caused by: (A) any breach or inaccuracy of any representation or warranty relating to the Pharmalucence Companies in Section 3.2 of this Agreement or in the Disclosure Schedule relating thereto delivered by them in connection herewith; (B) any nonfulfillment or breach of any covenant or agreement which is the obligation of the collective Sellers; (C) any Indebtedness of the Pharmalucence Companies or any Transaction Expenses that are not taken into account in the calculation of the True-Up Payments; or (D) any Liability for Taxes pursuant to Section 5.9(a) of this Agreement.

(c)     Indemnification by Buyer.  Buyer shall indemnify, defend and hold harmless Sellers from and against the entirety of any Losses any of the Sellers shall suffer, sustain or become subject to, through and after the date of the claim for indemnification, resulting from (i) any breach or inaccuracy of any representation or warranty of Buyer in Section 3.3 of this Agreement, or (ii) any nonfulfillment or breach of any covenant or agreement on the part of Buyer set forth in this Agreement.

(d)     Indemnifiable Losses.  All Losses for which the Buyer Parties are entitled to seek indemnification under this Agreement are referred to herein as "**Buyer Indemnifiable Losses**."  All Losses for which Sellers are entitled to seek indemnification under this Agreement are referred to herein as "**Seller Indemnifiable Losses**."  The indemnification obligations of Sellers with respect to Buyer Indemnifiable Losses shall be joint and several. All Buyer Indemnifiable Losses shall be satisfied first from the Escrow Funds, then may be set off against any Earn-Out Payments (subject to the Cap) at the discretion of Buyer.

(e)     Threshold for Claims.  No claim for Losses shall be made by the Buyer Parties under Section 6.1(b)(ii)(A) unless the aggregate of Losses exceeds $500,000 for which claims are made hereunder by the Buyer Parties, in which case the Buyer Parties shall be entitled to seek compensation only for Losses in excess of $500,000 (the

"**Limitation**"); provided, however, that the Limitation shall not apply with respect to any Losses arising directly from or related to any breach or inaccuracy of the Fundamental Representations.  Notwithstanding the provisions of this Section 6.1(e), the Limitation shall not apply to any Losses based upon, resulting from or arising out of any claims for indemnification involving Fraud and/or willful misconduct.

(f)  Cap on Indemnification.  The aggregate amount to be paid by the Sellers for claims for Losses made under Section 6.1(b)(ii)(A) shall not exceed (i) 60% of the Cap for any Losses which are not based upon, resulting from, or arising out of a breach of the Fundamental Representations, and (iii) 100% of the Cap with respect to all Losses. Notwithstanding the provisions of this Section 6.1(f), the Cap shall not apply to any Losses based upon, resulting from or arising out of any claims for indemnification involving Fraud and/or willful misconduct.

(g)  Exclusive Remedy.  The indemnification provisions of this Section 6.1 and Section 5.9 shall be the exclusive remedies and recourse with respect to this Agreement and the transactions contemplated hereby (including without limitation for breaches of representations, warranties and covenants).  Buyer and the Sellers hereby waive any and all other rights and remedies they may have, whether statutory, equitable or at common law; provided, however, that Buyer shall be entitled to seek injunctive relief or other equitable relief in addition to any and all remedies available at law or in equity in connection with potential or actual breaches of Sections 5.7(b) and (c).

(h)  No Additional Representation and Warranties.  Except for the representations and warranties set forth in Section 3 of this Agreement, there are no other express or implied representations and warranties from Sellers or Buyer.

6.2  Matters Involving Third Parties.

(a)  If any third party shall notify any Party (the "**Indemnified Party**") with respect to any matter which may give rise to a third party claim (a "**Third Party Claim**") by such Indemnified Party for indemnification against any other Party (the "**Indemnifying Party**") under this Agreement, then the Indemnified Party shall promptly notify each Indemnifying Party thereof; provided, however, that the failure to so notify the Indemnifying Party promptly shall not relieve the Indemnifying Party of its obligations hereunder except to the extent such failure shall have materially prejudiced the Indemnifying Party.

(b)  Any Indemnifying Party will have the right to defend the Indemnified Party against the Third Party Claim with counsel of the Indemnifying Party's choice, reasonably satisfactory to the Indemnified Party, so long as (i) the Indemnifying Party notifies the Indemnified Party, within ten (10) Business Days after the Indemnified Party has given notice of the Third Party Claim to the Indemnifying Party (or by such earlier date as may be necessary under applicable procedural rules in order to file a timely appearance and response) that the Indemnifying Party is assuming the defense of such Third Party Claim, provided, that if the Indemnifying Party assumes control of such defense it must first agree and acknowledge in such notice that the Indemnifying Party is

fully responsible (with no reservation of any rights other than the right to be subrogated to the rights of the Indemnified Party) for all Losses relating to such Third Party Claim, (ii) the Indemnifying Party provides the Indemnified Party with evidence reasonably acceptable to the Indemnified Party that the Indemnifying Party has and will at all times continue to have the financial resources to defend against the Third Party Claim (including any increased losses caused by such defense) and fulfill its indemnification obligations hereunder with respect thereto and provides security therefor, (iii) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently and at its own costs and expense, and (iv) the Third Party Claim (A) does not involve injunctive relief, specific performance or other similar equitable relief, any claim in respect of Taxes, any Governmental Authority, any criminal allegations, or any potential damage to the goodwill, reputation or overriding commercial interests of the Buyer, the Pharmalucence Companies or the Business (including customer and supplier relations); (B) is not one in which the Indemnifying Party is also a party and joint representation would be inappropriate or there may be legal defenses available to the Indemnified Party which are different from or additional to those available to the Indemnifying Party; (C) does not involve a claim which, upon petition by the Indemnified Party, the appropriate court rules that the Indemnifying Party failed or is failing to vigorously prosecute or defend; or (D) does not involve any Release or threat of Release of any Hazardous Materials at, on, under or from the Leased Real Property, the Owned Real Property, the Bedford Facility, or the Billerica Facility which, in order to be investigated or remediated as required by applicable Environmental Law, may interfere with the conduct of Business by the Buyer at such location.

(c)     So long as the conditions set forth in Section 6.3(b) are and remain satisfied, then (i) the Indemnifying Party may conduct the defense of the Third Party Claim in accordance with Section 6.3(b), (ii) the Indemnified Party may retain separate co-counsel at its sole cost and expense (except that the Indemnifying Party will be responsible for the fees and expenses of the separate co-counsel to the extent the Indemnified Party reasonably concludes that the counsel the Indemnifying Party has selected has an actual or potential conflict of interest), (iii) the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party (not to be unreasonably withheld, conditioned or delayed), (iv) the Indemnifying Party will not consent to the entry of any judgment with respect to the matter, or enter into any settlement which either imposes an injunction or other equitable relief upon the Indemnified Party or does not include a provision whereby the plaintiff or claimant in the matter releases the Indemnified Party from all Liability with respect thereto, and (v) the Indemnified Party shall, at the Indemnifying Party's request and at the Indemnifying Party's expense, reasonably cooperate in the defense of the matter.  In the event that the conditions in Section 6.3(b) are not satisfied or become unsatisfied in the case of any Third Party Claim, then the Indemnified Party may assume control of the defense of such claim to the entire exclusion (including with respect to settlement or entry of judgment) and at the entire expense of the Indemnifying Party.

