```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____             │
│ DATE FILED:  4/29/2020               │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
GLENN ALTO, EDWARD CONNOLLY in his        :
individual capacity and as trustee of the Connolly   :
2014 Grantor Retained Annuity Trust, and       :
LEWIS WILLIAM WATERS in his individual      :
capacity and as trustee of the Lewis William     :
Waters III 2014 Qualified Annuity Trust       :
                                              :
                                 Plaintiffs,  :
                                              :
            -v-                               :
                                              :
SUN PHARMACEUTICAL INDUSTRIES, INC., :
                                              :
                                 Defendant.   :
-------------------------------------------------------------------X

1:19-cv-09758-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

Plaintiffs are the former owners of Pharmalucence Inc., which was acquired by Defendant

Sun Pharmaceutical Industries, Inc. ("Sun").  Pursuant to the contract for the sale of Pharmalucence,

Sun agreed to pay Plaintiffs $70 million up front and $30 million in post-closing payments if

Plaintiffs achieved milestones related to the development of certain products.  Shortly after the deal

closed, a facility owned by Sun in Halol, India (the "Halol Facility") was found to be non-compliant

with FDA standards.  Because that facility could no longer ship products to the United States,

Plaintiff Glenn Alto—acting as General Manager of a Pharmalucence facility now owned by Sun in

the United States—recommended that Sun deprioritize products tethered to the contract milestones

in favor of other Sun products that had previously been manufactured in the Halol Facility.  Sun

adopted that recommendation.

Plaintiffs now allege that they are entitled to milestone payments outlined in the contract

because, among other reasons, Sun substituted products from the Halol Facility for the original

milestone-triggering products listed in the contract.  Because Count I of Plaintiffs' amended

complaint seeks a declaratory judgment that is contrary to the plain text of the contract, Sun's

motion to dismiss is GRANTED as to that count.  However, because Counts V and VI of the amended complaint raise factual questions that the Court cannot resolve on a motion to dismiss, Sun's motion to dismiss is DENIED as to those counts.

## I. BACKGROUND

### A. Facts[1]

#### 1. The Equity Purchase Agreement

Before the transaction at issue in this litigation, Plaintiffs owned Pharmalucence, a provider of molecular imaging products for nuclear medicine practitioners.  AC ¶ 2.  Pharmalucence owned a "state-of-the-art sterile injectable manufacturing facility in Billerica, MA" (the "Billerica Facility"). *Id.*  On May 15, 2014, Plaintiffs and Sun entered into the Equity Purchase Agreement ("EPA").  AC ¶ 4; *see* EPA, Ex. A to AC.[2]  The EPA is governed by New York law.  EPA § 8.9.  In the EPA, Plaintiffs agreed to sell Pharmalucence to Sun for $70 million due at closing and post-closing payments totaling $30 million upon the achievement of certain milestones (the "Milestone Events").  AC ¶¶ 2, 4.  The Milestone Events are defined in section 2.4 of the EPA ("the Earn-Out Schedule"). *Id.* ¶ 4; *see* Earn-Out Schedule, Ex. B to AC.  The Earn-Out Schedule is reproduced below.

---

[1] The facts are drawn from the Amended Complaint ("AC"), Dkt No. 25, and are accepted as true for the purposes of this motion to dismiss.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] The AC alleges that Defendant Sun Pharmaceutical Industries, Inc. is a wholly owned subsidiary of Sun Pharmaceuticals Limited ("Sun Ltd." and together with "Sun," "Sun Pharma").  AC ¶ 3.  The EPA was entered into by Plaintiffs and Caraco Pharmaceutical Laboratories Ltd.  EPA at 1.  The AC alleges that Sun Limited acquired Caraco in 1997 and changed its name to Sun Inc.  AC ¶¶ 23-27.  Sun, the Defendant in this case, does not dispute that it is bound by the EPA.

**SCHEDULE 2.4**

Earn-Out Payments

Buyer will inform Sellers in writing with applicable supporting documents after the achievement of each of the milestone events set forth below. Buyer will pay to Sellers the corresponding amounts as specified in the table below within thirty (30) Business Days after achievement of such milestone. Each of the milestone payments set forth in this Schedule 2.4 will be made only once. The aggregate payments due under this Schedule 2.4 will not exceed Thirty Million Dollars ($30,000,000).

| Milestone Event | Amount (USD) |
|---|---|
| 1. Receipt from the FDA of an approval letter in response to filing of a Prior Approval Supplement for the manufacturing site transfer from the Bedford Facility to the Billerica Facility of a Pharmalucence Existing Product. | 5 Million |
| 2. Acceptance by FDA of Pharmalucence's ANDA submission for mertiatide (generic MAG-3) by December 31, 2015. | 3.125 Million |
| 3. Acceptance by FDA of Pharmalucence's ANDA submission for tetrofosmin, 30 cc vial (generic Myoview) by December 31, 2016. | 3.125 Million |
| 4. Acceptance by FDA of the Pharmalucence or its co-development partner's ANDA submission for In-111 pentetreotide (generic Octreoscan) by December 31, 2017. | 3.125 Million |
| 5. Acceptance by any ex-US regulatory body of the submission of Pharmalucence ANDA or equivalent for tetrofosmin, 10 cc vial (generic Myoview) by June 30, 2017. | 3.125 Million |
| 6. Upon receipt of the written and final Regulatory Approval for the **MAG-3** product being developed by Pharmalucence in the US from the FDA by December 31, 2018. For the avoidance of doubt, such final, written approval will not be a tentative or conditional approval. | 3.125 Million |
| 7. Upon receipt of the written and final Regulatory Approval for the **tetrofosmin 30 cc vial** product being developed by Pharmalucence in the US from the FDA by December 31, 2018. For the avoidance of doubt, such final, written approval will not be a tentative or conditional approval. | 3.125 Million |

| | |
|---|---|
| 8. Upon receipt of the written and final Regulatory Approval for the **octreoscan** product being developed by Pharmalucence in the US from the FDA by December 31, 2019. For the avoidance of doubt, such final, written approval will not be a tentative or conditional approval. | 3.125 Million |
| 9. Upon receipt of the written and final Regulatory Approval for the **tetrofosmin 10 cc vial** product being developed by Pharmalucence in any market outside the U.S. by June 30, 2019. For the avoidance of doubt, such final, written approval will not be a tentative or conditional approval. | 3.125 Million |

For purposes of this Schedule 2.4, "**Acceptance**" means a written notice from the FDA, or in the case of the generic tetrofosmin product an ex-U.S. regulatory authority which is a counterpart to the FDA, that the Registration Application has been determined to be acceptable for filing.