6.3     Calculation of Indemnification Payments.

(a)     The amount of any Losses payable under this <u>Section 6</u> by the Indemnifying Party shall be net of any amounts actually recovered and received by the Indemnified Party or its Affiliates under applicable insurance policies or from any third party in respect of such Loss, in each case net of costs and expenses incurred by such Indemnified Party or its Affiliates in procuring such recovery and any retro-premium obligations, increases in premiums or premium adjustments, deductibles incurred or other obligations associated therewith.   If the Indemnified Party or its Affiliates actually receives any amounts under applicable insurance policies or from any third party with respect to such Loss, subsequent to an indemnification payment by the Indemnifying Party, then such Indemnified Party shall promptly reimburse the Indemnifying Party for any indemnification payment actually made to such Indemnified Party by such Indemnifying Party in connection with providing such indemnification payment up to the amount actually received by the Indemnified Party or its Affiliates, in each case, net of costs and expenses incurred by such Indemnified Party or its Affiliates in procuring such recovery and any retro-premium obligations associated therewith.

(b)     Subject to the other provisions regarding indemnification contained herein, if Sellers are obligated to reimburse or compensate the Buyer Parties for any liability for Taxes pursuant to the terms of <u>Section 5.9</u> or for any Buyer Indemnifiable Losses pursuant to the terms of this <u>Section 6</u>, then Sellers shall pay such amount to Buyer within ten (10) Business Days following the date upon which the amount of such Tax Liability or Buyer Indemnifiable Loss is finally determined or agreed upon by the Seller Representative and the Buyer.

6.4     <u>No Contribution or Circular Recovery</u>.   Sellers shall not have any right of contribution or cost recovery, and no cause of action under any Environmental Laws, against Buyer, the Pharmalucence Companies or any other Buyer Party with respect to any Buyer Indemnifiable Losses. Sellers hereby agree that they shall not make any claim for indemnification against Buyer or any other Buyer Party by reason of the fact that Sellers or any of their agents or other representatives was a controlling person, equityholder director, officer, manager, employee, agent or other representative of the Pharmalucence Companies or was serving as such for another Person at the request of the Pharmalucence Companies (whether such claim is for losses of any kind or otherwise and whether such claim is pursuant to any Law, Organizational Document, contractual obligation or otherwise) with respect to any claim brought by Buyer against such Person (whether such claim is pursuant to this Agreement, applicable Law, or otherwise).

6.5     <u>Certain Determinations</u>. Notwithstanding anything to the contrary contained in this Agreement, for purposes of determining the amount of any Losses that are the subject matter of a claim for indemnification hereunder, each representation, warranty and covenant in this Agreement and each certificate or document delivered pursuant hereto shall be read without regard and without giving effect to the term(s) "material" or "Material Adverse Effect" or similar qualifiers as if such words and surrounding related words (e.g. "reasonably be expected to," "could have" and similar restrictions and qualifiers) were deleted from such representation, warranty or covenant.  The right to indemnification, payment of Losses of an Indemnified Party or for other remedies based on any representation, warranty or covenant contained in or made pursuant to this Agreement shall not be affected by any investigation conducted with respect to,

or any knowledge acquired (or capable or being acquired) at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty or covenant.

## 7.    TERMINATION

7.1    <u>Termination</u>. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a)    by mutual written consent duly executed by each of the Sellers and Buyer;

(b)    by Buyer (on the one hand) or Sellers (on the other hand), upon notice to the other party, if the transactions contemplated by this Agreement have not been consummated on or prior to November 30, 2014 or such later date, if any, as Buyer and Sellers, may agree upon in writing (the "**Outside Date**"); <u>provided</u>, <u>however</u>, that no Person shall be entitled to terminate this Agreement pursuant to this <u>Section 7.1(b)</u> if such Person's knowing or willful breach of this Agreement has prevented the consummation of the transactions contemplated hereby;

(c)    by Sellers if (i) Buyer has breached or failed to perform any of its covenants or other agreements contained in this Agreement to be complied with by it such that the closing condition set forth in <u>Section 4.2(b)</u> would not be satisfied or (ii) there exists a breach of any representation or warranty of Buyer contained in this Agreement such that the closing condition set forth in <u>Section 4.2(a)</u> would not be satisfied, and in the case of both (i) and (ii) above, such failure to perform or breach is not cured within thirty (30) days after receipt of written notice thereof from Sellers or is incapable of being cured by Buyer by the Outside Date; or

(d)    by Buyer, if (i) Sellers have breached or failed to perform any of their covenants or other agreements contained in this Agreement to be complied with by it such that the closing condition set forth in <u>Section 4.1(b)</u> would not be satisfied or (ii) there exists a breach of any representation or warranty of Sellers contained in this Agreement such that the closing condition set forth in <u>Section 4.1(a)</u> would not be satisfied, and in the case of both (i) and (ii) above, such failure to perform or breach is not cured within thirty (30) days after receipt of written notice thereof from Buyer or is incapable of being cured by Sellers by the Outside Date; or

(e)    by Buyer in accordance with Section 5.12.

7.2    <u>Effect of Termination</u>.  In the event of termination of this Agreement pursuant to <u>Section 7.1</u>, this Agreement will become void and have no further force or effect, without any liability or obligation on the part of Sellers or Buyer, other than the provisions of this <u>Section 7.2</u> and <u>Section 8</u> (to the extent applicable) which will each survive any termination of this Agreement; <u>provided</u>, <u>however</u>, that nothing herein will relieve any Party from any liability for any willful breach of this Agreement by such Party occurring prior to such termination.  A Party's right to terminate this Agreement is in addition to, and not in lieu of, any other legal or equitable rights or remedies which such party may have.

## 8.    MISCELLANEOUS

8.1     Seller Representative.

(a)     Sellers hereby appoint EBGIBL, LLC, a Massachusetts limited liability company, as the "**Seller Representative**"; provided, however, that, the appointed representative of such company shall be L. William Waters, and such individual is subject to change at the discretion of the Seller Representative.  The Seller Representative shall serve as representative of Sellers with full power and authority to take all actions under this Agreement and the Ancillary Agreements solely on behalf of each of such Sellers.  Each Seller by approval of this Agreement, hereby irrevocably appoints the Seller Representative as the agent, proxy and attorney-in-fact for such Seller for all purposes of this Agreement, including full power and authority on such Seller's behalf (i) to consummate the transactions contemplated herein, (ii) to execute and deliver on behalf of such Seller any amendment or waiver hereto, (iii) to take all other actions to be taken by or on behalf of such Seller in connection herewith, (iv) to negotiate, settle, compromise and otherwise handle all disputes under Section 2.3 and claims made under Sections 5.9 or 6 hereof, and (v) to do each and every act and exercise any and all rights which such Seller or Sellers collectively are permitted or required to do or exercise under this Agreement or the Ancillary Agreements.  Each Seller agrees that such agency and proxy are coupled with an interest, are therefore irrevocable without the consent of the Seller Representative and shall survive the death, incapacity or bankruptcy of any Seller.  Neither the Seller Representative nor any agent employed by it shall incur any liability to any Seller relating to the performance of its duties hereunder except for actions or omissions constituting fraud, bad faith, gross negligence or willful misconduct.

(b)     Any expenses or liabilities incurred by the Seller Representative in connection with the performance of its duties in such capacity under this Agreement or the Ancillary Agreements shall be reimbursed to the Seller Representative by the Sellers. The Seller Representative may from time to time submit invoices to Sellers covering their Pro Rata Portion of such expenses and/or liabilities and, upon the request of any Seller, shall provide such Seller with an accounting of all expenses paid.  In addition to any other rights or remedies, the Seller Representative may, upon prior or contemporaneous written notice, offset any amounts determined by it to be owed by any Seller to the Seller Representative against any amounts to be paid to Sellers.