For purposes of this Schedule 2.4, "**a Prior Approval Supplement**" means a filing with the FDA as required under the §314.70 of the FDCA in order to gain approval of a change that has a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of a drug product as these factors may relate to the safety or effectiveness of the drug product.

Additionally, Buyer, in Buyer's sole discretion, upon prior written notice to Sellers, may reprioritize and substitute for any of the products set forth in the table immediately above. If Buyer substitutes a product, whether that is an existing Buyer product that is transferred into the Facilities or a new product developed in the Facilities, those substituted products qualify for the milestone payments. In the event a product substitution occurs, the milestone timing and milestone payments associated with the product that was replaced ("**PL Product**") apply to the product that was substituted in its place ("**Sun Replacement Product**"). For clarification, the first four products that are filed from the facility are subject to the milestones ("Product 1, Product 2, Product 3, and Product 4"). If, for example, the PL Product in the Product 1 slot is substituted by a Sun Replacement Product, the Sun Replacement Product triggers the Product 1 milestone payments (both upon filing and approval) and the PL Product that was originally in the Product 1 slot moves to the Product 2 slot and is therefore subject to the milestone timing and milestone payments associated with the Product 2 slot. For the avoidance of doubt, the milestones set forth above shall be payable based on the first four products submitted for approval (whether PL Products or Sun Replacement Products).

In the event that Sun takes any action that materially diminishes the manufacturing and/or development capacity of the Facilities to the extent the ability to file four (4) PL or Sun Replacement Products is materially affected, Buyer shall continue in good faith, the development and filing of remaining PL Products and make any remaining Earn Out Payments on the earlier of (1) when the milestones are achieved within the specified time period, or (2) the deadline specified above as applicable to each milestone, regardless of whether or not milestone has been achieved.

In the event (i) Buyer terminates the employment of the Individual Seller who remains employed with Buyer for the longest period following the Closing without Cause (as defined in the applicable Employment Agreement between Buyer and such employee), (ii) fails to renew the employment of such Individual Seller following the expiration of the term set forth in such Individual Seller's employment agreement with Buyer or (iii) such Individual Seller resigns his employment with Buyer for Good

Reason, in either case prior to the earlier of (x) the achievement of the milestones set forth herein, or (y) the expiration of the time in which such milestones may be achieved, then Buyer shall pay the full amount of all potential remaining Earn-Out Payments hereunder, at the time such milestones are achieved, but disregarding any time limitations on the achievement of such milestones.

Under the Earn-Out Schedule, payments (the "Milestone Payments") are contingent on the achievement of the Milestone Events.  The EPA provides that if the Milestone Events do not occur Sun "shall have no obligation to pay" and Plaintiffs "shall have no right to receive any portion of the" Milestone Payments.  EPA § 2.4.  The Earn-Out Schedule divides the Milestone Payments as follows:  $5 million upon FDA approval of the Billerica Facility[3] and $25 million to be paid in four installments upon initial FDA[4] approval of an ANDA[5] for four Pharmalucence products and four installments to be paid upon the final Regulatory Approval[6] of those same products.

The Earn-Out Schedule provides for substitutions for the products identified on the Earn-Out Schedule.  The Earn-Out Schedule states that "Buyer,[⁷] in Buyer's sole discretion" and "upon prior written notice to Sellers may reprioritize and substitute for" any of the milestone products.  *Id.* at 2.  Furthermore, "[i]f Buyer substitutes a product, whether that is an existing Buyer product that is transferred to the Facilities or a new product developed in the Facilities, those substituted products qualify for the Milestone Payments."  *Id.*  Plaintiffs refer to this provision as the "First Four Products" provision.

---

[3] There is no dispute that Plaintiffs achieved Milestone Event #1—"[r]eceipt from the FDA of an approval letter in response to filing of a Prior Approval Supplement for the manufacturing site transfer from the Bedford Facility to the Billerica Facility of a Pharmalucence Existing Product"—and that Sun paid Plaintiffs $5 million.  *Id.*

[4] Milestones #5 and #9 contemplate that the approval of tetrofosmin will be by an "ex-US regulatory body."  Earn-Out Schedule at 1.