(c)     Each Seller shall severally, but not jointly, based on their respective Pro Rata Portion, indemnify and hold harmless, the Seller Representative from any and all losses, liabilities and expenses (including the reasonable fees and expenses of counsel) arising out of or in connection with the Seller Representative's execution and performance (solely in its capacity as the Seller Representative and not in its capacity as a Seller) of this Agreement and the Ancillary Agreements, except for fraud or willful misconduct by the Seller Representative.   This indemnification will survive the termination of this Agreement and the Ancillary Agreements. The Seller Representative may, in all questions arising under this Agreement, rely on the advice of counsel and for anything done, omitted or suffered in good faith by the Seller Representative in accordance with such advice, the Seller Representatives will not be liable to Sellers.  In no event will the Seller Representative (solely in its capacity as the Seller Representative

and not in its capacity as a Seller) be liable hereunder or in connection herewith to any of the Sellers for any indirect, punitive, special or consequential damages.

(d)     Each Seller (including, in each case for purposes of this Section 8.1(d), the Seller Representative) agrees that Buyer and, following the Closing, the Pharmalucence Companies, shall be entitled to rely on any action taken by the Seller Representative, on behalf of each Seller (each, an "**Authorized Action**"), and that each Authorized Action shall be binding on each Seller as fully as if such Seller had taken such Authorized Action.  Each Seller agrees to pay, and to indemnify and hold harmless, each of the Buyer Indemnified Parties from and against any Losses which they may suffer, sustain, or become subject to, as the result of any claim by any Person that an Authorized Action is not binding on, or enforceable against, any Seller. In addition, each Seller hereby releases and discharges Buyer and, following the Closing, the Pharmalucence Companies, from and against any Losses arising out of or in connection with the Seller Representative's failure to distribute any amounts received by the Seller Representative on Sellers' behalf to Sellers.  Payment of all amounts paid by or on behalf of Buyer to the Seller Representative shall constitute payment by Buyer to each of the Sellers and satisfaction of the Buyer's obligation to pay such amount hereunder (notwithstanding any withholding by the Seller Representative).

8.2     Press Releases and Announcements.  Prior to Closing, no Party shall, nor shall it permit any of its managers, directors, officers, employees, agents, or representatives to, issue any press release or public announcement relating to the subject matter of this Agreement without the prior written approval of the other Parties hereto.  Following the Closing, Sellers shall not, nor shall they permit any of their agents or representatives to, issue any press release or public announcement relating to the subject matter of this Agreement without the prior written approval of Buyer; provided, however, that both prior to and following Closing, any Party may make any public disclosure it believes in good faith is required by Law, in which case the disclosing Party will advise the other Party prior to making the disclosure and shall insofar as may be practicable reflect on such disclosure substantially all reasonable comments of the other Parties.

8.3     Specific Performance.  Sellers acknowledge that the Pharmalucence Companies' business is unique and recognizes and affirms that in the event of a breach of this Agreement by such Person, money damages may be inadequate and Buyer may have no adequate remedy at law.  Accordingly, Sellers agree that Buyer shall have the right, in addition to any other rights and remedies existing in its favor, to enforce its rights and Sellers' obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive and/or other equitable relief, in each case without the requirement of posting a bond or proving actual damages.  If any such action is brought by Buyer to enforce this Agreement, Sellers hereby waive the defense that there is an adequate remedy at law.

8.4     No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

8.5     Entire Agreement.  This Agreement (including the other documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior

understandings, agreements, or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof.

8.6    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign this Agreement or any of such Party's rights, interests, or obligations hereunder without the prior written approval of the other Parties, except that Buyer may assign (a) its rights and obligations hereunder to any of its Affiliates, (b) as collateral security its rights pursuant hereto to any Person providing financing to Buyer or any of its Affiliates, and (c) its rights and obligations hereunder to any subsequent purchaser of Buyer, such permitted transferee or a material portion of their assets (whether such sale is structured as a sale of stock, sale of assets, merger, recapitalization or otherwise).

8.7    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.  It is the express intent of the Parties hereto to be bound by the exchange of signatures on this Agreement via facsimile or electronic mail via the portable document format (PDF).

8.8    Notices.   All notices, requests, demands, claims, and other communications hereunder will be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) three (3) Business Days after it is sent by registered or certified mail, return receipt requested, postage prepaid, (ii) one day after receipt is electronically confirmed, if sent by fax (provided that a hard copy shall be promptly sent by first class mail), or (iii) one (1) Business Day following deposit with a recognized national overnight courier service for next day delivery, charges prepaid, and, in each case, addressed to the intended recipient as set forth below:

If to Sellers:

Glenn Alto
132 Cold Spring Road
Westford, MA  01886

Edward J. Connolly and/ or
The Connolly 2014 Grantor Retained Annuity Trust
105 Warren Road
Townsend, MA 01469

L. William Waters and/or
Lewis William Waters III 2014 Qualified Annuity Trust
5 McMahon road
Bedford, MA 01730

With a copy (which shall not constitute notice) to:

Morse, Barnes-Brown & Pendleton, P.C.
City Point
230 Third Avenue
4th Floor
Waltham, MA  02451
Attention:  Carl F. Barnes, Esq.

If to the Seller Representative:

With a copy (which shall not constitute notice) to:

EBGIBL, LLC
c/o L. William Waters
5 McMahon road
Bedford, MA 01730

Morse, Barnes-Brown & Pendleton, P.C.
City Point
230 Third Avenue
4th Floor
Waltham, MA  02451
Attention:  Carl F. Barnes, Esq.

If to Buyer:

Mr.   Kalyanasundaram   Subramanian,   Chief
Executive Officer
Caraco Pharmaceutical Laboratories Ltd.
c/o Taro Pharmaceuticals U.S.A., Inc.
3 Skyline Drive, Hawthorne, NY 10532
Phone: 914-345-9001 ext.6905
Fax:    914-345*0823

With a copy (which shall not constitute notice) to:

Reed Smith LLP
1717 Arch Street, Suite 3100
Philadelphia PA 19103

and

GP Singh Sachdeva
Sun Pharma USA
Caraco Pharmaceutical Laboratories Ltd.
1 Commerce Drive
Cranbury, NJ
Phone: 609 819 8200
Fax: 609 655 7448

Attention: Margaret S. Jones, Esq.

Any Party may give any notice, request, demand, claim, or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is delivered to the individual for whom it is intended.  Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

8.9    Governing Law.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

8.10   CONSENT TO JURISDICTION.   BUYER AND SELLERS HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE APPLICABLE STATE OR FEDERAL COURTS SITTING IN NEW YORK, NEW YORK, FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF

OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND EACH OF BUYER AND SELLERS AGREE NOT TO COMMENCE ANY LEGAL PROCEEDING RELATED THERETO EXCEPT IN SUCH COURTS.  EACH OF BUYER AND SELLERS IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH HE OR IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH COURT OR THAT SUCH ACTION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

8.11   WAIVER OF TRIAL BY JURY.  TO THE EXTENT PERMITTED BY LAW, SELLERS AND BUYER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY IN CONNECTION HEREWITH.  SELLERS HEREBY EXPRESSLY ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR BUYER TO ENTER INTO THIS AGREEMENT.

8.12   Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and the Seller Representative.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent occurrence of such kind.

8.13   Severability.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the invalid or unenforceable term or provision in any other situation or in any other jurisdiction.  If a final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

8.14   Expenses.  Except as otherwise explicitly provided in this Agreement, each of the Parties will bear such Party's own direct and indirect costs and expenses (including fees and expenses of legal counsel, investment bankers, brokers or other representatives or consultants) incurred in connection with the negotiation, preparation and execution of this Agreement and the transactions contemplated hereby, whether or not such transactions are consummated.