[5] An "ANDA" is an Abbreviated New Drug Application.  The FDA grants final regulatory approval to a pharmaceutical company to market a drug product by approving either a New Drug Application ("NDA"), commonly submitted for brand drugs, or an ANDA, which is submitted for generic drugs.  *See* 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) [NDA] or (j) [ANDA] is effective with respect to such drug.").  An ANDA includes information about the proposed drug product, including the facility involved in the manufacture, processing, packaging, or testing of the drug product.  *See* 21 U.S.C. § 355(j); 21 C.F.R. §§ 314.94; 314.50(d)(1)

[6] "Regulatory Approval" is defined in the EPA as "an approval of the FDA necessary for the commercial manufacture, use, storage, import, export, transport, promotion, commercialization, supply or sale of a product in the U.S."  EPA at 11.

[7] In the EPA, Plaintiffs are "Sellers" and Sun is the "Buyer."

The Earn-Out Schedule also anticipates, and provides a remedy for, circumstances in which Sun's actions make it more difficult for Plaintiffs to achieve the milestones.  The Earn-Out Schedule provides that:

> In the event that Sun takes any action that materially diminishes the manufacturing and/or development capacity of the Facilities to the extent the ability to file four (4) PL or Sun Replacement Products is materially affected, Buyer shall continue in good faith, the development and filing of remaining PL Products and make any remaining Earn Out Payments on the earlier of (1) when the milestones are achieved within the specified time period, or (2) the deadline specified above as applicable to each milestone, regardless of whether or not milestone has been achieved.

*Id.*

The Earn-Out Schedule also includes what Plaintiffs have dubbed a "Last Man Standing" provision.  As a condition of sale, Plaintiffs agreed to remain as employees of Sun post-closing. AC ¶ 39.  Plaintiff Lewis William Waters remained as an employee "to integrate Sun Pharma's financial and computer systems" with Pharmalucence's existing systems.  *Id.* ¶ 40.  Plaintiff Edward Connolly remained as an employee to "spearhead site expansion and technology implementation." *Id.*  Plaintiff Glenn Alto remained as general manager of the Billerica Facility.  *Id.*  Plaintiffs believed that the continued employment of at least one Seller served to ensure progress toward the Milestone Payments.  *Id.* ¶ 41.  Thus, the parties negotiated the following provision:

> In the event (i) Buyer terminates the employment of the Individual Seller who remains employed with Buyer for the longest period following the Closing without Cause (as defined in the applicable Employment Agreement between Buyer and such employee), (ii) fails to renew the employment of such Individual Seller following the expiration of the term set forth in such Individual Seller's employment agreement with Buyer or (iii) such Individual Seller resigns his employment with Buyer for Good Reason, in either case prior to the earlier of (x) the achievement of the milestones set forth herein, or (y) the expiration of the time in which such milestones may be achieved, then Buyer shall pay the full amount of all potential remaining Earn-Out Payments hereunder, at the time such milestones are achieved, but disregarding any time limitations on the achievement of such milestones.

Earn-Out Schedule at 2-3.  If this provision is triggered, then the deadlines for the achievement of the Milestone Events no longer apply.

### 2. Transfer from Halol Facility

Approximately nine weeks after closing, Sun Pharma management informed Plaintiff Glenn Alto that Sun Ltd.'s facility in Halol, India had received a notice of non-compliance with current Good Manufacturing Procedures as a result of an FDA inspection.  AC ¶ 48.  As a result of its non-compliance, Sun Ltd.'s Halol Facility was embargoed from sending products to the United States.  *Id.* ¶ 49.  The AC alleges that this was a "catastrophic event for Sun Ltd." because "Halol was Sun Ltd.'s sole injectable product facility, accounting for a large portion of Sun Ltd.'s United States revenue and up to 25% of overall company profit[.]"  *Id.*  The Halol Facility did not receive FDA clearance to begin shipping drugs to the United States until June 2018.  *Id.* ¶ 56.

Sun Pharma management allegedly decided to transfer production of high value products formerly made in Halol to the Billerica Facility.  *Id.* ¶ 50.  The transfer of manufacturing and production of high value products from the Halol Facility competed for manufacturing resources with Pharmalucence's existing projects.  *Id.* ¶¶ 51-52.  Consequently, "Alto determined that Pharmalucence did not have the resources necessary to both (i) accomplish Pharmalucence's existing projects, and (ii) transfer production of the Sun Ltd. products from Halol to the Billerica Facility as directed by Sun Pharma."  *Id.* ¶ 52.  Hence, Alto, in consultation with Pharmalucence's executive management and subject matter experts, evaluated Pharmalucence projects to determine which Pharmalucence projects should be de-prioritized to free up resources for products transferred from the Halol Facility.  *Id.* ¶ 53.  "That evaluation took into account projected return on investment, technical risk, regulatory expediency, strategic importance, project complexity and Defendant's development priorities."  *Id.*  Based on this evaluation, Alto recommended that Sun Pharma discontinue development of tetrofosmin.  *Id.* ¶ 54.  "Vecuronium bromide 10 mg and 20 mg were both included in the Halol product transfer, with the 10 mg version being designated 'highest priority.'"  *Id.* ¶ 62.