8.15   Construction.  The Parties have jointly participated in the negotiation and drafting of this Agreement.  In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumptions or burdens

of proof shall arise favoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to "Pharmalucence Companies" herein shall be deemed to refer both to each Pharmalucence Company on an individual basis and also to the Pharmalucence Companies on a collective basis, and any reference to "Sellers" herein shall be deemed to refer both to each Seller on an individual basis and also to Sellers on a collective basis.  As used in this Agreement, the word "including" means without limitation, the word "or" is not exclusive and the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Each defined term used in this Agreement shall have a comparable meaning when used in its plural or singular form. Unless the context otherwise requires, references herein: (a) to Articles, Sections, Exhibits and Schedules mean the Articles and Sections of and the Exhibits and Schedules attached to this Agreement, (b) to an agreement, instrument or document means such agreement, instrument or document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and not prohibited by this Agreement and (c) to a Law means such Law as amended from time to time and includes any successor legislation thereto. The headings and captions used in this Agreement, or in any Schedule or Exhibit hereto are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize or in any way affect any provision of this Agreement or any Schedule or Exhibit hereto. Any capitalized terms used in any Schedule or Exhibit attached hereto and not otherwise defined therein shall have the meanings set forth in this Agreement (or, in the absence of any ascribed meaning, the meaning customarily ascribed to any such term in pharmaceutical industry or in general commercial usage).  All amounts payable hereunder and set forth in this Agreement are expressed in U.S. dollars, and all references to dollars (or the symbol "$") contained herein shall be deemed to refer to United States dollars. Where any provision in this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether the action in question is taken directly or indirectly by such Person. The Parties agree that the original of this Agreement will be written in the English language, and each Party waives any rights it may have under the laws of its country of residence to have such Agreement written in its local language. If a local language version is provided, it is for convenience only and the English language version shall be the binding document.

8.16   Incorporation of Exhibits and Schedules.  The Exhibits, Schedules and Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.  The Exhibits, Schedules and Disclosure Schedules to this Agreement, and any supplements or modifications thereof, relate only to the representations and warranties in the Section of the Agreement to which they expressly relate, and not to any other representation or warranty in this Agreement.  The Exhibits, Schedules and Disclosure Schedules do not modify the Agreement except to the extent specifically provided in the Agreement.

8.17   Conflict of Interest.  If the Seller Representative so desires, acting on behalf of the Sellers and without the need for any consent or waiver by the Buyer, the Pharmalucence Companies or any other Person, Morse, Barnes-Brown & Pendleton, P.C. LLP ("**MBBP**") shall be permitted to represent the Seller Representative and/or the Sellers after the Closing in connection with any matter related to the transactions contemplated by this Agreement and any other agreements referenced herein or any disagreement or dispute relating thereto. Without limiting the generality of the foregoing, after the Closing, MBBP shall be permitted to represent the Sellers, any of their agents and affiliates, or any one or more of them, in connection with any

negotiation, transaction, claim or dispute (which includes litigation, arbitration or any other adversary proceeding) with the Buyer, the Pharmalucence Companies, the Sellers, or any of their agents or affiliates under or relating to this Agreement, any transaction contemplated by this Agreement, and any related matter, such as claims or disputes arising under other agreements entered into in connection with this Agreement. Upon and after the Closing, the Pharmalucence Companies shall cease to have any attorney-client relationship with MBBP, unless and to the extent MBBP is specifically engaged in writing by either Pharmalucence Company or to represent the such Pharmalucence Company after Closing and either such engagement involves no conflict of interest with respect to the Sellers or the Seller Representative consents in writing at the time to such engagement. Any such representation of a Pharmalucence Company by MBBP after the Closing shall not affect the foregoing provisions hereof.

8.18    Attorney-Client Privilege.  Notwithstanding the transactions contemplated hereby, Buyer and the Sellers agree that neither Buyer nor the Pharmalucence Companies shall have the right to assert the attorney-client privilege as to pre-closing and post-closing communications between the Sellers or the Pharmalucence Companies (for the Pharmalucence Companies, only with respect to pre-closing communications), on one hand, and its counsel, MBBP, on the other hand, to the extent that the privileged communications relate to this Agreement or any of the ancillary agreements or to the transactions contemplated hereby and thereby. The parties agree that only the Sellers shall be entitled to assert or waive such attorney-client privilege in connection with such communications following the Closing. The files generated and maintained by MBBP as a result of the law firm's representation of the Sellers and the Pharmalucence Companies in connection with this Agreement or any of the ancillary agreements or any of the transactions contemplated hereby or thereby shall be and become the exclusive property of the Sellers. The attorney-client privilege may be waived on behalf of the Sellers only by the Sellers or the Seller Representative.

*[remainder of page intentionally left blank – signature page follows]*

IN WITNESS WHEREOF, the Parties hereto have each executed and delivered this Equity Purchase Agreement as of the day and year first above written.

CARACO PHARMACEUTICAL LABORATORIES LTD.

By:

Name: Kal Sundaram

Title: Chief Executive Officer

GLENN ALTO

EDWARD J. CONNOLLY

THE CONNOLLY 2014 GRANTOR RETAINED ANNUITY TRUST

By:

Name: Edward J. Connolly

Title: Trustee

L. WILLIAM WATERS

LEWIS WILLIAM WATERS III 2014 QUALIFIED ANNUITY TRUST

By:

Name: Lewis W. Waters

Title: Trustee

[Signature Page to Equity Purchase Agreement]

# EXHIBIT B

**SCHEDULE 2.4**

Earn-Out Payments

Buyer will inform Sellers in writing with applicable supporting documents after the achievement of each of the milestone events set forth below.  Buyer will pay to Sellers the corresponding amounts as specified in the table below within thirty (30) Business Days after achievement of such milestone.  Each of the milestone payments set forth in this Schedule 2.4 will be made only once. The aggregate payments due under this Schedule 2.4 will not exceed Thirty Million Dollars ($30,000,000).

| Milestone Event | Amount (USD) |
|---|---|
| 1.  Receipt from the FDA of an approval letter in response to filing of a Prior Approval Supplement for the manufacturing site transfer from the Bedford Facility to the Billerica Facility of a Pharmalucence Existing Product. | 5 Million |
| 2.  Acceptance by FDA of Pharmalucence's ANDA submission for mertiatide (generic MAG-3) by December 31, 2015. | 3.125 Million |
| 3.  Acceptance by FDA of Pharmalucence's ANDA submission for tetrofosmin, 30 cc vial (generic Myoview) by December 31, 2016. | 3.125 Million |
| 4.  Acceptance by FDA of the Pharmalucence or its co-development partner's ANDA submission for In-111 pentetreotide (generic Octreoscan) by December 31, 2017. | 3.125 Million |
| 5.  Acceptance by any ex-US regulatory body of the submission of Pharmalucence ANDA or equivalent for tetrofosmin, 10 cc vial (generic Myoview) by June 30, 2017. | 3.125 Million |
| 6.  Upon receipt of the written and final Regulatory Approval for the **MAG-3** product being developed by Pharmalucence in the US from the FDA by December 31, 2018.  For the avoidance of doubt, such final, written approval will not be a tentative or conditional approval. | 3.125 Million |
| 7.  Upon receipt of the written and final Regulatory Approval for the **tetrofosmin 30 cc vial** product being developed by Pharmalucence in the US from the FDA by December 31, 2018.  For the avoidance of doubt, such final, written approval will not be a tentative or conditional approval. | 3.125 Million |

| | |
|---|---|
| 8. Upon receipt of the written and final Regulatory Approval for the **octreoscan** product being developed by Pharmalucence in the US from the FDA by December 31, 2019.  For the avoidance of doubt, such final, written approval will not be a tentative or conditional approval. | 3.125 Million |
| 9. Upon receipt of the written and final Regulatory Approval for the **tetrofosmin 10 cc vial** product being developed by Pharmalucence in any market outside the U.S. by June 30, 2019.  For the avoidance of doubt, such final, written approval will not be a tentative or conditional approval. | 3.125 Million |

For purposes of this Schedule 2.4, "**Acceptance**" means a written notice from the FDA, or in the case of the generic tetrofosmin product an ex-U.S. regulatory authority which is a counterpart to the FDA, that the Registration Application has been determined to be acceptable for filing.