Plaintiffs allege that Alto made this recommendation "with the understanding that the transferred Halol products would trigger the substitution clauses of the Earn-Out Schedule." *Id.* ¶ 54.  Plaintiffs allegedly believed that at the time of Alto's recommendation to discontinue development of tetrofosmin, they were responding to Sun Pharma's directive "to reprioritize the product pipeline to accommodate the need to transfer products from Halol" and the recommendation "would not impact their earn-out rights under the 'First Four Products' provision of the Earn-[O]ut Schedule." *Id.* ¶ 58.  After Alto had submitted his recommendation, Sun Ltd.'s Senior Vice President of Global Manufacturing Benny Klener told him that "any attempt to prioritize development of Pharmalucence products over transfer of Halol products would be against company interests." *Id.* ¶ 57.  Alto allegedly "interpreted this statement as a threat that he would be terminated for cause should he pursue further development of tetrofosmin." *Id.*

In February 2015, "Alto sent a memorandum to Sun Ltd. CEO Kal Sundaram, requesting that the first Sun Ltd. product transferred to the Billerica Facility be formally recognized as a substitute product for tetroforsmin under the Earn-Out Schedule." *Id.* ¶ 59.  After receiving no response, Alto again contacted Sun Pharma's management in March and April of 2015.  *Id.* ¶ 60-61.  Alto allegedly "reiterated Sellers' request to 'update[] Schedule 2.4 of the Equity Purchase Agreement to reflect the new priorities established by Sun Pharma for new product manufacturing at the Billerica site.'"  *Id.* ¶ 61.  Alto proposed that "Vecuronium Bromide (10 mg) CBE30 shall substitute for ANDA, tetrofosmin, 30cc vial (generic Myoview)" and "Vecuronium Bromide (20 mg) CBE30 shall substitute for ANDA, tetrofosmin, 10cc vial (generic Myoview)[.]"  *Id.*  This substitution would have trigged Milestone Events #3, #5, #7, and #9.  *Id.*  "Vecuronium bromide 10 mg and 20 mg were both included in the Halol product transfer" and "the 10 mg version" was "designated 'highest priority.'"  *Id.* ¶ 62.

In late April 2015, Alto and Sundaram allegedly discussed the proposed modification to the Earn-Out Schedule.  *Id.* ¶ 63.  The AC alleges that Sundaram "acknowledged that transfers from"

the Halol Facility "were properly considered 'milestone triggers.'" *Id.* However, Sun refused to amend the Earn-Out Schedule allegedly because "filings for the substitute products had not yet occurred." *Id.* In addition, Plaintiffs allege that Sundaram told Alto that Plaintiffs' rights to Milestone Payments "had been forfeited in September 2014, when Sellers deprioritized tetrofosmin." *Id.*

Because they allegedly now realized that Sun did not interpret the transfer of the Vecuronium Bromide products as having triggered the "First Four Products" provision of the Earn-Out Schedule, Plaintiffs requested that Sun "resurrect the tetrofosmin program and its payment obligations upon completion of the tetrofosmin related milestones." *Id.* ¶ 64. Plaintiffs repeatedly requested that Sun provide updates on plans to re-prioritize development of tetrofosmin. *Id.* ¶¶ 65-68. Sun rejected these proposals. *Id.* ¶ 69.

On July 14, 2015, Alto's employment agreement (the "Employment Agreement") with Pharmalucence expired. *Id.* ¶ 74; *see* Employment Agreement, Ex. C to AC, § 1.1. Alto was the last Individual Seller who remained employed at Sun. AC ¶ 75. Consequently, Plaintiffs allege that the expiration of Alto's employment agreement triggered the "Last Man Standing" provision in the EPA. *Id.* ¶ 77. Accordingly, the deadlines for the achievement of the Milestone Events allegedly no longer applied.

On August 4, 2015, Plaintiffs' counsel allegedly sent Sun a demand later regarding "Milestone Payments Under Schedule 2.4 to the EPA." *Id.* ¶ 80. This letter demanded that Sun "acknowledge its obligations under the Earn-Out Schedule, specifically that (1) the first four products filed from the Pharmalucence Facilities or submitted for approval were subject to the milestone payments, and (2) Sun's decision to transfer production of the transferred products to the Facilities from the Halol Facility effected a product substitution pursuant to the Earn-Out Schedule." *Id.* ¶ 82. Sun rejected these demands. *Id.* ¶ 83. In response to another letter from Plaintiffs, Sun acknowledged that "the ANDA for generic MAG-3 was submitted to the FDA on

May 2, 2016[.]" *Id.* ¶ 87.  Consequently, on January 18, 2017, Sun made a Milestone Payment related to Milestone Event #2.  *Id.* ¶ 88.  Although the deadline for the achievement of Milestone Event #2 was December 31, 2015, the Last Man Standing provision had eliminated the time limits for the achievement of the Milestone Events.

Sun has not made any other Milestone Payments.  Plaintiffs allege that "[o]n information and belief, the FDA accepted Pharmalucence's ANDA submission for In-111 pentetreotide during the first half of 2019, triggering Milestone Event [#4]." *Id.* ¶ 91.  The AC further alleges that "[o]n or around July 12, 2019, the FDA issued its final approval for mertiatide, triggering Milestone Event [#6]." *Id.* ¶ 92.

**B. Procedural History**

On October 22, 2019, Plaintiffs filed the complaint that initiated this case.  Dkt No. 1. Defendant subsequently filed a motion to dismiss Counts I, IV, and V of the complaint.  Dkt No. 21.  Plaintiffs filed the AC on December 31, 2019.  The AC asserts five claims for relief.  Count I seeks a declaratory judgment that "the first four products out of the Pharmalucence facility trigger the milestone payments under the Earn-Out Schedule and that no formal written substitution need take place." *Id.* ¶ 99.  Count II seeks a declaratory judgment that "the Last Man Standing provision of the Earn-Out Schedule has been triggered, removing the date restriction from current and future milestone payments, including upon FDA approval of In-111 pentetreotide, at any time, which would trigger Milestone Payment eight (8)." *Id.* ¶ 106.  Count III asserts a claim for breach of the EPA because  "[o]n information and belief, FDA accepted Pharmalucence's ANDA submission for In-111 pentetreotide during the first half of 2019" and "the FDA issued its final approval for mertiatide" in July 2019, but Defendant has failed to make the Milestone Payments related to Milestone Events #4 and #6.  *Id.* ¶¶ 107-14.