For purposes of this Schedule 2.4, "**a Prior Approval Supplement**" means a filing with the FDA as required under the §314.70 of the FDCA in order to gain approval of a change that has a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of a drug product as these factors may relate to the safety or effectiveness of the drug product.

Additionally, Buyer, in Buyer's sole discretion, upon prior written notice to Sellers, may reprioritize and substitute for any of the products set forth in the table immediately above. If Buyer substitutes a product, whether that is an existing Buyer product that is transferred into the Facilities or a new product developed in the Facilities, those substituted products qualify for the milestone payments. In the event a product substitution occurs, the milestone timing and milestone payments associated with the product that was replaced ("**PL Product**") apply to the product that was substituted in its place ("**Sun Replacement Product**"). For clarification, the first four products that are filed from the facility are subject to the milestones ("Product 1, Product 2, Product 3, and Product 4"). If, for example, the PL Product in the Product 1 slot is substituted by a Sun Replacement Product, the Sun Replacement Product triggers the Product 1 milestone payments (both upon filing and approval) and the PL Product that was originally in the Product 1 slot moves to the Product 2 slot and is therefore subject to the milestone timing and milestone payments associated with the Product 2 slot. For the avoidance of doubt, the milestones set forth above shall be payable based on the first four products submitted for approval (whether PL Products or Sun Replacement Products).

In the event that Sun takes any action that materially diminishes the manufacturing and/or development capacity of the Facilities to the extent the ability to file four (4) PL or Sun Replacement Products is materially affected, Buyer shall continue in good faith, the development and filing of remaining PL Products and make any remaining Earn Out Payments on the earlier of (1) when the milestones are achieved within the specified time period, or (2) the deadline specified above as applicable to each milestone, regardless of whether or not milestone has been achieved.

In the event (i) Buyer terminates the employment of  the Individual Seller who remains employed with Buyer for the longest period following the Closing without Cause (as defined in the applicable Employment Agreement between Buyer and such employee), (ii) fails to renew the employment of such Individual Seller following the expiration of the term set forth in such Individual Seller's employment agreement with Buyer or (iii) such Individual Seller resigns his employment with Buyer for Good

Reason, in either case prior to the earlier of (x) the achievement of the milestones set forth herein, or (y) the expiration of the time in which such milestones may be achieved, then Buyer shall pay the full amount of all potential remaining Earn-Out Payments hereunder, at the time such milestones are achieved, but disregarding any time limitations on the achievement of such milestones.

# EXHIBIT C

# EXECUTIVE EMPLOYMENT AGREEMENT

This EXECUTIVE EMPLOYMENT AGREEMENT (the "Agreement") is made as of the date last executed by and between Pharmalucence, Inc. ("Pharmalucence" or the "Company") and Glenn Alto (the "Executive").

## R E C I T A L S

WHEREAS, the Company desires to employ Executive as its Vice President and General Manager under the terms and conditions hereinafter provided; and

WHEREAS, Executive desires to be employed by the Company as Vice President and General Manager under the terms and conditions hereinafter provided.

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereby agree as follows:

## A G R E E M E N T

1.     <u>Employment Term, Position, and Duties and Responsibilities</u>

1.1     <u>Term</u>  The employment of Executive by the Company pursuant to this Agreement shall commence on July 15, 2014 (the "Effective Date") and continue for a term not to exceed twelve (12) months unless otherwise terminated by either party in accordance with the provisions of Section 4 of this Agreement (the "Term").

1.2     <u>Position and Duties</u>  Executive shall be employed as the Company's Vice President and General Manager and, during the Term of this Agreement, shall devote his full time, attention, energies and abilities in these capacities to the proper management and conduct of the Company's business, to the exclusion of any other occupation.  Executive shall report to Kal Subramanian, Chief Executive Officer, Caraco Pharmaceutical Laboratories Ltd. and shall have direct responsibility for providing strategic leadership for the Company by working with the Executive Management Team to establish future, long-range goals, strategies, plans and policies and perform such other duties as are otherwise delegated to him from time-to-time by the Company and not inconsistent with Executive's role as a Vice President and General Manager of the Company.  Executive acknowledges that the general purpose for his employment under this Agreement is to ensure a smooth and efficient transition of the aforementioned responsibilities to Executive's successor(s) as the Company deems necessary in its sole discretion.  The Company acknowledges that Executive's duties shall specifically including taking all reasonable actions to assist the Company in achieving on a timely basis each of the milestone events identified in Schedule 2.4 to the Equity Purchase Agreement dated as of May 15, 2014 between Caraco Pharmaceutical Laboratories Ltd. and Executive, among other Sellers listed on the signature page thereto (the "EPA").

1.3     <u>Location and Schedule</u>  During the Term of this Agreement, Executive will be based at the Company's facility located at 29 Dunham Road, Billerica, MA 01821 (the

"Billerica Facility"). Executive understands and agrees, however, that from time to time, it will be necessary for him to travel domestically and/or internationally in the fulfillment of his duties and responsibilities and otherwise as business needs may require.

       1.4    Exclusive Services and Best Efforts  Executive agrees to devote his best efforts, energies, and skills to the full discharge of the duties and responsibilities attributable to his position and, to this end and excluding any periods of paid time off to which Executive is entitled, he agrees he will devote his full professional time and attention exclusively to the business and affairs of the Company.  It is expressly understood and agreed that, during the Term of this Agreement, Executive will not be employed by, retained by, or represent any other person, firm or company engaged in a business of a similar nature or in competition with the Company without the Company's prior written consent.  Executive also agrees that he shall not take personal advantage of any business opportunities (other than passive investments that do not violate Paragraph 5.2 of this Agreement) which arise during his employment and which may benefit the Company.  All material facts regarding such opportunities must be promptly reported to the Chief Executive Officer, Caraco Pharmaceutical Laboratories, Ltd. ("CEO") for consideration by the Company.  Notwithstanding the foregoing, Executive may: (a) participate in charitable and civic affairs (including service on charitable or civic boards and committees); and (b) with the prior written consent of the CEO, serve on the Board of unaffiliated companies, but in all cases such activities shall be permitted only so long as such activities, either individually or in the aggregate, do not interfere with the substantial performance of Executive's duties under this Agreement and/or compete with the business affairs of the Company.

       1.5    Compliance with Company Policies and Procedures  Executive agrees to abide by all Bylaws, policies, practices, procedures and rules of the Company and adhere to the Company's professional standards, including but not limited to those policies and procedures explained in the Company's Employee Handbook and any other manuals or Code of Conduct, as the same may be amended from time to time in the Company's sole discretion, and/or otherwise stated within this Agreement.