Count IV asserts a claim for breach of contract of the EPA because Sun allegedly prioritized the manufacturing and production of the high value products from the Halol Facility to the Billerica

Facility, which "materially diminished the manufacturing capacity and/or development of the Facilities, materially affecting the ability to file four PL or Sun Replacement Products, including both tetrofosmin products." *Id.* ¶ 117.  Count V asserts a claim for breach of contract because Defendant has allegedly "not taken commercially reasonable efforts to make effective the transactions contemplated by the EPA . . . [b]y refusing to develop tetrofosmin or recognize any Sun Replacement Products[.]" *Id.* ¶ 121.  Count VI asserts a claim for breach of the implied covenant of good faith and fair dealing because "Defendant has refused to pursue the development of tetrofosmin denying Plaintiffs the right to $12.5 million in milestone payments due under the Earn-Out Schedule." *Id.* ¶ 127.

Defendant filed this motion to dismiss Counts I, V, and VI of the AC on January 9, 2020. Dkt Nos. 30, 32-33.  Plaintiffs thereafter filed their opposition, Dkt No. 31, and Defendants filed their reply.  Dkt No. 34.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  If a complaint fails to meet this pleading standard, a defendant may move to dismiss it for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all well-pleaded factual allegations and draws all inferences in the plaintiff's favor.  *See Palin v. N.Y. Times Co.*, 933 F.3d 160, 165 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010). To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible

when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quotation omitted). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

In determining the adequacy of a claim under Rule 12(b)(6), a court is generally limited to "facts stated on the face of the complaint[.]" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quotation omitted). However, "extrinsic documents may be considered as part of the pleadings if they either are (1) attached to the complaint; (2) incorporated into the complaint by reference; or (3) integral to the complaint." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010). While the Court must accept the facts as alleged in the complaint, "when any allegations contradict the evidence contained in the documents relied upon by a plaintiff, the documents control, and the Court need not accept the allegations contained within the complaint as true." *Rozsa v. May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002) (citation omitted). In deciding this motion to dismiss, the Court has considered the EPA, the Earn-Out Schedule, and the Employment Agreement because they are attached to the complaint.

### B. Contract Interpretation Under New York Law

New York law governs the EPA. *See* EPA § 8.9. Under New York law, the initial interpretation of a contract is a matter of law for the court to decide. This initial interpretation

includes "the threshold question of whether the terms of the contract are ambiguous." *Alexander &*
*Alexander Servs. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (citations
omitted); *accord, e.g.*, *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("Whether or not a
writing is ambiguous is a question of law to be resolved by the courts." (citation omitted)).  Contract
language is ambiguous if it is "capable of more than one meaning when viewed objectively by a
reasonably intelligent person who has examined the context of the entire integrated agreement."
*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993)
(quotation omitted); *see also Breed v. Ins. Co. of North Am.*, 46 N.Y.2d 351, 355 (1978) (noting that no
ambiguity exists when contract language has "a definite and precise meaning" about which "there is
no reasonable basis for a difference of opinion" (citation omitted)).  "Language whose meaning is
otherwise plain does not become ambiguous merely because the parties urge different
interpretations in the litigation." *Hunt, Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.
1989).

A court applying New York law "may neither rewrite, under the guise of interpretation, a
term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with
its instinct for the dispensation of equity upon the facts of a given case." *Bank of New York Mellon v.*
*WMC Mortg., LLC*, 12CV7096 (DLC), 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) (quoting
*Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992)).  Rather, "a written agreement that is
complete, clear and unambiguous on its face must be enforced according to the plain meaning of its
terms." *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (quotation omitted).

## III. DISCUSSION

### A. Count I

The declaratory judgment sought by Plaintiffs in Count I is contrary to the unambiguous
terms of the Earn-Out Schedule.  Plaintiffs seek a declaration that "the first four products out of the
Pharmalucence facility trigger the milestone payments under the Earn-Out Schedule and that no

formal written substitution need take place."  AC ¶ 99.  Plaintiffs rely on the text of the substitution

provision of the Earn-Out Schedule.  *Id.* ¶ 95.  This provision states that:

> Additionally, Buyer, in Buyer's sole discretion, upon prior written notice to Sellers, may reprioritize and substitute for any of the products set forth in the table immediately above.  If Buyer substitutes a product, whether that is an existing Buyer product that is transferred into the Facilities or a new product developed in the Facilities, those substituted products qualify for the milestone payments.  In the event a product substitution occurs, the milestone timing and milestone payments associated with the product that was replaced ("PL Product") apply to the product that was substituted in its place ("Sun Replacement Product").  For clarification, the first four products that are filed from the facility are subject to the milestones ("Product 1, Product 2, Product 3, and Product 4").  If, for example, the PL Product in the Product 1 slot is substituted by a Sun Replacement Product, the Sun Replacement Product triggers the Product 1 milestone payments (both upon filing and approval) and the PL Product that was originally in the Product 1 slot moves to the Product 2 slot and is therefore subject to the milestone timing and milestone payments associated with the Product 2 slot.  For the avoidance of doubt, the milestones set forth above shall be payable based on the first four products submitted for approval (whether PL Products or Sun Replacement Products).