       2.    Compensation

       2.1    Base Salary  During the Term of this Agreement, the Company hereby agrees to pay to Executive an annualized base salary of Three Hundred Thousand and 00/100 Dollars ($300,000.00) (the "Base Salary"), less all applicable federal, state and local income and employment taxes and other required or elected withholdings, to be tendered in equal installments on the Company's regularly-scheduled paydays as it is earned but not less frequently than monthly.  Executive's Base Salary will either be direct deposited in any account he designates or mailed to him at any address he designates.

       2.2    Exempt Status  Executive's position is considered exempt from the overtime pay requirements of applicable federal and state law and, as such, Executive will not be entitled to earn any overtime compensation for any hours worked over forty (40) hours in any given workweek.

2.3     Yearly Bonuses  During the Term of this Agreement, Executive will be eligible to earn an annual cash bonus equal to twenty percent (20%) of his Base Salary for that year contingent upon the fulfillment of Company and individual performance objectives and the achievement of annual target goals related to the same which are set by the Company at the beginning of each fiscal year (the "Fiscal Year Bonus").  If Executive's employment by the Company terminates without Cause pursuant to Paragraph 4.5 prior to the expiration of the twelve (12) month Term period established under Paragraph 1.1, the Fiscal Year Bonus will be prorated based on the duration of Executive's actual employment.  Fiscal Year Bonuses are subject to the terms of the Company's bonus plans, policies and practices in effect from time to time, and will be calculated and paid in accordance with the terms of the applicable bonus plans, policies and practices at the same time as the same are calculated and paid to other eligible employees; provided, however, that Executive need not be employed by the Company as of the date the Fiscal Year Bonus is calculated or paid in order to be eligible to receive the Fiscal Year Bonus following a termination of Executive's employment without Cause during the Term.

3.     Fringe Benefits and Perquisites

3.1     Participation in Employee Benefit Plans  Executive may participate in and receive benefits under any and all health and welfare benefit plans (including but not limited to group healthcare (medical, prescription, vision and dental), life insurance, long-term disability plans, family leave insurance, and other benefit plans (including but not limited to 401(k)) that are offered to other executive employees of the Company, to the extent he is eligible thereunder and in accordance with all terms and conditions of such plans, policies, and practices.  The health and welfare benefit plans in effect at the inception of this Agreement in which Executive participates shall not be reduced or discontinued at any time during the Term of this Agreement.

3.2     Vacation  During the Term, Executive shall be entitled to five (5) weeks of paid vacation per year of the Term, such vacation to accrue and be available for use during the Term in accordance with the Company's previously-existing vacation policy and other practices in effect from time-to-time.  Executive shall schedule vacation time in accordance with the Company's vacation policy and practices and in a manner that will not unreasonably interfere with the performance of his duties and with the approval of the CEO, which approval shall not be unreasonably withheld or delayed.

3.3     Reimbursement of Expenses  The Company will reimburse Executive for all reasonable, ordinary and necessary business and travel expenses (including business class travel on all international flights over five (5) hours) incurred in the performance of his job duties and the promotion of the Company's business, subject to his keeping and submitting to the Company accurate and complete records and a full accounting of all such expenses as required by Company policies, procedures and practices.

3.4     Other Perquisites  Executive shall be provided such additional perquisites and fringe benefits as are generally made available to other similarly-situated executives of the Company, including but not limited to paid time away from work for Company-observed

- 3 -

holidays, sick days and bereavement in accordance with the provisions of the Company's applicable policies and practices.

4.     Termination

4.1     Generally   Upon the termination of this Agreement by way of Executive's resignation for any reason, the Company's termination of Executive's employment for any reason, or upon mutual agreement of the parties, Executive will receive payment for any and all unpaid Base Salary earned through the effective date of such resignation, termination or agreement (the "Termination Date") in a lump sum, subject to all applicable income and employment taxes and other required and elected withholdings, as soon as required by law but in no event later than the first regularly-scheduled paydate after the Termination Date.

4.2     By Executive's Death   Executive's employment under this Agreement shall terminate automatically upon his death.  Upon the termination of this Agreement due to Executive's death, the Company shall have no further obligations under this Agreement except that the Company shall pay to Executive's estate, no later than the next regularly-scheduled paydate following notice to the Company of Executive's death or upon such earlier date as required by law, all remaining earned Base Salary.

4.3     By Executive's Disability   The Company reserves the right to terminate Executive's employment under this Agreement if Executive suffers any physical or mental illness or incapacity that, in the Company's reasonable business judgment, would prevent Executive from performing substantially all of his duties under this Agreement with or without a reasonable accommodation for a total of one hundred and eighty (180) calendar days, whether or not continuous and whether or not due to one or more disabilities, during any twelve (12) month period.  Upon the termination of this Agreement due to Executive's disability, the Company shall have no further obligations under this Agreement except that the Company shall pay to Executive, no later than the next regularly-scheduled paydate following Executive's termination or upon such earlier date as required by law, all remaining earned Base Salary.

4.4     By Company for Cause   The Company may terminate Executive's employment under this Agreement at any time by action of the CEO for Cause.  For purposes of this Agreement, "Cause" shall mean: (i) Executive's willful failure to devote substantially all of his business time and reasonable best efforts to the performance of his job duties; (ii) Executive's gross negligence or other misconduct which is demonstrably and materially injurious to the Company and/or its affiliates, monetarily or otherwise, including but not limited to fraud, theft, dishonesty, embezzlement, falsification of records or moral turpitude by Executive; (iii) Executive's conviction (or entering into a plea bargain admitting guilt or nolo contendre) of any felony in any federal or state court of competent jurisdiction; (iv) Executive's willful and material breach of any term of this Agreement; (v) Executive's willful violation or refusal to follow specific and lawful directions from the CEO, provided such directions are not inconsistent with Executive's duties and responsibilities Executive is holding at the time of the directives; (vi) Executive's willful failure to perform (other than by reason of disability) his job duties, or his gross negligence in the performance of his job duties; (vii)

- 4 -

Executive's breach of his fiduciary obligations to the Company; (viii) Executive's violation of the Company's Code of Conduct or other professional standards, including but not limited to its policies against discrimination and harassment; (ix) Executive's knowing and intentional engagement in behavior that endangers the safety or welfare of the Company's employees, customers or other third parties; and/or (x) Executive's excessive absenteeism, alcoholism or drug abuse.  Upon the termination of this Agreement by the Company for Cause, the Company shall have no further obligations under this Agreement except that the Company shall pay to Executive, no later than the next regularly-scheduled paydate following Executive's termination or upon such earlier date as required by law, all remaining earned Base Salary.  Executive shall remain eligible to receive Earn-Out Payments on the schedule set forth in Schedule 2.4 to the EPA, subject to the achievement of the milestone specified therein within the specified time periods stated therein.

      4.5    <u>By Company Without Cause</u>  The Company shall have the option to terminate this Agreement at any time without Cause upon  six (6) months advance written notice to Executive (the "<u>Notice Period</u>"), provided, however, that if the Company terminates this Agreement pursuant to this Paragraph 4.5 within the last six (6) months of the Term, the Notice Period shall be deemed to be equal to the remainder of the Term.  Notwithstanding the foregoing, in the event the Company terminates this Agreement without Cause as defined in Section 4.4 above, the Company shall retain the right to relieve Executive of any or all of his job duties and instruct him not to report to work for all or any part of the Notice Period (the "<u>Garden Leave</u>"), or alternatively pay him the amount, in one lump sum, that he would have earned in Base Salary for the Notice Period in lieu of continuing his employment during such period, subject to all applicable income and employment taxes and other required and elected withholdings.  Upon the Company's tendering of all remaining earned Base Salary to Executive, including payment for his Notice Period, the Company shall have no further obligations to Executive under this Agreement, except that the Company shall pay to Executive the prorated portion of the Fiscal Year Bonus for the year of Executive's termination in accordance with Paragraph 2.3, treating, for such purpose, the last day of the Notice Period as Executive's Termination Date.  Executive shall remain eligible to receive Earn-Out Payments on the schedule set forth in Schedule 2.4 to the EPA, subject to the achievement of the milestones specified therein at the time such milestones are achieved but disregarding any time limitations on the achievement of such milestones.