Earn-Out Schedule at 2 (emphasis omitted).  Plaintiffs argue that Sun substituted the ten and twenty

milligram versions of Vecuronium Bromide for the milestone products by transferring them to the

Billerica Facility.  *See* AC ¶ 61.  Plaintiffs argue that the substitution provision was drafted to prevent

Sun "attempting to bypass the milestone payments by transferring in Sun's own products instead of

developing Pharmalucence's existing products."  Opposition to Motion to Dismiss ("Opp."), Dkt

No. 31, at 11.

 As an initial matter, Plaintiffs claim for a declaratory judgment is inconsistent with the plain

terms of the contract.  The Earn-Out Schedule provides that "the first four products that are *filed*

from the [Billerica] facility are subject to the milestones[.]"  Earn-Out Schedule at 1 (emphasis

added).  But Plaintiffs ask for a declaratory judgment that "the first four products out of the

Pharmalucence facility trigger the milestone payments under the Earn-Out Schedule."  AC ¶ 99.

Plaintiffs' request for a declaratory judgment thus omits the word "filed."

 This is not a trivial omission because a "filing" is integral to the triggering of a Milestone

Event.  Indeed, for that reason, Plaintiffs' proposed interpretation cannot be reconciled with the

triggers for the Milestone Events.  The substitution provision must be interpreted in light of the milestone triggers.  *See Adams v. Suozzi*, 433 F.3d 220, 228 (2d Cir. 2005) ("A written contract will be read as a whole, and every part will be interpreted with reference to the whole[.]" (quotation omitted)).  Milestones #2-#5 refer to "[a]cceptance by FDA of . . . [an] ANDA submission" for a product or "[a]cceptance by any ex-US regulatory body of . . . [an] equivalent" to an ANDA.  Earn-Out Schedule at 1.  The language of the substitution provision itself confirms that a submission is integral to the Milestone Payments:  "[T]he milestones set forth above shall be payable based on the first four products *submitted for approval* (whether PL Products or Sun Replacement Products)."  *Id.* at 2 (emphasis added).  Thus, for a product to qualify as a substituted product, it must be submitted for approval to the FDA or an "ex-US regulatory body."  *Id.*  Because the AC does not allege that the products that were transferred from the Halol Facility were submitted for approval, those products cannot qualify as substitute products that can trigger the milestones.

Further support for this interpretation comes from the provision of the Earn-Out Schedule stating that if "Sun takes any action that materially diminishes the manufacturing and/or development capacity of the Facilities to the extent the ability to file four (4) PL or Sun Replacement Products is materially affected," it is obligated to "continue in good faith[] the development and filing of remaining PL Products[.]"  Earn-Out Schedule at 2.  Plaintiffs allege, in essence, that they were unable to achieve the milestones because Sun transferred products from the Halol Facility to the Billerica Facility and thus deprioritized development of Pharmalucence procuts—precisely what this provision forbids.  And Plaintiffs have alleged a violation of this provision in Count IV of the AC, which Sun has not challenged on this motion to dismiss.  *See* AC ¶¶ 115-18.  Plaintiffs' proposed interpretation of the substitution provision is implausible because Plaintiffs are attempting to shoehorn into that provision a claim that is specifically addressed by a different contractual provision.

Plaintiffs' arguments to the contrary are unpersuasive.  Plaintiffs first rely on the section of the substitution provision that states "[f]or clarification, the first four products that are filed from the facility are subject to the milestones ('Product 1, Product 2, Product 3, and Product 4')."  Earn-Out Schedule at 2.  By its plain terms, this provision applies only to products that are filed.  At least one such "filing" is the filing of an ANDA with the FDA.  As noted above, Milestones #2-#4 all refer to an "ANDA submission" as a milestone trigger and Milestone #5 refers to an "equivalent" to an ANDA submission.  *Id.* at 1.  Even if an ANDA filing or equivalent were not the only filing that could serve as a trigger for the substitution provision—a point vigorously disputed by the parties— there is no allegation in the AC to permit a plausible inference that there was any action in this case that could constitute a "filing" with respect to the allegedly substituted products in this case.

Plaintiffs' argument on this point is also belied by other provisions of the Earn-Out Schedule.  After the "[f]or clarification" provision highlighted by Plaintiffs, the substitution provision states "[i]f, for example the PL Product in the Product 1 slot is substituted by a Sun Replacement Product, the Sun Replacement Product triggers the Product 1 milestone payments (*both upon filing and approval*)[.]"  *Id.* at 2 (emphasis added).  This provision is significant because it suggests that there are two events that trigger milestone payments:  a "filing" and an "approval."  Clearly, the "written and final Regulatory Approval" by the FDA or an "ex-US regulatory body" referred to in Milestones #6-#9 constitutes an "approval."  *Id.* at 1-2.  As with the term "filing," the Court need not take a position on whether this is the only kind of "approval" that could satisfy the substitution provision.  Even if it is not, there are no allegations in the complaint that could permit the inference that anything that could qualify as an "approval" for either of the allegedly substituted products occurred in this case.  Therefore, these provisions provide no support for Plaintiffs' proposed interpretation.

Accordingly, Sun's motion to dismiss is granted as to Count I of Plaintiffs' complaint.  The Court will not grant Plaintiffs leave to replead Count I because any attempt to replead would be

futile.  *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997) (noting that

leave to amend need not be granted where the proposed amendment would be futile).