      4.6    <u>By Executive</u>  Executive retains his right to, at any time, resign from his employment and terminate this Agreement, for any reason or no reason, upon three (3) months advance written notice to the Company (the "<u>Resignation Notice Period</u>").  Notwithstanding the foregoing, the Company shall retain the right, upon receipt of Executive's written resignation and/or notice to terminate this Agreement, to relieve Executive of any or all of his job duties and instruct him not to report to work for all or any part of the Resignation Notice Period, or alternatively pay him the amount, in one lump sum, that he would have earned in Base Salary for the Resignation Notice Period in lieu of continuing his employment during such period, subject to all applicable income and employment taxes and other required and elected withholdings.  Upon the Company's tendering of all remaining earned Base Salary to Executive, including payment for his Resignation Notice Period, the Company shall have no further obligations to Executive under this Agreement.

5.      Secrecy and Protection of Confidential Information, Invention
        Assignment, and Agreement Not to Compete with or Raid the Company

5.1     Secrecy and Ownership of Confidential Information.

        (a)      Definition of Confidential Information.  As used in this Employment
Agreement, the term "Confidential Information" means all technical, non-technical and other
business data including but not limited to processes or services plans, correspondence, orders,
contracts, computer records, mailing, contact and customer lists, wherever or however stored.
"Confidential Information" also includes all tangible and intangible property belonging to the
Company, including intellectual property related to the Company's business or services, which
is known, which becomes known by, used or disclosed to Executive during the Term of this
Employment Agreement and/or at any other time in connection with his performing or having
performed services for the Company, whether or not generated by or for Executive, or
discovered or developed by Executive during his employment with the Company including,
but not limited to, trade secrets, designs, devices, techniques, sketches, drawings, models,
inventions, improvements, ideas, concepts, discoveries, processes, methods of operation,
know-how, expressions of ideas and systems, software, software source documents, microcode
and source code, routines, sub-routes and algorithms, structure, sequence and organization of
computer programs, specifications, and information related to research, development,
purchasing, accounting, systems development, marketing, merchandising and selling, business
plans or forecasts, software and know-how, and other related data, whether or not patentable
or copyrightable.  "Confidential Information" shall not include information which is:

        (i)      generally known or readily available to the trade or public or
                 which becomes so known or readily available without the fault of
                 Executive;

        (ii)     known or possessed by Executive without restriction as to
                 disclosure or use prior to its receipt hereunder;

        (iii)    disclosed in any publication or other source from and after the
                 time it becomes generally available to the public; or

        (iv)     disclosed pursuant to governmental, regulatory or judicial order;
                 provided, however, that Executive shall have first given the
                 Company written notice thereof and provided reasonable
                 opportunity to seek a protective order.

        (b)      Non-Disclosure of Confidential Information.  Executive agrees that
during his employment with the Company, and at all times thereafter, he will not, except
pursuant to his employment responsibilities or provision of services to the Company, directly
or indirectly, use, disclose, or cause to be used or disclosed, any Confidential Information
belonging to the Company; make, use, download, upload, transmit, release, print, copy,
retain, or disclose documents or copies of documents containing such Confidential Information
for his own use; or assist any unrelated third parties in obtaining, using, transmitting, copying
or disclosing such Confidential Information.  Executive acknowledges and agrees that the

- 6 -

foregoing restrictions include restrictions against disclosures being made via the internet, in any email, on any website, on any online journal or web log ("blog"), on any social media or social networking sites (including but not limited to Twitter, Facebook, LinkedIn, YouTube, MySpace and the like), or in or through any cloud, file sharing or file hosting service (including but not limited to Dropbox Free, Dropbox Pro, Dropbox for Business, and the like).

        (c)    Return of Confidential Information. Executive agrees that all Confidential Information and all other documents made, compiled, acquired or otherwise accessed by Executive during the course of Executive's employment with and/or at any other time in connection with his provision of services to the Company, regardless of media or location (including but not limited to documents, files and records, lists, notebooks, software, disks, cloud or file shares, and all copies thereof), is and shall remain the sole property of the Company. Executive further agrees that all originals and copies thereof shall be delivered to the Company immediately upon termination of his employment (whether voluntary or involuntary), and at any other time upon the request of the Company, regardless of the reason for the request. To the extent that Executive transfers any Confidential Information to any personal electronic storage device or has or maintains any Confidential Information on any personal removable or non-removable magnetic media owned by Executive (for example, a computer's hard disk drive), or transfers, saves or maintains any Confidential Information on any cloud or file sharing service or system (including but not limited to Dropbox Free, Dropbox Pro, Dropbox for Business and the like) Executive agrees that immediately upon the Termination Date of this Employment Agreement or at any other time requested by the Company, he will provide the Company with a complete, true and accurate copy of all such Confidential Information and other documents and data and then appropriately and completely purge his computer, other personal electronic devices, removable or non-removable magnetic media, and cloud and file sharing accounts of the Confidential Information and other documents and data belonging to the Company in a manner reasonably performed to effectively prevent the disclosure to any third parties of any Confidential Information belonging to the Company. Executive also agrees to cooperate with the Company if the Company requests to confirm the removal or return of the data on Executive's personal computer, personal electronic storage devices, removable or non-removable magnetic media, and file hosting and file sharing accounts and acknowledges and agrees that any personal information stored on any of the same shall be subject to review by the Company for confirmation of the removal of the Confidential Information described herein.

        5.2    Restrictions Against Competition, Solicitation and Raiding. Executive agrees that at all times while he is employed by the Company and, regardless of the reason for termination of his employment or this Agreement, for a period of twelve (12) months from his Termination Date (the "Restricted Period"), whether With or Without Cause, he will not, as an officer, director, manager, employee, partner, sole proprietor, agent, representative, independent contractor, consultant, franchisor, franchisee, creditor, owner or otherwise, or co-partner of any person, firm, company or business entity other than the Company, or in any individual or representative capacity whatsoever, directly or indirectly, without the express prior written consent of the Company:

(i)      directly or indirectly engage, participate or invest in any Restricted Business.  For purposes of this Agreement, (A) the term "participate" shall not include a cumulative ownership of less than two percent (2%) of a class of stock of a publicly-held corporation which is traded on a national securities exchange or in the over-the-counter market, so long as such Restricted Party does not have any active participation in the business or management of such entity; and (B) the term "Restricted Business" means any enterprise, business or venture anywhere within North America, and/or any other geographic areas in which any of the Pharmalucence Companies transacted business within the twenty-four (24) month period prior to the termination of Executive's employment, which is engaged in or which proposes to engage in the manufacture and sale of radiopharmaceutical kits;

(ii)      directly or indirectly approach, contact or solicit the Company's customers or prospective customers to engage in business or provide services or products in direct or indirect competition with the Company's business in the manufacture and sale of radiopharmaceutical kits, or encourage any customer or prospective customer of the Company to terminate, alter or in any way reduce, limit or restrict its business relationship or prospective business relationship with the Company for any reason or no reason.  For purposes of this Agreement, (A) "customer" means any person, company, business, association, organization, partnership, or other private or governmental entity with whom the Company has and/or had a business relationship any time within the twelve (12) months preceding his Termination Date, regardless of the reason therefor, (B) "prospective customer" means such persons or entities to whom or which the Company, at any time within the twelve (12) months preceding his Termination Date, was or is in the process of responding to business inquiries from or with whom or which the Company has substantial plans to solicit, is in the process of soliciting the development of a new business relationship and/or has quoted, proposed or solicited any products or services, and (C) "solicit" means the direct or indirect soliciting, inducing, attempting to induce or assisting any other person, business, company, association, organization, partnership or other entity in any such solicitation, inducement or attempted inducement, in all cases regardless of whether the initial contact was by Executive or any other person or entity; or

(iii)      directly or indirectly approach, contact or solicit the services of, employ or agree to employ, engage or otherwise retain the services of any person who is or was an employee of the Company, or encourage any employee of the Company to terminate his or her employment with the Company for any reason or no reason.