### B. Count V

Plaintiffs have plausibly alleged a breach of section 5.2 of the EPA ("Section 5.2").  *See* AC

¶¶ 119-23.  That provision states:

> <u>General</u>.  Each of the parties hereto shall use commercially reasonable efforts to take
> all action and to do all things necessary, proper, or advisable in order to consummate
> and make effective the transactions contemplated by this Agreement including without
> limitation satisfaction, but not waiver, of the closing conditions described in <u>Section 4</u>
> above.

EPA § 5.2.  Plaintiffs allege that "[b]y refusing to develop tetrofosmin or recognize any Sun

Replacement Products, Defendant has not taken commercially reasonable efforts to make effective

the transactions contemplated by the EPA, including Schedule 2.4."  AC ¶ 121.

Sun's arguments in favor of dismissal are unavailing.  Sun first argues that Section 5.2 does

not apply because Plaintiffs' sale of Pharmalucence to Sun closed on July 15, 2014.  *Id.* ¶ 4 n.2.  Sun

argues that Section 5.2's reference to "the transactions contemplated by this Agreement" refers

exclusively to the transfer of Plaintiffs' equity securities in Pharmalucence to Sun.  EPA § 5.2.

According to Sun, Section 5.2 does not create any obligations with respect to the Milestones.

Sun's argument is contrary to the plain meaning of Section 5.2 of the EPA.  By its plain

terms, Section 5.2 refers to "the transactions contemplated by this Agreement[.]"  *Id.*  The Milestone

Payments are such a transaction.  Section 2.1 of the EPA states:

> As consideration for the purchase of the Equity Securities at the Closing, subject to
> the provisions of this Agreement and the adjustments and payments set forth in
> Sections 2.2, and 2.3 Buyer shall pay up to an aggregate amount of ONE HUNDRED
> MILLSION DOLLARS ($100,000,000) (the "Enterprise Value"), consisting of an up-
> front payment of SEVENTY MILLION DOLLARS ($70,000,000) ("Up-front
> Payment") to be paid in accordance with Section 2.2 and (ii) contingent payments
> equaling, in the aggregate, the amount of THIRTY MILLION DOLLARDS
> ($30,000,000) (the "Earn-Out Payment") to be paid in accordance with Section 2.4.

*Id.* § 2.1 (emphasis omitted).  Hence, under section 2.4, the Milestone Payments are a transaction contemplated by the Agreement and Sun's argument is unpersuasive.

Sun next argues that Section 5.2 cannot apply to the Milestone Payments because Section 5.2 did not survive the closing of the EPA.  Sun points to section 6.1(a)(iv) of the EPA, which provides "[a]ll covenants of the Parties under Sections 2.3, 5.7, 5.8, and 5.9 shall survive the Closing and shall continue in full force and effect in accordance with their terms."  *Id.* § 6.1(a)(iv).  Sun argues that because Section 5.2 is not listed among the surviving covenants in section 6.1(a)(iv), it did not survive the closing.

This argument mischaracterizes section 6.1(a)(iv).  That provision does not state that the listed covenants are the only covenants that survive the closing, and there is no other provision of the EPA that suggests that Section 5.2 was terminated at the closing.  Furthermore, as noted by Plaintiffs, section 6.1(a)(iv) does not list section 2.4, which contains the Earn-Out Schedule, as surviving the closing.  It would make no sense to adopt Sun's interpretation, as the covenants listed in the Earn-Out Schedule could only be satisfied post-closing.  In response to this argument, Sun argues that section 2.4 unambiguously creates obligations that can only be performed 'following the closing.'"  Reply Memorandum of Law in Support of Partial Motion to Dismiss ("Rep."), Dkt No. 34, at 6 (quoting EPA § 2.4) (brackets omitted).  That is true, and it shows why Sun's argument about the meaning of section 6.1(a)(iv) is incorrect.

Sun's next argument is that Plaintiffs have not plausibly pleaded a breach of Section 5.2.  In Count V, Plaintiffs allege that Sun breached the EPA by 1) refusing to develop tetrofosmin or 2) refusing to recognize any Sun Replacement Products.  AC ¶ 121.  Sun argues that Plaintiffs have not pleaded any facts to suggest that either of these actions was commercially unreasonable because Plaintiffs admit in the AC that based on an "evaluation [that] took into account projected return on investment, technical risk, regulatory expediency, strategic importance, project complexity and [Sun's] development priorities," Alto "recommended to [Sun] that it discontinue development of

tetrofosmin so that Pharmalucence could instead devote necessary resources to transfer products" from Sun's other production facilities in Halol, India.  *Id.* ¶¶ 53-54.

Sun's argument is unpersuasive because whether Sun has exercised commercially reasonable efforts to develop tetrofosmin presents a question of fact that the Court cannot adjudicate on this motion to dismiss.  It is true that the AC alleges that Plaintiff Alto recommended that Sun discontinue development of tetrofosmin.  However, the AC also alleges that Sun refused to provide resources to reprioritize tetrofosmin.  *See, e.g.*, *id.* ¶¶ 65-66.  Even if it was commercially reasonable for Sun to deprioritize tetrofosmin in response to the closing of its Halol Facility (which the Court cannot, need not, and does not decide at this stage), it was not necessarily reasonable to refuse subsequently to reprioritize tetrofosmin.  Indeed, the AC alleges that the Halol Facility received FDA clearance to begin shipping drugs to the United States in June 2018.  *Id.* ¶ 56.  It is at least plausible that it would have been commercially reasonable for Sun to reprioritize tetrofosmin after its Halol Facility received FDA clearance or even to have done so some time after the initial closure but before the facility received FDA clearance.  Therefore, on this motion to dismiss, the Court cannot conclude, as a matter of law, that Plaintiffs have not adequately pleaded a breach of Section 5.2.  Accordingly, Sun's motion to dismiss is denied as to Count V.