Notwithstanding the foregoing, to the extent Executive, at the Termination Date, remains bound by the restrictions set forth in Paragraph 5.7(b) and its subparagraphs of the EPA, for a Non-Competition Period (as defined therein) that exceeds the Restricted Period (as defined above), the Non-Competition Period shall control.

5.3      Executive's Acknowledgements.  Executive acknowledges (i) that his position with the Company requires the performance of services which are special, unique, and extraordinary in character and places him in a position of confidence and trust with the customers and employees of the Company, through which, among other things, he shall obtain knowledge of the Company's Confidential Information and become acquainted with its customers, in which matters

the Company has substantial proprietary interests; (ii) that the restrictive covenants set forth above are reasonable and necessary in order to protect and maintain such proprietary interests and the other legitimate business interests of the Company; and (iii) that the Company would not have entered into this Agreement unless such covenants were included herein.  Executive also acknowledges that the business of the Company presently extends throughout the United States and worldwide, and that he will personally supervise and engage in such business on behalf of Company and, accordingly, that it is reasonable that the restrictive covenants set forth above are not more limited as to geographic area then is set forth therein.  Executive further acknowledges and agrees that his employment by the Company under this Employment Agreement, along with the benefits and attributes of that employment, is fair, adequate and valid consideration to compensate him for agreeing to all the restrictions contained in this Employment Agreement, including but not limited to his agreements as more specifically stated in Paragraph 5.2 and its subparagraphs above not to compete with the Company, not to raid the Company, and not to solicit the Company's customers and prospective customers during the portion of the Restricted Period that extends beyond his Termination Date.  Executive represents and warrants that his knowledge, skills and abilities are sufficient to permit him, in the event of termination of his employment for any reason, whether voluntary or involuntary, to earn a satisfactory livelihood without violating the restrictions agreed to within this Employment Agreement, including but not limited to the agreement not to perform or be engaged to provide services for any competitor of the Company.  Executive also represents to the Company that the enforcement of such covenants will not prevent him from earning a livelihood or impose an undue hardship on him during the period of the restrictions.

       5.4   <u>Assignment of Rights to Intellectual Property</u>.  Executive shall promptly and fully disclose all Intellectual Property to the Company.  Executive hereby assigns and agrees to assign to the Company (or as otherwise directed by the Company) Executive's full right, title and interest in and to all Intellectual Property.  Executive agrees to execute any and all applications for domestic and foreign patents, copyrights or other proprietary rights and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by the Company to assign the Intellectual Property to the Company and to permit the Company to enforce any patents, copyrights or other proprietary rights to the Intellectual Property.  Executive will not charge the Company for time spent, although the Company will reimburse Executive for any expenses Executive reasonably incurs, in complying with these obligations.  All copyrightable works that Executive creates shall be considered "work made for hire".  "Intellectual Property" means inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by Executive (whether alone or with others, whether or not during normal business hours or on or off Company premises) during Executive's employment that relate to either the Products or any prospective activity of the Company under active consideration.  "Products" means all products planned, researched, developed, tested, manufactured, sold, licensed, leased or otherwise distributed or put into use by the Company or any of its affiliates, together with all services provided or planned by the Company, during Executive's employment.

6.      Severability   This Agreement shall be deemed to consist of a series of separate covenants, the invalidity or unenforceability of any individual covenant shall in no way affect the continued validity or enforceability of any other covenant hereof.

7.      Notices   Except as otherwise specifically provided herein, any notice, consent, demand or other communication to be given under or in connection with this Agreement shall be in writing and shall be deemed duly given when delivered personally, when transmitted by facsimile transmission, one (1) calendar day after being deposited with any nationally recognized overnight delivery service, or three (3) calendar days after being mailed by First Class U.S. mail, charges or postage prepaid, properly addressed, if to the Company, at its Billerica Facility, presently located at 29 Dunham Road, Billerica, MA 01821, directed to the attention of the Chief Executive Officer, Caraco Pharmaceutical Laboratories, Ltd., and, if to Executive, at his residential address set forth following his signature below.  Either party may change such address from time to time by providing adequate notice to the other of such change.

8.      Governing Law   This Agreement shall be governed by and construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts, exclusive of any choice of law rules.

9.      Amendments; Waivers   This Agreement may not be modified or amended or terminated except by an instrument in writing, signed by Executive and a duly-authorized officer of the Company other than Executive.  By an instrument in writing similarly executed, either party may waive compliance by the other party with any provision of this Agreement that such other party was or is obligated to comply with or perform provided, however, that such waiver shall not operate as a waiver of, or estoppel with respect to, any other or subsequent failure.  No failure to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power provided herein or by law or in equity.

10.     Assignment   Except as otherwise specifically provided herein, neither party shall assign this Agreement nor any rights hereunder without the consent of the other party, and any attempted or purported assignment without such consent shall be void.  This Agreement shall otherwise bind and inure to the benefit of the parties hereto and their respective successors, assigns, heirs, legatees, devisees, executors, administrators and legal representatives.

11.     Voluntary Execution; Representations   Executive acknowledges that (A) he has consulted with or has had the opportunity to consult with independent counsel of his own choosing concerning this Agreement and has been advised to do so by the Company and (B) that he has read and understands this Agreement, is competent and of sound mind to execute this Agreement, is fully aware of the legal effect of this Agreement, and has entered into it freely based on his own judgment and without duress.  Executive represents and covenants that his employment hereunder and compliance with the terms and conditions hereof will not conflict with or result in the breach by him of any agreement to which he is a party or by

- 10 -

which he may be bound, he had not violated and in connection with his employment with the Company will not violated any non-solicitation or other similar covenant or agreement by which he is or may be bound, and in connection with his employment with the Company he will not engage in any unauthorized use of any confidential or proprietary information he may have obtained in connection with his employment with any other employer.

12.   <u>Entire Agreement</u>  This Agreement contains the entire agreement of the parties and supersedes all prior or contemporaneous negotiations, correspondence, understandings and agreements between the parties, regarding the subject matter of this Agreement.


**[THE REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]**

IN WITNESS WHEREOF, this Agreement has been duly executed by or on behalf of the parties hereto as of the date first above written.

PHARMALUCENCE, INC.:

By: _____
Name:
Title: S. le' Sundaram
       officer

EXECUTIVE:

_____
Glenn Alto
Address:  132 Cold Spring Road
Westford, MA 01886

- 12 -

IN WITNESS WHEREOF, this Agreement has been duly executed by or on behalf of the parties hereto as of the date first above written.

PHARMALUCENCE, INC.:

By: _____
Name:
Title:

EXECUTIVE:

_____
Glenn Alto
Address: 132 Cold Spring Road
Westford, MA 01886