### C. Count VI

Plaintiffs have plausibly alleged a violation of the implied covenant of good faith and fair dealing.  Count VI alleges that Sun breached the implied covenant of good faith and fair dealing by "refus[ing] to pursue the development of tetrofosmin."  *Id.* ¶ 127.  "The covenant of good faith and fair dealing, implied in every contract under New York law, includes an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part."  *Kader v. Paper Software, Inc.*, 111 F.3d 337, 342 (2d Cir. 1997) (quotation omitted).  "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits

of the contract." *511 W 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002) (quotation omitted).  "While the duties of good faith and fair dealing do not imply obligations 'inconsistent with other terms of the contractual relationship' they do encompass 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" *Gillespie v. St. Regis Residence Club*, 343 F. Supp. 3d 332, 341 (S.D.N.Y. 2018) (quoting *Jennifer*, 98 N.Y.2d at 153).

Sun's arguments in favor of dismissal are unavailing.  Sun first argues that the AC alleges that because Alto allegedly suggested to Sun that Sun "discontinue the development of tetrofosmin," it cannot be held liable for a breach of the duty of good faith and fair dealing. AC ¶ 54.  This argument is unpersuasive because it is premature.  For similar reasons as the Court noted above with respect to Count V, the Court cannot conclude, as a matter of law, that Sun's alleged refusal to pursue the development of tetrofosmin did not violate the implied covenant of good faith and fair dealing.  The cases cited by Sun do not support dismissal because those cases were decided at the summary judgment phase of the litigation.  *See* Memorandum of Law in Support of Partial Motion to Dismiss, Dkt No. 33, at 18 (citing *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (on appeal of order granting summary judgment)); Rep. at 9 (citing *Schweizer v. Sikorsky Aircraft Corp.*, 634 F. App'x 827, 830 (2d Cir. 2015) (same); *Lykins v. IMPCO Techs., Inc.*, No. 15 CIV. 2102 (PGG), 2018 WL 3231542, at *11 (S.D.N.Y. Mar. 6, 2018) (order granting summary judgment)).  Plaintiffs have plausibly alleged a violation of the good faith and fair dealing; that is all that is required at the motion to dismiss phase.

Sun's second argument for dismissal is that Plaintiffs' breach of the implied covenant of good faith and fair dealing is duplicative of its claim for breach of contract.  Ordinarily, "a breach of the duty of good faith and fair dealing is considered a breach of contract."  *ARS Kabirwala, LP v. El Paso Kabirwala Cayman Co.*, No. 1:16-CV-6430-GHW, 2017 WL 3396422, at *4 (S.D.N.Y. Aug. 8, 2017) (quoting *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011)) (brackets omitted).  Therefore,

"[r]aising both claims in a single complaint is redundant, and courts confronted with such complaints under New York law regularly dismiss any freestanding claim for breach of the covenant of fair dealing." *Id.* (quotation omitted)  However, "[t]he law in New York is that a party 'may assert causes of action in both breach of contract and quasi-contract where there is a bona fide dispute concerning existence of a contract *or whether the contract covers the dispute in issue.*'" *Fantozzi v. Axsys Techs., Inc.*, No. 07 CIV. 02667 (LMM), 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008) (quoting *Courtien Commc'ns, Ltd. v. Aetna Life Ins. Co.*, 193 F. Supp. 2d 563, 571 (E.D.N.Y. 2002)) (emphasis added); *see also Randall v. Guido*, 655 N.Y.S.2d 527, 527 (1st Dep't 1997).  Consequently, in certain circumstances, a party can "argue the breach of contract claim and the breach of the implied covenant of good faith and fair dealing in the alternative." *Fantozzi*, 2008 WL 4866054, at *7.

Here, the dispute is whether Sun breached either the EPA or the implied covenant of good faith and fair dealing by refusing to develop tetrofosmin.  It is unclear whether Section 5.2, or another provision of the EPA, extends to this dispute.  For example, it is possible that the Court might conclude at a later phase of this litigation that Sun is not obligated to make the Milestone Payments under Section 5.2 but nevertheless still conclude that Sun breached the implied covenant of good faith and fair dealing arising under the EPA.  It is also conceivable that Plaintiffs will not be able to successfully prove that their claim in Count IV for breach of the provision of the Earn-Out Schedule prohibiting "manufacturing and/or development capacity of the facilities" but could prove a claim for breach of the implied covenant of good faith and fair dealing.  Indeed, Plaintiffs' claim for the breach of implied covenant of good faith and fair dealing is not tethered to Section 5.2.  Accordingly, the Court cannot dismiss Plaintiffs' claim for a breach of the implied covenant of good faith and fair dealing and Sun's motion to dismiss is denied as to Count VI.

## IV. CONCLUSION

Because Count I seeks a declaratory judgment that is contrary to the unambiguous meaning of the EPA, Sun's motion to dismiss is GRANTED as to that count and Plaintiffs are denied leave

to replead.  However, because Counts V and VI raise factual questions that cannot be resolved at this phase of the litigation, Sun's motion to dismiss is DENIED as to those counts.

The Clerk of Court is directed to terminate the motion pending at Dkt No. 32.

SO ORDERED.

Dated:  April 29, 2020

_____
GREGORY H. WOODS
United States District Judge